Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/10/2016 08:06 AM CDT

State of Nebraska, appellee, v.
John R. Oldson, appellant.
___ N.W.2d ___

Filed June 10, 2016.    No. S-13-562.

1. **Trial: Evidence: Motions to Suppress: Waiver: Appeal and Error.**
   The failure to object to evidence at trial, even though the evidence was
   the subject of a previous motion to suppress, waives the objection, and
   a party will not be heard to complain of the alleged error on appeal.
2. **Appeal and Error.** An objection, based on a specific ground and prop-
   erly overruled, does not preserve a question for appellate review on
   some other ground not specified at trial.
3. **Rules of Evidence: Other Acts.** Whether evidence is admissible for any
   proper purpose under the rule governing admissibility of evidence of
   other crimes, wrongs, or acts rests within the discretion of the trial court.
4. **Rules of Evidence: Other Acts: Appeal and Error.** It is within the
   discretion of the trial court to determine relevancy and admissibility of
   evidence of other wrongs or acts under the balancing rule and the other
   acts rule, and the trial court's decision will not be reversed absent an
   abuse of discretion.
5. **Juries: Evidence: Proof.** Propensity evidence may lead a jury to con-
   vict, not because the jury is certain the defendant is guilty of the charged
   crime, but because it has determined the defendant is "a bad person who
   deserves punishment," whether or not the crime was proved beyond a
   reasonable doubt.
6. **Rules of Evidence: Other Acts: Proof.** Under Neb. Evid. R. 404(1),
   Neb. Rev. Stat. § 27-404(1) (Cum. Supp. 2014), proof of a person's
   character is barred only when in turn, character is used in order to show
   action in conformity therewith.
7. **Rules of Evidence: Other Acts.** The State cannot present the defend-
   ant's other acts so that the jury makes the intermediate inference of
   the defendant's bad character, leading to the ultimate inference that the
   defendant is guilty.

8. \_\_\_\_: \_\_\_\_. Evidence of specific instances of conduct that only incidentally impugns a defendant's character is not prohibited by Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Cum. Supp. 2014).

9. \_\_\_\_: \_\_\_\_. All relevant evidence is subject to the overriding protection of Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), including other acts evidence.

10. **Rules of Evidence.** Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), allows the exclusion of evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

11. **Evidence: Words and Phrases.** Relevant evidence is that which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

12. **Evidence.** The probative value of evidence involves a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the fact from the ultimate issue of the case.

13. **Evidence: Words and Phrases.** Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.

14. \_\_\_\_: \_\_\_\_. Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis.

15. **Evidence: Intent.** If character evidence is admitted for a proper purpose, then, ipso facto, it is not admitted for the purpose of showing propensity.

16. **Trial: Appeal and Error.** A defendant may not gain an advantage on appeal by failing to pursue strategies at trial to minimize prejudice.

17. **Constitutional Law: Trial: Juries: Witnesses.** An accused's constitutional right of confrontation is violated when either (1) he or she is absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness or (2) a reasonable jury would have received a significantly different impression of the witnesses' credibility had counsel been permitted to pursue his or her proposed line of cross-examination.

18. **Trial: Evidence: Presumptions: Proof.** Under the presumption of innocence, the State must establish guilt solely through the probative evidence introduced at trial.

19. **Rules of Evidence: Other Acts: Due Process: Presumptions.** While Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Cum. Supp. 2014), may

prevent the admission of other acts evidence for propensity purposes as a protection of the presumption of innocence, it does not follow that the State violates due process by adducing testimony that could result in the revelation of other acts if the defense chooses to pursue certain lines of questioning on cross-examination.

20. **Criminal Law: Constitutional Law: Due Process: Rules of Evidence.** Whether rooted directly in the Due Process Clause of the 14th Amendment or in the Compulsory Process or Confrontation Clause of the 6th Amendment, the federal Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.

21. **Constitutional Law: Criminal Law: Trial.** The right to present a defense is not unqualified and is subject to countervailing public interests such as preventing perjury and investigating criminal conduct.

22. **Due Process: Evidence: Presumptions.** The aim of the requirement of due process is not to exclude presumptively false or unreliable evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false.

23. **Confessions: Police Officers and Sheriffs: Evidence.** Mere deception will not render a statement involuntary or unreliable; the test is whether the officer's statements overbore the will of the defendant.

24. **Police Officers and Sheriffs.** Police practices of deception during interrogation are not inherently offensive.

25. **Criminal Law: Due Process: Time.** A criminal defendant's claim of denial of due process resulting from preindictment delay presents a mixed question of law and fact.

26. **Trial: Due Process: Time: Appeal and Error.** When reviewing a trial court's determination of a claim of denial of due process resulting from preindictment delay, an appellate court will review determinations of historical fact for clear error, but will review de novo the trial court's ultimate determination as to whether any delay by the prosecutor in bringing charges caused substantial prejudice to the defendant's right to a fair trial.

27. **Due Process: Criminal Law: Pretrial Procedure: Time.** The Fifth Amendment's Due Process Clause has only a limited role to play in protecting against oppressive delay in the criminal context.

28. **Due Process: Criminal Law: Pretrial Procedure: Time: Proof.** The Due Process Clause requires dismissal only if a defendant can prove that the preindictment delay caused actual prejudice to his or her defense and was a deliberate action by the State designed to gain a tactical advantage.

29. **Trial: Evidence: Appeal and Error.** Because authentication rulings are necessarily fact specific, a trial court has discretion to determine

whether evidence has been properly authenticated. An appellate court reviews the trial court's ruling on authentication for abuse of discretion.

30. **Rules of Evidence.** Authentication or identification of evidence is a condition precedent to its admission and is satisfied by evidence sufficient to prove that the evidence is what the proponent claims.

31. **Motions for New Trial: Appeal and Error.** The standard of review for the denial of a motion for new trial is whether the trial court abused its discretion in denying the motion.

32. **Judges: Motions for New Trial: Evidence: Witnesses: Verdicts.** A trial judge is accorded significant discretion in granting or denying a motion for new trial, because the trial judge sees the witnesses, hears the testimony, and has a special perspective on the relationship between the evidence and the verdict.

33. **Criminal Law: Motions for New Trial: Evidence: Proof.** A criminal defendant who seeks a new trial because of newly discovered evidence must show that if the evidence had been admitted at the former trial, it would probably have produced a substantially different result.

34. **Circumstantial Evidence.** Circumstantial evidence is not inherently less probative than direct evidence.

35. **Sentences: Appeal and Error.** An appellate court will not disturb sentences that are within statutory limits, unless the district court abused its discretion in establishing the sentences.

36. **Judgments: Appeal and Error.** When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.

37. **Statutes: Appeal and Error.** Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.

38. **Homicide: Sentences.** A life-to-life sentence for second degree murder is a permissible sentence under Neb. Rev. Stat. § 29-2204 (Cum. Supp. 2014).

39. **Sentences.** When imposing a sentence, the sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the offense.

40. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Howard County: Karin L. Noakes, Judge. Affirmed.

James R. Mowbray and Sarah P. Newell, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and James D. Smith for appellee.

Heavican, C.J., Wright, Connolly, McCormack, Miller-Lerman, and Cassel, JJ., and Bishop, Judge.

McCormack, J.

## TABLE OF CONTENTS

I.   Nature of Case ............................................................ 727
II.  Background .................................................................. 727
     1.  Night of May 31, 1989 ........................................ 728
         (a) Oldson and Beard Leave Tavern Together ........ 728
         (b) Oldson Goes Home ............................................ 729
         (c) Possible Telephone Call to Oldson .................... 729
         (d) Sharlene Whitefoot Calls Oldson ...................... 730
         (e) Rex White and Glen Hall .................................. 730
     2.  Year Following Beard's Disappearance .................. 730
         (a) Oldson's Statement Heard by Kittinger ............. 730
         (b) Oldson's Statements to Whitefoot ..................... 731
         (c) Oldson's Statements to Law Enforcement ........ 731
             (i)  Statements on June 2, 1989 ....................... 731
             (ii) Statement on June 6, 1989 ........................ 731
         (d) Pickup Cleaned ................................................. 732
         (e) Witness to Oldson's Statements to
             Minnie Eggers .................................................... 733
         (f) Oldson's Statements to Barbara Dasher ............ 733
     3.  Oldson's Diary Excerpts (Exhibits 263
         Through 271) ............................................................ 733
     4.  Beard's Remains Found in 1992 ............................ 734
         (a) Cause of Death ................................................. 734
         (b) Oldson Visits Site Where Remains Found ........ 735
         (c) Oldson's Statements to Journalist ..................... 735
     5.  Oldson's Statements While in Prison
         Awaiting Trial ........................................................ 736

    6.   Defense ........................................................ 737
       (a) No Physical Evidence Linking Oldson
          to Crime ............................................... 737
       (b) Minnie Denies Strange Behavior or
          Being Threatened ................................. 737
       (c) Beard Commonly Left Tavern With
          Other Men ........................................... 737
       (d) Michael Hawley .................................. 737
       (e) Rex White .......................................... 738
       (f) Brian Mentzer and Carnival Workers ......... 738
       (g) Reported Sightings of Beard After Her
          Disappearance .................................... 739
       (h) Sex Ranch Diary ................................. 739
       (i) Jerome Walkowiak ............................. 741
    7.   Verdict and Sentence ................................. 741
III. Assignments of Error ................................... 741
IV. Analysis ...................................................... 742
    1.   Motion to Suppress .................................. 742
    2.   Oldson's Journal Excerpts ........................ 743
       (a) Standard of Review ............................ 744
       (b) Analysis ............................................. 744
         (i)   Rule 404 ....................................... 744
            a. Forbidden Propensity Reasoning ........... 744
            b. Other Acts Evidence to Show
               Propensity .............................. 746
            c. When Propensity Reasoning Is
               Permissible ............................. 747
            d. Other Acts Evidence Not for
               Propensity Purposes ............... 748
            e. Proof of Other Acts .............. 749
            f. Articulating Proper Purpose ........... 749
            g. Limiting Instructions ............. 750
         (ii)  Rule 403 ....................................... 751
         (iii) Application .................................... 752
            a. Exhibit 266 ......................... 752
              i.  Background ..................... 752

a) Theory of Logical Relevancy ...... 752
b) Court Concluded Exhibit Not
   Other Acts Evidence .................... 753
c) Court Gave Limiting Instruction.. 753
ii. Analysis .......................................... 753
   a) Probative Value: Whether
      Statement Referred to Beard
      Was Question for Jury ................ 753
   b) Excerpts Not Taken Out of
      Context, and Defense Could
      Have Completed Evidence........... 754
   c) Hobson's Choice Argument ......... 755
   d) "Pure" Character Evidence .......... 756
      i)   Oldson's Argument Abstracts
           Single Phrase.......................... 757
      ii)  Statement Not Character
           Trait ....................................... 757
      iii) Even if Statement Reflects
           Character, Admissible for
           Motive ................................... 757
      iv)  "Character" Evidence Not
           Prohibited by Rule 404 When
           Admitted for Proper Purpose.. 758
      v)   Conclusion............................. 760
   e) Unfair Prejudice Did Not
      Outweigh Probative Value ........... 760
b. Exhibit 270 ......................................... 761
   i.  Background...................................... 761
      a) Theory of Logical Relevancy ...... 762
      b) Limiting Instruction .................... 762
   ii. Analysis .......................................... 762
      a) Relevant for Consciousness
         of Guilt......................................... 763
      b) Sexual Contact With Beard
         Contemporaneous With Killing
         Is Not Other Acts Evidence ......... 764

c) List of Other Women ................... 764
    i) Whether Oldson Had Sexual
      Contact With Other Women
      Listed Is Irrelevant to Logical
      Relevance of Excerpt ............. 764
    ii) Limiting Instruction................ 765
    iii) Other Women Not Uncharged
       Misconduct to Be Proved by
       Clear and Convincing
       Evidence ................................. 766
    iv) Reference to Other Women
       Not Unfairly Prejudicial......... 766
d) No "Creepy" Fetish Reference .... 766
e) No Abuse of Discretion in
   Concluding Exhibit 270 More
   Probative Than Unfairly
   Prejudicial .................................... 768
f) Not Inadmissible Because
   Relevance Dependent Upon Other
   Evidence Entered by State........... 768
c. Exhibits 263, 264, 265, 267, 268, 269,
  and 271 ................................................. 769
  i. Background..................................... 769
  ii. Analysis ......................................... 770
    a) Exhibits Not Unfairly
      Prejudicial .................................... 770
    b) Future Intention Is Not Other
      Acts Evidence ............................. 771
    c) Probativeness, Though Sometimes
      Limited, Not Outweighed by
      Unfair Prejudice.......................... 771
d. Taking Exhibits Into Jury Room ........... 773
3. Witnesses Kittinger and Dasher: Hybrid Hobson's
  Choice With Right to Confrontation and
  Presumption of Innocence ...................................... 773
  (a) Background...................................................... 774

       (i)   Dasher ....................................................... 774
       (ii)  Kittinger .................................................. 775
   (b) Standard of Review ........................................... 775
   (c) Analysis ............................................................ 775
4.  Tampering With Witnesses ...................................... 777
   (a) Background ....................................................... 778
       (i)   Objections and Rulings ............................. 778
       (ii)  1989 Statement ......................................... 778
       (iii) Multiple Interviews and Multiple Stories .. 779
       (iv) Walkowiak's Testimony at Hearing on
           Motion in Limine ..................................... 779
       (v)  2011 Interview ......................................... 779
       (vi) Walkowiak's Testimony at Trial ............... 781
   (b) Standard of Review ........................................... 781
   (c) Analysis ............................................................ 782
5.  Speedy Trial Under Due Process Clause ................. 787
   (a) Background ....................................................... 787
   (b) Standard of Review ........................................... 787
   (c) Analysis ............................................................ 787
6.  Alleged Backus Diary .............................................. 789
   (a) Background ....................................................... 789
       (i)   Mailed From Unknown Address in
           Omaha ...................................................... 790
       (ii)  Backus' Deposition .................................. 790
       (iii) Handwriting ............................................. 790
       (iv) Douglas Olson .......................................... 791
       (v)  Testimony by Private Investigator ............. 791
       (vi) Douglas' Other Writings ........................... 791
       (vii) Consistencies of Diary With Real Events .. 792
   (b) Standard of Review ........................................... 793
   (c) Analysis ............................................................ 793
7.  Motion for New Trial .............................................. 796
   (a) Standard of Review ........................................... 796
   (b) Ground One: Douglas Found After Trial ........... 796
       (i)   Background ............................................... 796

a. Telephone Conversation With
Girlfriend ............................................... 796
b. Interview With Private Investigator
and Police ............................................. 797
c. Douglas' Testimony at Hearing ............. 797
d. Defense Arguments at Hearing.............. 799
(ii) Analysis...................................................... 799
(c) Ground Two: Late Disclosure of DNA
Report of Hairs on Sweater............................... 802
8. Cumulative Error ...................................................... 803
9. Sufficiency of Evidence ......................................... 803
10. Life Sentence............................................................ 804
(a) Standard of Review .......................................... 805
(b) Analysis .......................................................... 805
V. Conclusion .................................................................. 807

## I. NATURE OF CASE

John R. Oldson appeals from his conviction of second degree murder and sentence to life imprisonment. The victim, Catherine Beard, disappeared in 1989. Her remains were found in 1992. Oldson makes numerous arguments on appeal, including that journal entries written by Oldson while incarcerated for another crime and entered into evidence against him at trial were inadmissible and that the testimony of certain witnesses should have been excluded because he was presented with a "Hobson's choice" of either conducting effective cross-examination that would bring to light other bad acts or not conducting an effective cross-examination. We affirm both the conviction and the sentence.

## II. BACKGROUND

On December 5, 2012, Oldson was charged with first degree murder in relation to the death of Beard on or about May 31, 1989. The information alleged that the murder was premeditated or committed during the perpetration or attempt to kidnap or sexually assault Beard. The following evidence was presented at trial.

## 1. Night of May 31, 1989

### (a) Oldson and Beard Leave
### Tavern Together

On May 31, 1989, Oldson, Oldson's father, Oldson's uncle, and two other members of a work crew, Lawrence Kittinger and Dale Hoppes, were laying brick. They were working on a project at the home of Bonnie McCartney and Roger McCartney. The testimony varied as to how long the project took. Hoppes testified that the project lasted approximately 3½ days. Roger McCartney testified that based on his review of the bills, the brickwork started after May 29 and took a couple of weeks to complete.

After work around 4:30 to 5 p.m., the crew went to the Someplace Else Tavern in Ord, Nebraska. Oldson, Kittinger, and Hoppes rode in Oldson's father's two-tone, cream-and-brown Ford pickup. Oldson's father drove. Oldson's father parked the pickup in the alley behind the bar. The back of the pickup was full of masonry tools.

Numerous witnesses testified that they saw Oldson speaking with Beard, who was sitting at the end of the bar in the Someplace Else Tavern. Though Oldson and Beard were acquainted with one another, there was testimony that they had never been romantically involved. Kittinger and Hoppes testified that Oldson went over to talk with Beard almost immediately after their arrival. Witnesses reported that Oldson and Beard went to stand close together near the jukebox and the pool table. At some point, Oldson had his hand or arm on Beard's shoulder.

Hoppes testified that Oldson asked his father for the keys to the pickup. Several witnesses saw Oldson and Beard walk out of the bar through the back door and into the back alley. It was approximately 6:30 p.m. when Oldson and Beard left the tavern together. No one ever saw either Oldson or Beard return to the tavern that night. Beard never returned home.

Beard left her half-finished drink, cigarettes, jacket, house key, and umbrella at the bar. When Beard's sister later checked

Beard's room in the house where Beard resided with her mother, she found Beard's belongings undisturbed.

### (b) Oldson Goes Home

Oldson's father, Kittinger, and Hoppes waited for a while for Oldson to return with the pickup to give them a ride, but Oldson "never showed up." Oldson's father and Kittinger walked together back to Oldson's father's house. Kittinger testified that he and Oldson's father arrived at Oldson's father's house about an hour after Kittinger saw Oldson and Beard leave together. In a statement read to the jury by the defense, Oldson's father, deceased at that time of trial, reported to law enforcement that he and Kittinger left the tavern about 30 minutes after Oldson. It takes about 15 minutes to walk from the Someplace Else Tavern to Oldson's father's house.

When Oldson's father and Kittinger arrived at the house, Oldson was on his way out. Oldson appeared freshly showered. Kittinger asked Oldson if he had gotten "lucky," and Oldson responded that he had not. Instead, according to Kittinger, Oldson told him that "two guys had hustled her away from him in a pickup."

### (c) Possible Telephone Call to Oldson

Roger McCartney (hereinafter Roger) testified that one evening after he got home from work, anywhere between 6:30 and 7 p.m., he tried to call Oldson's father at his home, but reached Oldson. Roger testified that he had concerns about the brickwork. This was the only time he called Oldson's home. Roger did not recall the specific date of the telephone call. He testified that if the call was on May 31, 1989, the crew would have had only 1½ days to have completed a substantial amount of brickwork. Roger recalled speaking to an investigator approximately 1 week after Beard's disappearance. In the report of that conversation, the officer reported that Roger said he made the telephone call around 7:30 to 8:30 p.m. on May 31. Roger testified that further reflection caused him to question the date given to the investigator.

#### (d) Sharlene Whitefoot Calls Oldson

Sharlene Whitefoot, an employee of the Someplace Else Tavern in 1989, discovered that Beard's personal items had been left at the bar, and she called Oldson at his father's home. Whitefoot testified that it was approximately 10:30 p.m. on May 31, 1989, when she spoke with Oldson. When Whitefoot asked Oldson if he had seen Beard, Oldson said he was just getting out of the bathtub and indicated that he did not know where Beard was. Whitefoot and the owner of the Someplace Else Tavern reported Beard as missing.

#### (e) Rex White and Glen Hall

Around 3 a.m. on the day after Beard's disappearance, there was a robbery at an Ord motel, located 1 mile from the Someplace Else Tavern. Law enforcement never found any connection between the robbery and Beard's disappearance. The robbery was committed by Rex White and Glen Hall. The victim was a man from out of town.

White and Hall, accompanied by five acquaintances, including the robbery victim, had been at another bar in town from 3 to 7:30 p.m. on May 31, 1989. The victim was "flashing" around a lot of cash, wanted to have a party in his motel room, and offered White and Hall $100 each if they could "find him a girl." White and Hall went to the Someplace Else Tavern around 7:30 p.m. to try to find Beard. According to White, Beard was not there.

### 2. YEAR FOLLOWING BEARD'S DISAPPEARANCE

#### (a) Oldson's Statement Heard by Kittinger

Kittinger testified that the day following Beard's disappearance, the crew was at the McCartney jobsite when they saw a marked police car nearby. Oldson's father wondered aloud what the police officer might want, to which Oldson replied, "It's probably something I did."

### (b) Oldson's Statements to Whitefoot

The day after Beard's disappearance, Oldson went back to the Someplace Else Tavern to confront Whitefoot. Oldson asked Whitefoot why she and the bar owner had reported Beard missing. Oldson reportedly said, "[W]hat's going to happen if her body comes floating down the river, who do you think they're going to blame? . . . [M]e."

Oldson explained to Whitefoot that he had grabbed Beard and had "ahold of her by her arms out in the alley but she got away." Whitefoot told Oldson that she did not believe him, because Oldson was a tall, muscular man and Beard was a very petite woman. At that point, Oldson left.

### (c) Oldson's Statements to Law Enforcement

#### (i) Statements on June 2, 1989

On or around June 2, 1989, Oldson was interviewed by Gerald Woodgate, who was the Valley County Sheriff at that time, and John Young, the Ord police chief. Oldson told him that when Oldson and Beard were in the alley, Oldson propositioned Beard for sex. Beard refused Oldson. Oldson said he went to his father's pickup with the intention of leaving. There was no indication by Oldson during this interview that he had grabbed or struggled with Beard.

As Oldson started to leave, he saw Beard go to another truck that had just pulled into the alley. Oldson described the truck as a "custom 150" Ford pickup about 7 years old, but shiny, with fog lights, and "88 county" license plates. Oldson described the driver as having long hair; he could not tell if the driver was male or female. Oldson gave a similar interview to another police officer around that time.

#### (ii) Statement on June 6, 1989

On June 6, 1989, Oldson was interviewed by an investigator for the Nebraska State Patrol. Oldson described that he saw Beard at the bar and asked her if she wanted to "play a little touch and feel outside." She said, no, that she did not think of

him "in that way." However, when Oldson continued to ask Beard, she eventually agreed to go outside to "at least talk about it." Oldson reported that it was 7:30 p.m. when he and Beard stepped into the alley.

Oldson reported that he and Beard stood by the passenger side of his father's pickup. He again asked Beard if "she would like to do something." Beard again said that she did not think of him in that way. Oldson became upset and tried to grab Beard by her wrists to pull her into the pickup, but Beard pulled away from him. According to Oldson, Beard never entered the pickup.

Oldson reported that he slid over to the driver's side and began to drive away. As he was leaving, he noticed a dark blue or black Ford pickup pull into the alley. He saw Beard walk over to the pickup and begin talking with the driver. Beard then walked over to the passenger side of the truck and got in. Oldson described the driver of the truck as male, possibly with a mustache, possibly long, blond hair. He did not describe any other occupants. Oldson said it was a commercial pickup with "88 county" plates.

Oldson reported that he went home and took a bath. He got out of the tub to answer a telephone call from Roger at about 7:45 p.m. After the brief call with Roger about work being done on the McCartney house, Oldson finished his bath. Oldson then gathered up clothes and detergent to go to the Laundromat. When he was on his way to the Laundromat, Oldson ran into his father and Kittinger. Oldson reported that Whitefoot called him later that night.

The state trooper testified that local law enforcement investigated the owners of all vehicles similar to Oldson's description located in county No. 88, or Loup County. All such individuals were ruled out as having any information or involvement in Beard's disappearance.

### (d) Pickup Cleaned

Three to ten days after Beard's disappearance, a local resident saw Oldson's father's pickup in the driveway with

both doors open and the seat completely removed and lying on the ground. A water hose ran to the truck, and a bucket was nearby.

### (e) Witness to Oldson's Statements to Minnie Eggers

In 1990, an Ord resident observed Oldson with his girlfriend and future wife, Minnie Eggers (Minnie), at the Someplace Else Tavern. She testified that she overheard Oldson tell Minnie that "if she didn't do whatever it was he wanted that he would do the same thing to her that he had done to Cathy." She testified that Minnie seemed scared. Oldson looked around to see if anyone had heard him. Minnie told Oldson that she loved him and would do whatever he wanted.

### (f) Oldson's Statements to Barbara Dasher

Ord resident, Barbara Dasher, testified that she and Oldson would often converse at the Someplace Else Tavern. One day while conversing at the bar after Beard's disappearance, Oldson suddenly "look[ed] mean" and said "right in my ear" that "[t]hey'd never be able to find [Beard]." On another occasion, Oldson told Dasher that "Beard was dead and that we'll never see her again" and that "Beard deserved what she got."

Dasher testified that later, after Beard's remains were found, Oldson threatened her. Oldson told her that if she ever "said anything," she "could get the same thing as . . . Beard."

### 3. Oldson's Diary Excerpts (Exhibits 263 Through 271)

Woodgate testified that between December 1989 and September 1990, he had "occasion to come into contact with . . . writings of . . . Oldson." His agency made copies of those writings, and he verified that nine exhibits, exhibits 263 through 271, were accurate copies, with certain portions redacted. The exhibits will be fully set forth in the analysis section below. They include Oldson's musing: "Maybe the

problem has been my making girls <u>too</u> high a priority - and having real problems with <u>accepting rejection</u>. Which may be how all this got started. 'Get it any way you can' (?) Doesn't sound like a good attitude. It got me in trouble." They also include Oldson's statement: "I really have no idea about what to do or where to go. My <u>first</u> priority is to get rid of something A.S.A.P.! That is, if I can still find them. The only . . . link left between me and . . . ." Another exhibit states that he "must rate C.B. as most gratifying, . . . YUH! Go on and gitcha some!"

During cross-examination, the defense elicited testimony from Woodgate that the journal excerpts were but small portions of a document that consisted of over 200 pages. Woodgate also affirmed that the document concerned various different topics, such as politics, religion, world events, personal letters, lists of actresses, and letters to public figures. Woodgate testified that, based on the writings, law enforcement obtained search warrants. However, investigators were unable to find anything incriminating in either the Oldson house or the pickup. Furthermore, Woodgate affirmed that during the 9-month period overlapping the search warrants, Oldson had no access to the house, grounds, or pickup to be able to dispose of any evidence located therein.

### 4. Beard's Remains Found in 1992

Beard's remains were found in April 1992. Most of the remains were found in the alluvial fan of a pasture beyond a fence alongside a minimum maintenance road about 6 miles outside of Ord. Traveling the speed limit from the Someplace Else Tavern to the place where the remains were found takes 9 minutes. Traveling the speed limit from the place the remains were found to Oldson's residence also takes approximately 9 minutes.

### (a) Cause of Death

A forensic anthropologist specializing in bone trauma testified that Beard's remains indicated perimortem blunt trauma

to the chest, face, and skull. In addition, the remains indicated stab wounds in the ribs, the lumbar vertebrae, sacrum, and wrist. These together indicated "foul play and a violent death." While the blunt trauma could be consistent with being struck by either a vehicle or some sort of tool, the stab wounds could not have been caused by a pedestrian-vehicle collision.

A forensic pathologist similarly testified that Beard's death was a homicide and was caused by blunt force trauma to the head and trunk in association with sharp force injuries in the ribs and lumbar. The pathologist testified that when a pedestrian is hit by a moving vehicle, the pedestrian suffers a characteristic basilar fracture of the skull caused when the body lands while in rotation off of the vehicle. Beard did not suffer such a fracture.

### (b) Oldson Visits Site Where Remains Found

A friend of Minnie's testified that when Beard's remains were discovered, Oldson and Minnie suggested they go to the site where the remains were found. Oldson was "driving like he was really anxious and nervous" and was "talking very excitedly" on the way there. The friend did not recall what Oldson said, though. Part of the time, Oldson was speaking with Minnie through sign language, which the friend did not understand.

### (c) Oldson's Statements to Journalist

A journalist interviewed Oldson after Beard's remains were found. Oldson generally denied being responsible for Beard's death. He said he was merely an acquaintance of Beard's. Oldson also claimed to be a virgin until he married Minnie.

Oldson told the journalist that he had tried to get Beard into his father's truck with him the night she disappeared. Oldson said that he had become more desperate as the night went on and that "'[f]inally I just reached the bottom of the barrel, what the hell, we'll try [Beard], and she wouldn't

have anything to do with me.'" According to Oldson, she refused him, saying, "'[O]h, John, I like you as a friend but never in that way. No, no, get away. No, no.'" Then Oldson drove off. As he was leaving, Oldson saw Beard get into another truck.

### 5. Oldson's Statements While in Prison Awaiting Trial

While incarcerated awaiting trial for the murder of Beard, Oldson's conversations with his wife, Minnie, were recorded. In one conversation, Oldson speculated that law enforcement may have been able to find "a few molecules of DNA" evidence linking him to Beard. Minnie questioned how that could be possible if Oldson had never been there.

Oldson explained that in May 1989, he had approached the "town floozy" at the "saloon" and said, "Hey baby come on out back." He got into the passenger side of the pickup, sat down, and said, "Come on in here with me and we'll go do something." But Beard told him, "No, I don't like you in that way." Oldson then tried to pull her into the truck. They "scrambled around a little bit," and Beard may have "bumped her head." Beard "managed to jerk herself away."

Oldson said he was embarrassed because the "town floozy" was not interested in him. Upset and angry, and unable to face his coworkers in the bar, he left with the pickup. He went to the jobsite and "did some things." Then he went home, took a bath, and grabbed some laundry. He ran into his father when he was on his way to the Laundromat.

In another conversation, Oldson again wondered what kind of evidence law enforcement might have. Oldson wondered whether law enforcement had found DNA evidence on his "brick hammer," the bumper of the truck, or on a gas can. He explained that his and Beard's DNA "would have mingled." Beard's DNA could have been in the truck and on him, because he had grabbed Beard by the arm and Beard had "struggled back."

6. Defense

(a) No Physical Evidence Linking
Oldson to Crime

The defense emphasized that no physical evidence was found linking Oldson to Beard, despite several searches. Without stating that Oldson was incarcerated at the time, the defense emphasized that when law enforcement executed the search warrant based on Oldson's journal entries, Oldson was "more or less quarantined and had no access to the house or the grounds or the trucks for a nine-month period." Furthermore, during the time the search warrants were sought and executed, Oldson had limited, supervised communication with the house's inhabitants. The defense also pointed out that Oldson indicated in his diary that he knew law enforcement was reading it.

(b) Minnie Denies Strange Behavior
or Being Threatened

Minnie testified for the defense. She said that there was nothing out of the ordinary in the way Oldson drove out to the site where the remains were found. Further, she did not think that Oldson would have been proficient enough in sign language to carry on a conversation with her at that time. Minnie denied that Oldson ever threatened to do to her what he had done to Beard. She testified that Oldson never made any incriminating statements to her concerning Beard. Minnie testified that Dasher had a reputation in the community for being untruthful.

(c) Beard Commonly Left Tavern
With Other Men

The defense adduced evidence that it was common for Beard to leave the bar with different men. The defense then presented other likely suspects.

(d) Michael Hawley

The defense presented the prior statements of former Ord resident, Michael Hawley, deceased at the time of trial. Hawley

carried in his wallet a picture from a "dirty magazine" of a woman who looked like Beard. He said he did not like Beard and described her as a thief and a hustler, and he stated she had "narced off" a friend of his. Hawley did not have an alibi for the night of Beard's disappearance. One witness, a former Ord resident who was also deceased at the time of trial, reported to police that he arrived at the Someplace Else Tavern at 6:30 p.m. on the night of Beard's disappearance and saw Beard talking to Hawley. The witness left at 6:45 p.m. Hawley drove a "maroon with white top" Pontiac Grand Prix with "56 county" plates.

### (e) Rex White

John Hopkins, deceased at the time of trial, had given a statement to law enforcement that shortly after Beard's disappearance, he had a conversation with White about where Beard might be. Hopkins was White's supervisor on a cement job. White told Hopkins, "'I know where she is. I can show you where she's at. . . . We skinned her alive and I think she liked it.'" Hopkins reported that White seemed to be telling the truth. Furthermore, Hopkins got the impression from the conversation that Beard was out in the open somewhere.

Hopkins' live-in girlfriend testified that she recalled coming home and finding Hopkins "sobbing." The girlfriend testified over the State's objection that Hopkins was upset because White had told him that White killed Beard. Specifically, White told Hopkins that he skinned Beard and buried her under concrete under a restroom project north of Ord where White was working. She and Hopkins drove to the jobsite and found a bag of lime missing.

### (f) Brian Mentzer and Carnival Workers

In a statement to police, Mel Ellingson, a former boyfriend of Beard's and deceased at the time of trial, reported that Beard once told him that a person by the name of Brian Mentzer was going to kill her and had threatened her once in a bar. Ellingson also recalled Beard's telling him that two "'guys from the

carnival'" she was acquainted with had called her because they were going to be visiting. Ellingson said the men drove a green pickup while they were in Ord. Ellingson also said that the owner of the carnival lived in Taylor, Nebraska, and therefore would have "88 county" license plates.

### (g) Reported Sightings of Beard
### After Her Disappearance

The defense further presented evidence that Beard may have been seen in the days following her disappearance. One witness testified that the night of Beard's disappearance, he saw an unfamiliar man and woman at the convenience store on the highway leading into Burwell, Nebraska, about 17 miles from Ord. The woman was approximately Beard's weight and stature, but had darker hair. She appeared "drunk or doped."

Two other witnesses had reported to law enforcement that on the day after Beard's disappearance, they saw someone who matched the picture and physical description of Beard walk into a cafe in Morrill, Nebraska, which is about 360 miles from Ord. She was carrying a jacket and a military green duffelbag. The bag was "full clear up to the top with clothing or personal items," and she appeared tired.

Ellingson said in a statement to police that he was traveling back to Ord from Valentine, Nebraska, the day after Beard's disappearance. En route, at about 6 p.m., he saw a vehicle traveling in the opposite direction. He was traveling about 60 miles per hour; the other vehicle was traveling about 90 miles per hour. He noticed there were three people in the vehicle and he "'could swear'" that Beard was seated in the middle between the driver and the other occupant. He believed he recognized the vehicle as belonging to a person who had previously lived across from Beard's house and had dated Beard at one time.

### (h) Sex Ranch Diary

The defense suggested that Beard had been with Jean Backus and Wetzel Backus after her disappearance and ultimately was

murdered by Jean Backus. The Backuses owned 2,300 acres in Garfield County, Nebraska, near Ord.

The defense called the current sheriff for Valley County, who indicated that in March 2012, he came into contact with handwritten pages from a diary. The diary contained information regarding the possible death of a woman by the name of "Kathy" from Ord. The sheriff testified that the diary facially appeared to belong to Jean Backus, who was married at that time to Wetzel Backus.

The diary indicated that "Kathy's" death, as well as the death of three other women, had occurred on the Backus ranch. The sheriff testified that the other women listed in the diary were Sharon Bald Eagle, Karen Weeks, and Jill Dee Cutshall. All these women were known to have disappeared. Bald Eagle disappeared in 1984, and Weeks and Cutshall disappeared in 1987.

The sheriff testified the diary indicated that the Backuses had found Cutshall during a trip to Fremont, Nebraska, walking and without any clothes, and that the Backuses had found Bald Eagle in South Dakota. Bald Eagle had in fact disappeared from a reservation in South Dakota. Cutshall's clothes had been found in a forest.

The diary referred to "Kathy" as missing from Ord in 1989, and the sheriff affirmed that the diary indicated a "local man" was being blamed for "Kathy's" disappearance. Further, the diary indicated the author of the diary had run "Kathy" over with a pickup.

The sheriff testified that he had conducted an investigation into the diary. The sheriff explained that Jean Backus denied writing the diary and had granted law enforcement permission to search the ranch. Law enforcement conducted a thorough search and was unable to find any human remains or other suspicious evidence on the Backus property. The sheriff did not believe the diary to be valid.

### (i) Jerome Walkowiak

Over defense counsel's request to declare him unavailable and utilize only prior statements made to the police, Jerome Walkowiak testified that he was at the Someplace Else Tavern on May 31, 1989, and saw Beard talking with a man with a red beard and other "common-looking guys" with black beards. The man with the red beard had a ponytail and a knife "hanging on his side."

Walkowiak remembered that Oldson and Beard were also talking, and he saw Oldson and Beard go out to the back alley after Oldson went to the restroom. The bearded men had left the Someplace Else Tavern just before that. Walkowiak looked out the back alley and saw a blue, but not dark blue, truck with "88 county" license plates. The same men he saw Beard talking to in the bar were in the pickup. Walkowiak testified that he saw Oldson get into the truck with Beard and the other men.

Defense counsel then confronted Walkowiak with his statement from 1989 wherein he told law enforcement that he saw Oldson walk away and that Oldson did not get into the truck with Beard and the other men. Walkowiak testified that he did not know why he had said that. The defense proceeded to read extensively and repeatedly from Walkowiak's 1989 interview. Walkowiak testified that he did not remember the 1989 interview and that his memory of the night of May 31, 1989, was better now than it was then.

### 7. Verdict and Sentence

The jury returned a verdict of guilty of second degree murder. The court sentenced Oldson to life-to-life imprisonment.

### III. ASSIGNMENTS OF ERROR

Oldson makes 12 assignments of error. He assigns that the trial court erred (1) by admitting excerpts from Oldson's journals which were inadmissible under Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Cum. Supp. 2014), in violation of his rights to be presumed innocent, due process, and a fair

trial; (2) by admitting excerpts from Oldson's journals which were inadmissible under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), in violation of his rights to be presumed innocent, due process, and a fair trial; (3) by allowing Oldson's journal excerpts to go back with the jury during deliberations, in violation of his rights to be presumed innocent, due process, and a fair trial; (4) by not admitting the alleged Jean Backus diary at trial, in violation of his rights to present a defense, due process, and a fair trial; (5) by failing to suppress evidence as requested by the defense, in violation of the 4th and 14th Amendments and their Nebraska counterparts; (6) by failing to dismiss the case as a violation of Oldson's right to a speedy trial under the Due Process Clause of the 5th and 14th Amendments and their Nebraska counterparts; (7) by forcing Oldson to choose between effectively cross-examining witnesses and opening the door to highly prejudicial evidence of other bad acts, in violation of Oldson's right to confrontation under the Sixth Amendment and its Nebraska counterpart; (8) by overruling his motion for a new trial, in violation of his rights to present a defense, due process, and to a fair trial; and (9) by giving Oldson a life sentence when the jury found him guilty of a lesser offense. Oldson also asserts that (10) the State's tampering with witnesses Rhonda Donnelson and Walkowiak violated Oldson's rights to a fair trial, to present a defense, and to due process under the 5th, 6th, and 14th Amendments and their Nebraska counterparts; (11) there was insufficient evidence to support the conviction; and (12) his conviction should be reversed on the ground of cumulative error.

## IV. ANALYSIS

### 1. MOTION TO SUPPRESS

We begin our analysis by addressing Oldson's assignment of error that the trial court erred in denying his motion to suppress. Oldson argues that by virtue of omitting exculpatory information, the affidavit in support of the warrant for Oldson's

arrest contained deliberately or recklessly false information, in violation of the Fourth Amendment under *Franks v. Delaware*.[1] Therefore, his recorded conversations while in jail awaiting trial should have been excluded as fruit of the poisonous tree. When Oldson's recorded conversations were offered at trial, defense counsel did not object to the evidence under the Fourth Amendment and did not renew the motions to suppress. Defense counsel instead objected to the statements on the grounds of foundation, confrontation, and due process. When the court specifically asked defense counsel if there were any other objections to the recorded conversations, defense counsel said that there were not.

[1,2] Where there has been a pretrial ruling regarding the admissibility of evidence, a party must make a timely and specific objection to the evidence when it is offered at trial in order to preserve any error for appellate review.[2] The failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and a party will not be heard to complain of the alleged error on appeal.[3] Furthermore, an objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on some other ground not specified at trial.[4] Because the defense failed to renew its Fourth Amendment objection at trial, he waived his assignment of error concerning his motion to suppress.

## 2. OLDSON'S JOURNAL EXCERPTS

We turn next to Oldson's journal excerpts, which are the subject of two assignments of error and the central focus of Oldson's appeal.

---

[1] *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

[2] *State v. Herrera*, 289 Neb. 575, 856 N.W.2d 310 (2014).

[3] *Id.*

[4] See *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013).

#### (a) Standard of Review

[3] Whether evidence is admissible for any proper purpose under the rule governing admissibility of evidence of other crimes, wrongs, or acts rests within the discretion of the trial court.[5]

[4] It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under the balancing rule and the other acts rule, and the trial court's decision will not be reversed absent an abuse of discretion.[6]

#### (b) Analysis

The defense objected to exhibits 263 through 271 under either rule 403 or rule 404, often both. Oldson makes several unique arguments in this appeal as to the meaning and applicability of those statutes, based on his interpretation of their guiding principles. Before addressing the particular exhibits, therefore, we find it helpful to set forth in detail the guiding principles of rules 403 and 404. We begin with rule 404.

### (i) Rule 404

#### a. Forbidden Propensity Reasoning

[5] Rule 404, found at § 27-404, codifies the common-law tradition prohibiting "'resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt.'"[7] "'The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime.'"[8] This is because propensity evidence may

---

[5] See *Sturzenegger v. Father Flanagan's Boys' Home*, 276 Neb. 327, 754 N.W.2d 406 (2008).

[6] See *State v. McGuire*, 286 Neb. 494, 837 N.W.2d 767 (2013).

[7] *Old Chief v. United States*, 519 U.S. 172, 181, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997).

[8] *Id.*

lead a jury to convict, not because the jury is certain the defendant is guilty of the charged crime, but because it has determined the defendant is "'a bad person [who] deserves punishment,'" whether or not the crime was proved beyond a reasonable doubt.[9]

[6] Rule 404 thus prohibits the admission of "[e]vidence of a person's character or a trait of his or her character . . . for the purpose of proving that he or she acted in conformity therewith on a particular occasion."[10] The prohibition in rule 404(1) consists of two parts: to prove "a person's character" in order to show that "he or she acted in conformity therewith."[11] "Proof of a person's character is barred only when in turn, character is used 'in order to show action in conformity therewith.'"[12]

Though difficult to define, character has been described as the generalized disposition or tendency to act in a particular way in all the varying situations of life, caused by something internal to the actor that arises from that person's moral being.[13] For example, a person's character may be "quarrelsome and contentious,"[14] peaceable,[15] chaste,[16] honest,[17] or the opposite

---

[9] *Id.*

[10] Rule 404(1).

[11] See, 1 Edward J. Imwinkelried, Uncharged Misconduct Evidence § 2:19 (rev. ed. 2002); 22B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure § 5233 (2014).

[12] 1 Imwinkelried, *supra* note 11 at 105.

[13] See, *State v. Torres*, 283 Neb. 142, 812 N.W.2d 213 (2012); *State v. Crider*, 375 Mont. 187, 328 P.3d 612 (2014); *State v. Marshall*, 312 Or. 367, 823 P.2d 961 (1991); *State v. Hedger*, 115 Idaho 598, 768 P.2d 1331 (1989); David P. Leonard, The New Wigmore: Evidence of Other Misconduct and Similar Events § 8.3 (Richard D. Friedman ed., 2009).

[14] *Trousil v. Bayer*, 85 Neb. 431, 433, 123 N.W. 445, 446 (1909).

[15] *Gering v. School Dist.*, 76 Neb. 219, 107 N.W. 250 (1906).

[16] *Brooks v. Dutcher*, 22 Neb. 644, 36 N.W. 128 (1888), *overruled on other grounds, City of Omaha v. Richards*, 49 Neb. 244, 68 N.W. 528 (1896).

[17] *State v. Vogel*, 247 Neb. 209, 526 N.W.2d 80 (1995).

of any of those characteristics. The concept of character is generally understood to have a moral component.[18]

The second part of the prohibition, to show that "he or she acted in conformity therewith," is to ask the trier of fact to infer what a person did from who that person is.[19] It is an attempt to prove, by initiating an attack on the defendant's character, that the defendant committed the acts constituting the crime charged.[20]

### b. Other Acts Evidence
### to Show Propensity

[7] What the State cannot do through direct testimony of the defendant's character it cannot do indirectly through evidence of the defendant's acts for the purpose of illustrating bad character. The State cannot introduce other acts that are relevant only through the inference that the defendant is "'by propensity a probable perpetrator of the crime.'"[21] Stated another way, the State cannot present the defendant's other acts so that the jury makes the intermediate inference of the defendant's bad character, leading to the ultimate inference that the defendant is guilty.[22]

This approach of establishing guilt through other acts is even more egregious than presenting reputation or opinion evidence of the defendant's bad character. The admission of other acts evidence presents a special danger of confusion of the issues and undue prejudice. Not only might the jury

---

[18] See, e.g., 22B Wright & Graham, Jr., *supra* note 11.

[19] 1 Imwinkelried, *supra* note 11. See, also, 12 Robert Lowell Miller, Jr., Indiana Evidence § 404.101 (3d ed. 2007 & Cum. Supp. 2015).

[20] See, Barbara E. Bergman et al., Wharton's Criminal Evidence § 4:18 (15th ed. 1997 & Cum. Supp. 2014-15); 1 Edward J. Imwinkelried et al., Courtroom Criminal Evidence § 801 (4th ed. 2005). See, also, e.g., *State v. Faust*, 265 Neb. 845, 660 N.W.2d 844 (2003), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007).

[21] *State v. Yager*, 236 Neb. 481, 490, 461 N.W.2d 741, 747 (1990).

[22] See, e.g., 1 Imwinkelried, *supra* note 11, § 2:21.

infer action based on the defendant's general lawbreaking character, but the jury might subconsciously penalize the defendant for the proven misdeeds.[23] In other words, such evidence of other acts might encourage a "preventive conviction even if [the defendant] should happen to be innocent momentarily."[24]

### c. When Propensity Reasoning Is Permissible

The prohibition against proving the character of a person in order to show action in conformity therewith—in other words, the use of propensity reasoning—is subject to limited exceptions. Those exceptions are generally favorable to the defendant's use of propensity evidence in his or her defense, while maintaining the prohibition against the prosecution's use of propensity evidence in its case in chief. Rule 404(1)(a) allows the defendant to offer a pertinent trait of his or her character, allowing the prosecution to rebut the same only if the defendant offers such evidence. Rule 404(1)(b) allows the defendant to present evidence of a pertinent character trait of the victim and allows the prosecution to rebut the same only if the defendant presents such evidence.

Under Neb. Evid. R. 405, Neb. Rev. Stat. § 27-405 (Reissue 2008), the manner in which either party can prove character in order to show action in conformity therewith, when allowed, is generally limited to reputation or opinion evidence. In accordance with the special danger that instances of misconduct entails, other prior acts can be introduced to show character in order to show action in conformity therewith only if a trait of character is an essential element of a charge, claim, or defense, or during cross-examination of reputation or opinion testimony.[25]

---

[23] *Id.*, § 1:03.

[24] *Old Chief v. United States, supra* note 7, 519 U.S. at 181.

[25] Rule 405.

### d. Other Acts Evidence Not for
### Propensity Purposes

[8] Evidence of specific instances of conduct that only incidentally impugns a defendant's character is not prohibited by rule 404.[26] If the underlying theory of the logical relevance of the other acts evidence is independent of propensity; i.e., if there is a "'rational chain of inferences that does not require an evaluation of character,'" then the court may admit the evidence of specific instances of conduct.[27] The other acts evidence in such circumstances is referred to as having a "special" or "independent" relevance, which means that its relevance does not depend upon its tendency to show propensity.[28]

Rule 404(2) thus states that evidence of "other crimes, wrongs, or acts" are admissible for purposes other than "to prove the character of a person in order to show that he or she acted in conformity therewith." Rule 404(2) provides the examples of proper purposes of other acts evidence as being "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." This list of proper purposes is illustrative and not meant to be exclusive.[29]

Authorities note that uncharged misconduct evidence routinely supports two inferences—one legitimate and one illicit.[30] Rule 404(2) permits introduction of relevant evidence concerning the occurrence of "other crimes, wrongs, or acts," so long as the sole purpose for the offer is not to establish a defendant's propensity to act in a particular manner, and thereby supply a basis for the inference that the defendant committed

---

[26] See, e.g., 40A Am. Jur. 2d *Homicide* § 286 (2008).

[27] *State v. Torres, supra* note 13, 283 Neb. at 158, 812 N.W.2d at 232 (quoting Leonard, *supra* note 13).

[28] *State v. Almasaudi*, 282 Neb. 162, 802 N.W.2d 110 (2011).

[29] See, *State v. Newman*, 250 Neb. 226, 548 N.W.2d 739 (1996); *State v. Myers*, 15 Neb. App. 308, 726 N.W.2d 198 (2006); *State v. Bockman*, 11 Neb. App. 273, 648 N.W.2d 786 (2002); *State v. Maggard*, 1 Neb. App. 529, 502 N.W.2d 493 (1993).

[30] 1 Imwinkelried, *supra* note 11, § 1:03.

the crime charged.[31] The "litmus test is noncharacter logical relevance"[32] of the other acts.

### e. Proof of Other Acts

As a threshold matter, the evidence of the other act will be admissible only if the trier of fact could reasonably conclude that the act occurred and that the defendant was the actor.[33] It cannot be the product of mere speculation. Rule 404(3) states that when, in a criminal case, evidence of other crimes, wrongs, or acts is admissible for a proper purpose, the prosecution must prove "to the court by clear and convincing evidence," "outside the presence of any jury," that the accused committed the crime, wrong, or act.

### f. Articulating Proper Purpose

In *State v. Sanchez*,[34] we also established the procedure, not explicitly set forth in the statutory scheme, that the proponent of other acts evidence shall state on the record the specific purpose or purposes for which the evidence is being offered, upon objection to its admissibility.[35] The trial court is similarly required to state the purpose or purposes for which such evidence is received.[36] We explained that such a procedure provides further protection for the defendant and simplifies our appellate review.[37]

---

[31] See, *State v. McGuire, supra* note 6; *State v. Yager, supra* note 21; Michael H. Graham, Handbook of Federal Evidence § 404:5 (7th ed. 2012).

[32] 1 Imwinkelried et al., *supra* note 20, § 904 at 372.

[33] Bergman et al., *supra* note 20, § 4:27.

[34] *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999).

[35] See, *State v. Burdette*, 259 Neb. 679, 611 N.W.2d 615 (2000); *State v. Sanchez, supra* note 34; *State v. Wisinski*, 12 Neb. App. 549, 680 N.W.2d 205 (2004); *State v. Powers*, 10 Neb. App. 256, 634 N.W.2d 1 (2001), *disapproved on other grounds, State v. Smith*, 267 Neb. 917, 678 N.W.2d 733 (2004).

[36] See *id.*

[37] See *State v. Sanchez, supra* note 34.

g. Limiting Instructions

And since evidence of other acts submitted for a proper purpose may at the same time lead the jury to infer bad character and employ propensity reasoning, the trial court must, *if requested by the defendant*,[38] instruct the jury to focus only on the proper purpose of the evidence. This requirement does not derive from rule 404, but from the more general provisions of Neb. Evid. R. 105, Neb. Rev. Stat. § 27-105 (Reissue 2008). Under rule 105, "[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the judge, *upon request*, shall restrict the evidence to its proper scope and instruct the jury accordingly." (Emphasis supplied.)

While, normally, the better practice is for a trial court to instruct the jury regardless of request, so as to ensure the evidence is not used for an improper purpose, the majority view is that the court does not have a duty to present a limiting instruction to the jury sua sponte.[39] We have thus said that the failure to provide limiting instructions absent a

---

[38] *State v. Torres, supra* note 13; *State v. Collins*, 281 Neb. 927, 799 N.W.2d 693 (2011); *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011); *State v. Baker*, 280 Neb. 752, 789 N.W.2d 702 (2010); *State v. Floyd*, 277 Neb. 502, 763 N.W.2d 91 (2009); *State v. McManus*, 257 Neb. 1, 594 N.W.2d 623 (1999); *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997); *State v. Newman, supra* note 29; *State v. Bockman, supra* note 29; *State v. Gray*, 8 Neb. App. 973, 606 N.W.2d 478 (2000), *overruled on other grounds, State v. Nelson*, 262 Neb. 896, 636 N.W.2d 620 (2001).

[39] See, *U.S. v. Perkins*, 94 F.3d 429 (8th Cir. 1996); *United States v. Multi-Management, Inc.*, 743 F.2d 1359 (9th Cir. 1984); *United States v. Price*, 617 F.2d 455 (7th Cir. 1979); *State v. Hill*, 307 Conn. 689, 59 A.3d 196 (2013); *State v. Russell*, 171 Wash. 2d 118, 249 P.3d 604 (2011); *State v. Miles*, 211 Ariz. 475, 123 P.3d 669 (Ariz. App. 2005); *Brown v. State*, 890 So. 2d 901 (Miss. 2004); *People v. Griggs*, 110 Cal. App. 4th 1137, 2 Cal. Rptr. 3d 380 (2003); *Stallworth v. State*, 868 So. 2d 1128 (Ala. Crim. App. 2001); *People v. Rice*, 235 Mich. App. 429, 597 N.W.2d 843 (1999); *State v. Williams*, 593 N.W.2d 227 (Minn. 1999); *State v. Shuman*, 622 A.2d 716 (Me. 1993); *People v. Pennese*, 830 P.2d 1085 (Colo. App. 1991); Leonard, *supra* note 13, § 4.5.

request is not reversible error.[40] Indeed, it may at times be a
tactical decision by defense counsel not to highlight, through
a limiting instruction, the evidence itself or the fact that the
jury could infer from the evidence anything other than its
proper purpose.[41]

### (ii) Rule 403

[9,10] We now turn more briefly to the principles underly-
ing rule 403. All relevant evidence is subject to the overriding
protection of rule 403, including other acts evidence. Rule
403 allows the exclusion of evidence if its probative value is
substantially outweighed by the danger of unfair prejudice,
confusion of the issues, or misleading the jury, or by consider-
ations of undue delay, waste of time, or needless presentation
of cumulative evidence.[42]

[11,12] Relevant evidence is that which has any tendency
to make the existence of any fact that is of consequence to
the determination of the action more probable or less probable
than it would be without the evidence.[43] The probative value
of evidence involves a measurement of the degree to which
the evidence persuades the trier of fact that the particular fact
exists and the distance of the fact from the ultimate issue of
the case.[44]

[13,14] Most, if not all, evidence offered by a party is cal-
culated to be prejudicial to the opposing party.[45] Unfair preju-
dice means an undue tendency to suggest a decision based on
an improper basis.[46] Unfair prejudice speaks to the capacity
of some concededly relevant evidence to lure the fact finder

---

[40] *State v. Valverde, supra* note 4.

[41] See, e.g., *State v. Washington*, 693 N.W.2d 195 (Minn. 2005).

[42] See *State v. Myers, supra* note 29.

[43] *State v. Scott*, 284 Neb. 703, 824 N.W.2d 668 (2012).

[44] *State v. Payne-McCoy*, 284 Neb. 302, 818 N.W.2d 608 (2012).

[45] *Id.*

[46] *Id.*; *State v. Newman, supra* note 29.

into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis.[47] When considering whether evidence of other acts is unfairly prejudicial, we consider whether the evidence tends to make conviction of the defendant more probable for an incorrect reason.[48]

### (iii) Application

Applying these principles to the exhibits in question, we begin with exhibit 266.

### a. Exhibit 266

#### i. Background

In exhibit 266, Oldson writes: "Maybe the problem has been my making girls <u>too</u> high a priority - and having real problems with <u>accepting rejection</u>. Which may be how all this got started. 'Get it any way you can' (?) Doesn't sound like a good attitude. It got me in trouble."

#### a) Theory of Logical Relevancy

The theory of logical relevancy propounded by the State and adopted by the trial court was that this entire statement referred to Oldson's murder of Beard and his reason for killing her. The statement tied into other statements by Oldson that Beard had rejected him on the night of her disappearance.

The court concluded that the exhibit was admissible as evidence of motive and consciousness of guilt. In essence, the court found that the jury could reasonably infer from exhibit 266 that Oldson was acknowledging he had gotten himself into "trouble" because he attempted to "'[g]et it any way you can'" when Beard rejected him on the night of her disappearance.

The defense objected to this statement under rules 403 and 404.

---

[47] See *Old Chief v. United States, supra* note 7.

[48] *State v. Christian*, 237 Neb. 294, 465 N.W.2d 756 (1991).

b) Court Concluded Exhibit Not
Other Acts Evidence

The trial court specifically found that exhibit 266 was not evidence of another act under rule 404(2). The court also reasoned, "[t]he State is not offering this to prove [Oldson] has a character trait (problem with accepting rejection) that causes him or has caused him to murder other women" and, further, that the exhibit "does not indicate or imply that [Oldson] kills women who reject him."

c) Court Gave Limiting Instruction

In consideration of the proper purpose for which the court admitted the statement that Oldson had "problems with accepting rejection," the trial court sua sponte instructed the jury to limit its consideration of exhibit 266. The court orally instructed: "You have seen this evidence for a specific limited purpose. This evidence is being offered for the limited purpose to help you decide motive for the crime [Oldson] is currently charged with. You must consider this evidence only for this limited purpose."

*ii. Analysis*

a) Probative Value: Whether Statement
Referred to Beard Was
Question for Jury

We agree with Oldson that the obtuse style of Oldson's journal writing somewhat lessened the probative value of the journal excerpts.[49] But this does not render them inadmissible.

The probative value of exhibit 266 depended upon the determination that Oldson was writing about Beard. The determination of that foundational fact—that Oldson was referring to Beard—was a fact conditioning the relevancy of exhibit 266.[50]

---

[49] See, *Com. v. Avila*, 454 Mass. 744, 912 N.E.2d 1014 (2009); *Winfield v. U.S.*, 676 A.2d 1 (D.C. 1996).

[50] See, Neb. Evid. R. 104(2), Neb. Rev. Stat. § 27-104(2) (Reissue 2008); 45 Am. Jur. *Trials* 1 (1992).

It was the province of the jury to determine if the excerpt referred to Beard.[51]

The trial court's gatekeeping function was limited to determining whether the jury could reasonably find that conditioning fact by a preponderance of the evidence.[52] The trial court did not abuse its discretion in performing that function. The reasonableness of an inference that the statement in exhibit 266 referred to Beard must be viewed in light of the other evidence presented, especially the other journal excerpts.[53] In exhibit 263, Oldson describes his knowledge that the county attorney wished to bring charges against him regarding "the 'missing one.'" And in exhibit 267, Oldson laments: "I really have no idea about what to do or where to go. My first priority is to get rid of something A.S.A.P.! That is, if I can still find them. The only . . . link left between me and . . . ."

As will be explained below, we find these other journal excerpts admissible in their own right and supportive of the reasonable inference that Oldson was referring in those excerpts to Beard. Viewing the exhibits together, the jury could reasonably infer that when Oldson referred in exhibit 266 to "trouble" and "how all this got started," he was referring, in a purposefully vague way, to the anticipated charges against him for the disappearance of Beard.

### b) Excerpts Not Taken Out of Context, and Defense Could Have Completed Evidence

Oldson argues that the excerpts were unfairly prejudicial because they were taken from the journal out of context. We disagree. If the defense truly thought these excerpts were unfairly taken from the entire journal in a way that was

---

[51] See *id*.

[52] See *Huddleston v. United States*, 485 U.S. 681, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988).

[53] See, e.g., David P. Leonard, *Character and Motive in Evidence Law*, 34 Loy. L.A. L. Rev. 439 (2001).

misleading, the defense could have sought admission of other diary excerpts under the rule of completeness.[54] Moreover, the trial court was presented with the entirety of the journal in performing its gatekeeping function. We have likewise reviewed the journal in its entirety. We do not find any support for Oldson's assertion that by pulling exhibit 266 from its overall context, it became misleading.

#### c) Hobson's Choice Argument

Neither was there a so-called Hobson's choice that rendered exhibit 266 inadmissible. The defense was free to present to the jury the contextual evidence that Oldson was incarcerated for the attempted assault of another woman at the time he wrote this journal entry.

Hobson's choice traditionally means no real choice at all—a choice of taking what is available or nothing at all.[55] It is used to a lesser extent to denote the choice between one of two or more equally objectionable things.[56] This latter definition is apparently the one being used by Oldson, as he does not argue that rule 404 barred him from adducing the evidence. Oldson considered it equally objectionable to stay silent as to other possible contextual explanations of exhibit 266 or to present evidence of the assault for which Oldson was incarcerated at the time exhibit 266 was written. Oldson's solution to this dilemma is that the State should not have been allowed to create it.

Oldson presents no legal authority for this Hobson's choice claim. Oldson tries to incorporate rule 404 into his Hobson's choice argument, but rule 404 does not address the admissibility of evidence based on potential avenues of cross-examination. Furthermore, the logical relevance of any elicitation during cross-examination of the context of the writings

---

[54] See Neb. Evid. R. 106, Neb. Rev. Stat. § 27-106 (Reissue 2008).

[55] Concise Oxford American Dictionary 425 (2006).

[56] Webster's Third New International Dictionary of the English Language, Unabridged 1076 (1993).

would be independent of propensity and accordingly not prohibited under rule 404.

Admittedly, it might be a tough choice between standing silent and presenting evidence that Oldson was referring to an unrelated attempted assault conviction. But tough choices are not uncommon in trials. Hobson's choice arguments such as presented here are rarely found in case law. To the extent such arguments have been raised in similar contexts, most courts have rejected them.

For example, most courts reject "Catch 22" reasoning when considering whether the State can introduce escape as evidence of consciousness of guilt, when it is factually unclear whether the defendant was escaping from the crime he was being tried for or from other charges relating to other bad acts.[57] Courts reason that the defendant should not receive more favorable treatment on the ground that the defendant is alleged to have committed several offenses rather than a single crime.[58]

We are similarly unpersuaded here that the evidence may be rendered inadmissible because it presents a difficult strategic decision due to the defendant's criminal history. We find no legally supportable reason why Oldson's Hobson's choice meant the State could not admit exhibit 266 into evidence for the jury's consideration.

### d) "Pure" Character Evidence

Oldson also argues that exhibit 266 was inadmissible because the statement that he had problems accepting rejection

---

[57] 1 Imwinkelried, *supra* note 11, § 3:05. See, also, *United States v. De Parias*, 805 F.2d 1447 (11th Cir. 1986), *overruled on other grounds, U.S. v. Kaplan*, 171 F.3d 1351 (11th Cir. 1999); *United States v. Kalish*, 690 F.2d 1144 (5th Cir. 1982); *United States v. Boyle*, 675 F.2d 430 (1st Cir. 1982); *State v. Hughes*, 596 S.W.2d 723 (Mo. 1980); *People v. Remiro*, 89 Cal. App. 3d 809, 153 Cal. Rptr. 89 (1979); *Fentis v. State*, 582 S.W.2d 779 (Tex. Crim. App. 1976); *Fulford v. State*, 221 Ga. 257, 144 S.E.2d 370 (1965).

[58] *Id.*

was "pure" character evidence, which he asserts is inadmissible under rule 404(1) under any circumstances.

#### i) Oldson's Argument Abstracts Single Phrase

In arguing that there is a "pure" character statement rendering exhibit 266 inadmissible, Oldson focuses solely on the phrase, "having real problems with <u>accepting rejection</u>," abstracted from the references to "how all this got started" and "[i]t got me in trouble." Oldson thus extracts this one phrase from any context that it referred to Oldson's actions with Beard on the night of her disappearance and his motive for those actions. We find this extraction approach to a single phrase in exhibit 266 unfounded.

#### ii) Statement Not Character Trait

In any event, we find no merit to Oldson's "pure" character arguments as they pertain to this statement. First and most fundamentally, we do not consider that "having real problems with <u>accepting rejection</u>" is a character trait as contemplated by rule 404. It is not a generalized disposition or tendency to act in a particular way in all the varying situations of life, arising from that person's moral being.[59] At most, it is a recurring emotion when encountering a certain situation.

#### iii) Even if Statement Reflects Character, Admissible for Motive

Even if "having real problems with <u>accepting rejection</u>" were reflective of a character trait, it would not thereby be rendered inadmissible. Exhibit 266 was found by the court to be admissible for the limited purpose of showing Oldson's motive for killing Beard. We have explained that motive is the specific state of mind that leads or tempts a person to indulge in a specific criminal act.[60] Motive qualifies as a legitimate noncharacter theory because although character carries a connotation of an enduring general propensity, a

---

[59] See sources cited *supra* note 13.

[60] See, *State v. Torres, supra* note 13; *State v. Floyd, supra* note 38.

motive is a situationally specific emotion.[61] We have already concluded that the jury could reasonably infer from exhibit 266 that Oldson was reflecting upon the fact that he had killed Beard because she rejected him. Thus, the jury could infer that Oldson was stating a situationally specific emotion intrinsic to the charged act. The exhibit was not robbed of this noncharacter logical relevance simply because Oldson chose to write his journal entries in a generalized, obscure, and self-reflective fashion.

### iv) "Character" Evidence Not Prohibited by Rule 404 When Admitted for Proper Purpose

Oldson asserts that because his journal entry is worded in a generalized and obscure fashion, it is "pure" character evidence and is inadmissible even for a proper purpose. Oldson argues that character demonstrated by anything besides other acts can never be admissible for a proper purpose.

[15] We find no merit to this argument. If character evidence is admitted for a proper purpose, then, ipso facto, it is not admitted for the purpose of showing propensity. As such, it does not fall under the general, two-part prohibition found in rule 404(1), that evidence of a person's character or a trait of his or her character is inadmissible for the purpose of proving that he or she acted in conformity therewith.

And Oldson's underlying premise that there ought to be a distinction between when evidence is admissible for a proper purpose based on the form of the proof is inconsistent with the underlying policies of rule 404, which recognize the special danger of other acts evidence. As we have already discussed, indirect evidence of bad character through bad acts is even more harmful than direct opinion or reputation evidence of bad character, because the jury might subconsciously punish the defendant for the prior bad acts, in addition to his or her bad character.

---

[61] 1 Imwinkelried, *supra* note 11, § 3:15.

Admittedly, we find it hard to imagine circumstances where a more traditional notion of a character trait—a generalized characteristic with moral connotations, such as being a violent or dishonest person—could legitimately have "special" or "independent" relevance. But we have already said that this phrase concerning problems with rejection is not really a "character trait" as contemplated by rule 404.

To the extent that character under rule 404 could be seen as encompassing more particular thoughts or feelings, courts generally reject the argument that character can never be admitted for a proper purpose.[62] Under circumstances where the relevance of the evidence is not outweighed by any unfairly prejudicial effect, evidence of far more worse traits than "having real problems with <u>accepting rejection</u>" have been held admissible for a demonstrated proper purpose. This is true regardless of whether the trait was illustrated through other acts evidence or through opinion, reputation, or self-reflective statements by the defendant.[63] Traits such as misogyny,[64] racism,[65] alcoholism,[66] Satanism or witchcraft,[67] and being interested in "wealth, power, and death,"[68] have been found

---

[62] See, *People v. Griffin*, 224 P.3d 292 (Colo. App. 2009); *Masters v. People*, 58 P.3d 979 (Colo. 2002); *People v. Hoffman*, 225 Mich. App. 103, 570 N.W.2d 146 (1997); *State v. Powell*, 793 S.W.2d 505 (Mo. App. 1990); *State v. Crumb*, 277 N.J. Super. 311, 649 A.2d 879 (1994); *State v. Waterhouse*, 513 A.2d 862 (Me. 1986). Compare, *Dunkle v. State*, 139 P.3d 228 (Okla. Crim. App. 2006); *Turpin v. Com.*, 780 S.W.2d 619 (Ky. 1989), *abrogated on other grounds, Thomas v. Com.*, 864 S.W.2d 252 (Ky. 1993); *State v. Johnson*, 71 Ohio St. 3d 332, 643 N.E.2d 1098 (1994).

[63] See *id.*

[64] See, *Masters v. People, supra* note 62; *State v. Johnson, supra* note 62.

[65] See, *People v. Griffin, supra* note 62; *People v. Hoffman, supra* note 62; *State v. Crumb, supra* note 62.

[66] See *State v. Powell, supra* note 62.

[67] See, *Dunkle v. State, supra* note 62; *State v. Powell, supra* note 62, *State v. Waterhouse, supra* note 62.

[68] *Turpin v. Com., supra* note 62, 780 S.W.2d at 620.

admissible for proper purposes, most commonly, to establish motive for what would otherwise be an unprovoked and random act of violence.

Most apposite to the case at hand, courts have found that a defendant's self-reflective statements indicating motive or state of mind for the crime he or she is being charged with are admissible for a proper purpose, especially if made in the context of an admission or statement against interest.[69] Thus, for example, in *People v. Greenlee*,[70] the court held that the defendant's statement in a letter to a friend after the victim's death, commenting on a thriller novel and how he loved when the murder plan came together, "'[w]hich is, of course, how I got in this mess anyway,'" was admissible.[71] The court explained that this statement, combined with statements before the victim's death that the defendant had a plan to shoot and kill a woman and hide her body, was relevant for the proper purpose of proving the defendant's mental state when he shot the victim.[72]

### v) Conclusion

Exhibit 266 was not rendered inadmissible by virtue of being "pure" character evidence.

### e) Unfair Prejudice Did Not Outweigh Probative Value

It is unclear what prejudicial inferences could be made from the phrase "having real problems with <u>accepting rejection</u>" outside of the inference that this statement referred particularly to Beard. That inference is not "unfair." In other words, to the extent Oldson's concern really is that the State

---

[69] See, e.g., *Com. v. Bradshaw*, 86 Mass. App. 74, 13 N.E.3d 638 (2014); *People v. Greenlee*, 200 P.3d 363 (Colo. 2009); *Masters v. People, supra* note 62.

[70] *People v. Greenlee, supra* note 69.

[71] *Id*. at 367.

[72] *Id*.

is trying to obtain a conviction through a prohibited character attack, then we cannot fathom what bad character trait leading to a conviction could be derived from this so-called pure character statement. Many people dislike rejection. There is no inherent propensity inference that people who have problems with accepting rejection are violent to those who reject them.

Balancing the probative value of evidence against the danger of unfair prejudice is within the discretion of the trial court, whose decision we will not reverse unless there is an abuse of discretion.[73] As one court said, "'Only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect.'"[74] The trial court did not abuse its discretion in determining that the danger of unfair prejudice did not outweigh the probative value of exhibit 266.

### b. Exhibit 270

We turn next to exhibit 270.

### i. Background

Oldson states:

> Love that gut, tummy, belly, abdomen, stomach, midriff, middle, torso, etc. Extensive experience comes with Sandy, Dondie, C.B., and Linda. Other mediocre experiences with Robin, Cathie, Shirley,[(o)] Shawna, Alyce, K.P., [[illegible]] Donna H., Irma S., Allison, Ronda (from G.I. 1980), Mary Jane, Teresa, 2116; resident upstairs; 1980, Salinas 1987, Lincoln 48th/Leighton [(1989)], Darlene, Connie, Pam, Tammy S., Cami G, Bonnie M, Carolyn D, et. al. List remains incomplete. Will add more as

---

[73] See, *State v. Castillas*, 285 Neb. 174, 826 N.W.2d 255 (2013), *disapproved on other grounds, State v. Lantz*, 290 Neb. 757, 861 N.W.2d 728 (2015); *State v. Payne-McCoy, supra* note 44.

[74] *U.S. v. Bello-Perez*, 977 F.2d 664, 670 (1st Cir. 1992).

more comes available. For now, must rate C.B. as most gratifying, Sandy as most comfortable, Teresa as prettiest, maybe Darlene. Just don't know - they[']re all so nice. YUH! Go on and gitcha some!

Defense counsel argued that the exhibit was inadmissible in its entirety. The defense objected at trial to exhibit 270 under rules 403 and 404(1) and (2). The defense resisted any compromise that would strike portions of this excerpt.

### a) Theory of Logical Relevancy

In allowing exhibit 270 into evidence, the trial court implicitly determined that exhibit 270 supported the reasonable inference that Oldson had sexual contact with Beard on the night of her disappearance. The court also specifically stated that exhibit 270 was relevant to "disprove an exculpatory statement made by [Oldson] that he did not have sex until he was married and/or that he did not have sex with . . . Beard."

### b) Limiting Instruction

The court did not specifically instruct the jury as to exhibit 270, but generally instructed, sua sponte, as to all the journal excerpts as follows:

> Jurors, you are now seeing evidence that is being submitted to you for a specific limited purpose. This evidence is being offered for the limited purpose to help you decide what if any knowledge [Oldson] had of . . . Beard, the nature and extent of any relationship he and . . . Beard may have had, and for the purpose of evaluating [Oldson's] credibility with respect to any other statements that he made. You must consider this evidence only for this limited purpose.

### ii. Analysis

Oldson makes several disparate arguments on appeal concerning exhibit 270. First, Oldson argues that the sentence referring to Oldson's affinity for the midriff area is, similarly to the "having real problems with <u>accepting rejection</u>,"

inadmissible "pure" character evidence. Oldson claims that the sentence indicates a "stomach fetish" and that the State was attempting to influence the jury to convict Oldson because of his "creepy" sexual interests.[75]

Second, Oldson argues that it was improper for the State to introduce this excerpt for "impeachment" purposes when the inconsistent statements Oldson made indicating he was a virgin and that he had no sexual relationship with Beard were introduced by the State, not by Oldson.[76]

Third, Oldson argues that in order for the diary excerpt to be relevant for any proper purpose, the State needed to prove by clear and convincing evidence that sexual "acts" with all the women listed actually occurred.[77]

Fourth, and apparently alternative to his third argument, Oldson asserts that the excerpt is ambiguous—that the list of names might refer "merely to fantasies" instead of actual acts.[78] Further, "C.B." might not actually refer to Beard. In such case, Oldson argues that in order to clarify that the list referred only to fantasies, he was presented again with the Hobson's choice of either not making such argument or submitting to the jury unfairly prejudicial character evidence of his "unusual sexual proclivities."[79]

Finally, Oldson generally argues that any probative value of exhibit 270 was outweighed by its unfair prejudice and its tendency to confuse and mislead the jury.

### a) Relevant for Consciousness of Guilt

We agree with the trial court that exhibit 270 was relevant insofar as it supported the reasonable inference that Oldson had sexual contact with Beard. Evidence that Oldson had sexual

---

[75] Brief for appellant at 55, 61.

[76] *Id.* at 61.

[77] *Id.*

[78] *Id.*

[79] *Id.* at 66.

contact with Beard was circumstantial evidence of his guilt because Oldson had stated he was a virgin, Oldson and Beard had apparently not had a sexual relationship prior to her disappearance, and Oldson said that Beard rejected Oldson's sexual advances on the night of her disappearance.

In other words, if Oldson had sexual contact with Beard, then at least some of his prior exculpatory statements about his relationship with Beard and the events of the night of her disappearance were false. Prior false exculpatory statements are probative of the defendant's consciousness of guilt.[80] When the evidence is sufficient to justify an inference that the defendant acted with consciousness of guilt, the fact finder can consider such evidence even if the conduct could be explained in another way.[81]

### b) Sexual Contact With Beard Contemporaneous With Killing Is Not Other Acts Evidence

Evidence supporting the reasonable inference that Oldson had sexual contact with Beard on the night of her disappearance does not present a rule 404 issue, because it does not concern "other" acts. Rather, it concerns an act intrinsic to the crime. The State's theory of the case was that Oldson killed Beard in the course of a sexual assault. That the jury did not ultimately convict on that concurrent assault charge does not retrospectively change the nature of the evidence to be of "other acts."

### c) List of Other Women

#### i) Whether Oldson Had Sexual Contact With Other Women Listed Is Irrelevant to Logical Relevance of Excerpt

The trial court explicitly stated that exhibit 270 was not to show that Oldson had sexual contact with the other women

---

[80] *State v. Draganescu*, 276 Neb. 448, 775 N.W.2d 57 (2008).

[81] *Id.*

listed. The relevancy of this list of names, as the State pointed out, was to support the inference that "C.B." referred to Beard.

In a list of names, "C.B." is the only person referred to solely by two initials. In his brief on appeal, even Oldson recognizes that "the entire list is needed to demonstrate that Oldson is referring to . . . Beard."[82] Rule 404 has no application when the relevancy of the evidence does not depend on the actual occurrence of the other act indicated by a statement, but instead upon the statement itself.[83]

Oldson's argument that the other women listed could have been mere fantasies does nothing to further the argument that the list of women somehow fell under rule 404. Such a possibility likewise does not undermine the logical relevance of the list of women. In other words, it would not follow that because Oldson's sexual "experiences" with the other women listed were fantasies, the "most gratifying" "experience" with "C.B." was also a fantasy.

We have already rejected Oldson's Hobson's choice arguments and find them no more persuasive in the context of exhibit 270.

*ii) Limiting Instruction*

We find it pertinent that the court specifically instructed the jury with regard to the diary excerpts that it was to focus on the limited purposes of the nature and extent of any relationship Oldson had with Beard and the credibility of Oldson's prior statements. While it may have been appropriate to give the jury a more specific limiting instruction for exhibit 270, defense counsel did not request any such limiting instruction. Thus, the defense has waived any error in the failure to give

---

[82] Brief for appellant at 66.

[83] See *State v. Nissen*, 252 Neb. 51, 560 N.W.2d 157 (1997). See, also, *State v. Williams*, 282 Neb. 182, 802 N.W.2d 421 (2011).

one.[84] Likewise, to the extent that there was a special risk of prejudice because one of the listed names may have referred to Oldson's sister, defense counsel could have asked that particular name be stricken. Defense counsel did not.

### iii) Other Women Not Uncharged Misconduct to Be Proved by Clear and Convincing Evidence

Because the relevancy of the references to other women did not depend on the occurrence of any actual sexual acts with those women, there was nothing that needed to be proved under rule 404(3) by clear and convincing evidence.

### iv) Reference to Other Women Not Unfairly Prejudicial

Any unfair prejudice from other acts inferences that the jury could have derived as to the other women listed would be minimal. When the evidence merely implies uncharged misconduct, courts tend to find any error in admitting the evidence to be harmless.[85] Furthermore, "[w]hen the act is lawful or a mere tort rather than a crime, there is less risk of prejudice; and evidence of the act is all the more admissible."[86] While promiscuity or even sexual fantasies might be considered by some people to be reflective of a bad character trait, it is hardly the kind of character trait that would compel a jury by improper propensity reasoning to convict a defendant of murder.

### d) No "Creepy" Fetish Reference

Turning our attention to the first sentence of exhibit 270, we are generally unconvinced by Oldson's characterization

---

[84] See, *State v. Foster*, 286 Neb. 826, 839 N.W.2d 783 (2013); *Olson v. Sherrerd*, 266 Neb. 207, 663 N.W.2d 617 (2003); *State v. Scott*, 200 Neb. 265, 263 N.W.2d 659 (1978); *Stapleman v. State*, 150 Neb. 460, 34 N.W.2d 907 (1948); *Sedlacek v. State*, 147 Neb. 834, 25 N.W.2d 533 (1946).

[85] 1 Imwinkelried, *supra* note 11, § 2:16.

[86] 1 Imwinkelried et al., *supra* note 20, § 904 at 371.

of exhibit 270 as "character evidence" of a "creepy" "stomach fetish."[87]

To begin with, Oldson's perspective on this sentence seems clouded by a plethora of evidence and a theory of the prosecution that was never presented to the jury. Although the State sought to introduce evidence that Oldson had a fetish that involved cutting the abdomen area and that Beard's abdomen had been cut in the course of her murder, it was not allowed to do so. Such evidence, had it been presented, would have portrayed Oldson's midriff affinity in a darker light.

But the only evidence presented to the jury even remotely touching upon Oldson's sexual preferences was the first sentence of exhibit 270: "Love that gut, tummy, belly, abdomen, stomach, midriff, middle, torso, etc." The jury was presented with absolutely no evidence that such an affinity for the midriff area was connected with violence, or that Beard's murder involved her midriff area.

Reference to a female body part simply clarified the sexual nature of the other sentences. This illustrated that the "experiences" Oldson referred to throughout the excerpt were sexual experiences, either real or imagined. As even defense counsel noted, "[Y]ou can't understand what this means without seeing the stomach issues and talking about the sexual interests."

[16] This brings us to another point. If the defense was particularly concerned about references to the midriff area, it could have sought a compromise whereby that sentence was stricken and substituted with a more general explanation of context. Instead, defense counsel pursued a scorched earth policy. We will not allow defendants to gain an advantage on appeal by failing to pursue strategies at trial to minimize prejudice.

We have already rejected Oldson's arguments pertaining to so-called pure character statements when used for nonpropensity purposes. The logical relevancy of Oldson's affinity

---

[87] Brief for appellant at 55, 61.

toward midriffs did not depend upon propensity reasoning. And it is hard to imagine how the jury could ever derive, through propensity reasoning, that because Oldson liked women's midriffs, he killed Beard.

### e) No Abuse of Discretion in Concluding Exhibit 270 More Probative Than Unfairly Prejudicial

Whether Oldson was referring to Beard and a sexual experience with Beard the night of her disappearance was for the jury to decide, and the inferences that might follow from such determination would not be unfairly prejudicial. Balanced against this probative nature of exhibit 270 was the possible inference of promiscuity, an affinity for midriffs, and the extremely remote inference of incest that defense counsel arguably waived by failing to ask the court to strike one name from the list of names in the excerpt. The trial court did not abuse its discretion in its exercise of its gatekeeping function by determining that the probative value of exhibit 270 outweighed the danger of unfair prejudice.

### f) Not Inadmissible Because Relevance Dependent Upon Other Evidence Entered by State

Finally, we find no merit to Oldson's argument that the admission of exhibit 270 was improper because its relevance depended in part upon Oldson's previous statements, introduced by the State, which indicated that he did not have sexual contact with Beard. The case law Oldson relies on does not stand for the proposition he propounds. We have said that impeachment may not be utilized as an artifice for the purpose of putting before the jury substantive evidence that is otherwise inadmissible.[88] But demonstrating that a prior, nontestamentary exculpatory statement is false is not the same thing

---

[88] See *State v. Jackson*, 217 Neb. 363, 348 N.W.2d 876 (1984). See, also, e.g., *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011).

as impeachment. Besides that, the evidence in exhibit 270 pertaining to Oldson's relationship with Beard cannot be said to be otherwise inadmissible. Finally, the evidence of Oldson's prior statements concerning his relationship with Beard and the events of the night of her disappearance cannot be characterized as merely an artifice. We find no basis for concluding that exhibit 270 is inadmissible simply because its relevance is connected to other evidence properly admitted by the State.

### c. Exhibits 263, 264, 265, 267, 268, 269, and 271

The remaining excerpts from Oldson's journal concern Oldson's apparent reflections on being a suspect in police investigations of Beard's disappearance, and we address them together.

### *i. Background*

In exhibit 263, Oldson writes: "I guess the whole import of this thing with the 'missing one' has not hit home, yet. But it should, as they are now looking for charges. If they do prefer charges, well - ? I don't see how they can hang me for anything."

In exhibit 265, he writes: "Well, it looks as if this foolishness about the missing doo-doo has reached a point where the end is in sight. That's good. I like it - perhaps now I can ease my mind."

In exhibit 267, Oldson writes:

> I really have no idea about what to do or where to go. My first priority is to get rid of something A.S.A.P.! That is, if I can still find them. The only . . . link left between me and . . .
>
> But after that, I imagine I'll stay in the Midwest and try something. Maybe stick around here to work for Pop. He no doubt needs the help. And I could use the $ . . . .

In exhibit 268, Oldson writes: "Well, there it is. What's next, I wonder? It's gettin' closer - and G.S. and the Fried Eggplant gang aren't movin' - although they still could, conceivably.

How, I don't know - in fact, [illegible] wonder if there is <u>any</u> way he could even manufacture something? I doubt it."

Finally, in exhibit 269, Oldson writes:

Fried Eggplant gang ain't makin' it - they're gonna slip and fall and just generally fu— up! That's nice . . .

I'm gonna get away and I'll bet it breaks their yellow hearts - they're so dead-set that I did this and they're not gonna look any farther unless they are forced to. Well; now, they'd best look elsewhere, 'cuz I refuse to be a part of this charade any longer. I'm well fed up with this . . . tomfoolery - they can stick it in their asses. So there.

### ii. Analysis

#### a) Exhibits Not Unfairly Prejudicial

For the most part, Oldson argues only that these exhibits were inadmissible under rule 403. Oldson argues that these excerpts have limited probative value due to their ambiguity. Oldson claims this ambiguity is due, in part, to the excerpts' being taken out of context. Oldson asserts that the exhibits' limited probative value must be balanced against the unfair prejudice of the Hobson's choice Oldson was faced with in deciding whether to give the excerpts more proper context for the jury.

We have already discussed at length the Hobson's choice theory formulated by Oldson in this appeal, and we find no merit to it. Moreover, we find no basis for concluding that the excerpts have been manipulated into a disingenuous light by being taken out of the overall context of the journal.

Specifically, our reading of the exhibits in the context of the entirety of the journal supports the inference that Oldson was referring in these exhibits to Beard and not to the crime for which he was incarcerated at the time the diary was written or for some other crime for which he was under investigation. Surrounding these excerpts, Oldson repeatedly expressed his frustration that he was not allowed a work release. He mentions Beard by name, stating that the Valley County Attorney

was "so obsessed with Beard." It appears Oldson thought he was not getting a work release because the county attorney and other law enforcement, which he called the "Fried Eggplant gang," considered him the primary suspect in Beard's disappearance. As Oldson approached his release date, he expressed concern that law enforcement did not want to let him out of jail and that he would have to come back.

Although Oldson points out that when he wrote about getting rid of something "A.S.A.P.," he was incarcerated and therefore could not have access to whatever thing he wished to get rid of, he was approximately 2 months from release. The surrounding context of that excerpt indicates Oldson was writing about his plans upon release.

### b) Future Intention Is Not Other Acts Evidence

We reject any suggestion by Oldson that writing one's future intention to destroy evidence is evidence of other acts within the purview of rule 404. The writing, stating an intention to get rid of evidence, was not itself a legally cognizable act. Moreover, we have said that destruction of evidence of the crime charged is inextricably intertwined with the crime.[89]

### c) Probativeness, Though Sometimes Limited, Not Outweighed by Unfair Prejudice

We agree with Oldson that many of these exhibits are "barely inculpatory."[90] But to the extent that some of these exhibits lack great probative value, neither are they particularly prejudicial. And those exhibits that are somewhat more prejudicial also have more probative value.

As Oldson points out, exhibits 268 and 269 are largely exculpatory. Oldson opines in exhibits 268 and 269 that the only way law enforcement could bring charges against him

---

[89] See *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

[90] Brief for appellant at 64.

is if it manufactured evidence. But, for the most part, we disagree with Oldson's characterization of the exhibits as painting Oldson to be a "strange and obnoxious" character.[91] Instead, Oldson paints himself as justifiably angry.

In exhibits 269 and 271, Oldson admittedly expresses some unseemly disdain for law enforcement. But balanced against the prejudicial nature of the expressions of disrespect for law enforcement, exhibits 269 and 271 are probative of Oldson's guilt. The jury could reasonably infer from exhibit 269 that Oldson thought he would "get away," because law enforcement was going to make mistakes. The jury could reasonably infer from exhibit 271 that law enforcement would not find any incriminating evidence, because Oldson had particular knowledge about the evidence.

The oblique nature of Oldson's references to Beard in exhibits 263, 264, 265, and 267 or evidence relating to her disappearance—"the 'missing one,'" "certain things," "the missing doo-doo," and Oldson's stating he needed to "get rid of something A.S.A.P."—are even more probative and less "unfairly" prejudicial. These excerpts support the inference of a guilty conscious. "'No one doubts that the state of mind which we call "guilty consciousness" is perhaps the strongest evidence . . . that the person is indeed the guilty doer; nothing but an hallucination or a most extraordinary mistake will otherwise explain its presence.'"[92]

Consciousness of guilt may generally be inferred from the intent of or an attempt by the accused to conceal, alter, or remove evidence of the crime. In this case, consciousness of guilt could be inferred from Oldson's reference to a need to "get rid of something A.S.A.P."[93] Consciousness of guilt

---

[91] *Id*.

[92] *State v. Clancy*, 224 Neb. 492, 499, 398 N.W.2d 710, 716 (1987) (quoting 2 John Henry Wigmore, Evidence in Trials at Common Law § 273(1) (James H. Chadbourn rev. ed. 1979)), *disapproved in part on other grounds, State v. Culver*, 233 Neb. 228, 444 N.W.2d 662 (1989).

[93] See 29A Am. Jur. *Evidence* § 819 (2008).

may also be inferred from the secretive way in which Oldson referred to Beard throughout his writings. Balanced against such probative value is only the disrespectful tone that such references demonstrate.

The court did not abuse its discretion in finding exhibits 263, 264, 265, 267, 268, 269, and 271 admissible under rule 403.

#### d. Taking Exhibits Into Jury Room

Oldson's last argument and assignment of error pertaining to all the journal excerpts is that the court erred in allowing them in the jury room during deliberations. On this point, Oldson asks that we reconsider our opinion in *State v. Vandever*.[94] In *Vandever*, we held that heightened procedures under Neb. Rev. Stat. § 25-1116 (Reissue 2008), for refreshing the jury's memory with regard to recorded testimony, is limited to testimonial evidence. We explained that "testimonial evidence" for purposes of § 25-1116 encompasses only live testimony at trial by oral examination or by some substitute for live testimony that is a recording of an examination conducted prior to the time of trial and for use at trial.[95]

Oldson's journal was neither an examination nor a preparation for use at trial. It was not introduced as a substitute for live testimony. We decline Oldson's invitation to reconsider our opinion in *Vandever*. Therefore, we conclude that the trial court did not abuse its discretion in allowing exhibits 263 through 271 to go back to the jury room like any other exhibit entered into evidence during trial.

#### 3. Witnesses Kittinger and Dasher: Hybrid Hobson's Choice With Right to Confrontation and Presumption of Innocence

Oldson next makes several arguments pertaining to witnesses Dasher and Kittinger, asserting that the admission of their testimony presented a different kind of Hobson's choice:

---

[94] *State v. Vandever*, 287 Neb. 807, 844 N.W.2d 783 (2014).

[95] *Id*. at 815, 844 N.W.2d at 790.

one that violated his right to confrontation and the presumption of innocence.

### (a) Background

#### *(i) Dasher*

Dasher testified at trial that both Oldson and Oldson's father had threatened her in order to prevent her from reporting the comments Oldson had made to her concerning Beard. When Dasher testified that Oldson's father had threatened her, the defense moved for a mistrial. The defense argued that the fact that Dasher was mentioning the threat by Oldson's father for the first time at trial indicated her credibility was questionable. The defense then argued it was not in a position to attack Dasher's credibility in the way it fully merited "because of the 404 issues."

The defense elaborated outside the presence of the jury that according to past statements, Dasher had heard Oldson also threaten his sister. The defense claimed that Dasher was making things up and that the defense was unable to properly cross-examine Dasher without presenting prior bad acts to the jury concerning Oldson's relationship with his sister. The defense also noted that Dasher had previously made allegations against Oldson that were never pursued by law enforcement or corroborated, but it did not want to present those accusations to the jury.

The court overruled the motion for mistrial. When Dasher continued to testify that she did not report Oldson's statement to law enforcement right away because she did not think Oldson was guilty, the defense again moved for a mistrial, arguing that the line of questioning was "walking down a path or expecting her to say . . . I didn't say it because I was scared of him which are 404 issues." The second motion for mistrial was overruled. Little testimony was elicited from Dasher afterward.

Subsequently, a hearing was held for purposes of creating a record for appellate review on the motion for mistrial.

The defense entered into evidence investigative reports of interviews which the defense argued demonstrated Dasher's inconsistent statements and lack of truthfulness. The reports generally describe transgressions by Oldson against Dasher, her daughter, and Oldson's sister.

### (ii) Kittinger

The defense had moved in limine to exclude Kittinger's testimony reporting that the day after Beard's disappearance, when a law enforcement vehicle approached, Oldson said law enforcement was probably looking for him. As relevant here, the defense objected on the ground that Kittinger's testimony presented a Hobson's choice, wherein the defense would be unable to effectively cross-examine Kittinger without opening the door to inadmissible prior bad acts, in violation of rule 404(2). In this regard, the defense explained that in a prior statement to law enforcement, Oldson's father, deceased, said that the statement Kittinger referred to had really occurred after a different incident in November 1989, for which Oldson was ultimately incarcerated in 1990.

Defense counsel was allowed to question Kittinger, under oath, outside the presence of the jury. But the defense did not question Kittinger about whether Oldson's statement could have been made at a later date, sometime in November 1989. The court overruled the motion in limine.

### (b) Standard of Review

A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[96]

### (c) Analysis

Oldson argues broadly that the admission of the testimony of Dasher and Kittinger violated his right to confrontation and

---

[96] *Sturzenegger v. Father Flanagan's Boys' Home, supra* note 5.

the presumption of innocence by placing him in a Hobson's choice. Oldson claims both witnesses were actually recalling unrelated other acts. He argues that, at the very least, this Hobson's choice rendered the testimony of these witnesses more prejudicial than probative under rule 403. He does not argue specifically that the court erred in denying his motion for mistrial on these grounds. Thus, we consider these arguments in the context of the admissibility of Dasher's and Kittinger's testimony, and whether the trial court abused its discretion in allowing those witnesses to testify.

[17] An accused's constitutional right of confrontation is violated when either (1) he or she is absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness or (2) a reasonable jury would have received a significantly different impression of the witnesses' credibility had counsel been permitted to pursue his or her proposed line of cross-examination.[97]

[18] Under the presumption of innocence, the State must establish guilt solely through the probative evidence introduced at trial.[98] The right to a fair trial requires courts to be alert to courtroom practices that undermine the fairness of the factfinding process.[99] The jury's verdict must rest on a dispassionate consideration of the evidence.[100] Guilt shall not be founded on official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.[101]

The principles underlying the rights to confrontation or to a fair trial add nothing to our analysis of the merits of Oldson's Hobson's choice argument. In fact, that argument seems especially disingenuous as it pertains to Dasher and Kittinger. The

---

[97] *State v. Ballew*, 291 Neb. 577, 867 N.W.2d 571 (2015).

[98] *State v. Iromuanya, supra* note 88.

[99] *Id.*

[100] *Id.*

[101] *State v. Parker*, 276 Neb. 661, 757 N.W.2d 7 (2008).

trial court went out of its way to allow a cross-examination of those witnesses outside the presence of the jury in order to determine that their testimony was not a confused recollection of other acts. Furthermore, Oldson argues that much of the incidents of misconduct Dasher reported were "wild accusations."[102] We do not understand how making the choice to reveal wild accusations during cross-examination could violate rule 404.

[19] While rule 404 may prevent the admission of other acts evidence for propensity purposes as a protection of the presumption of innocence,[103] it does not follow that the State violates due process by adducing testimony that could result in the revelation of other acts if the defense chooses to pursue certain lines of questioning on cross-examination. Whatever choice was presented to defense counsel through the presentation of these two witnesses, such choice did not violate Oldson's right to confrontation, to a fair trial, or rule 404. And no unfair prejudice derived from Kittinger's and Dasher's testimony insofar as the other acts evidence was not presented to the jury by the State. Thus, neither did their testimony violate rule 403.

### 4. TAMPERING WITH WITNESSES

We turn next to Oldson's argument that, in violation of due process principles concerning the right to present a complete defense, the police tampered with witnesses Donnelson and Walkowiak. With regard to Donnelson, the defense moved in limine to exclude her testimony. And, although the motion was overruled, she was not called as a witness by the State. The defense did not articulate at trial a due process, witness tampering claim outside of the motion to exclude Donnelson's testimony. We conclude that the defense has presented no

---

[102] Brief for appellant at 120.

[103] See *State v. Glazebrook*, 282 Neb. 412, 803 N.W.2d 767 (2011).

cognizable assignment of error concerning any alleged witness tampering of Donnelson that was preserved below. Therefore, we address only the allegations regarding Walkowiak.

## (a) Background

### (i) Objections and Rulings

The defense moved in limine to prevent "any law enforcement officer to testify in any manner to rebut . . . Walkowiak's past recollection recorded using any information that was obtained from an interview that law enforcement conducted on August 24, 2011." The court granted the motion. The court found that a significant number of the 2011 statements were obtained in an "unfair manner," as they were based on questions that misrepresented facts and confused the witness.

Defense counsel asked the court, further, to declare Walkowiak incompetent to testify and unavailable, so that rather than allowing Walkowiak to testify at trial, the defense could simply publish to the jury a statement Walkowiak made to law enforcement in 1989. The defense argued that Walkowiak's recollection was irreparably confused by the 2011 interview and that the only reliable evidence as to what Walkowiak witnessed on the night of Beard's disappearance was what he had said in the 1989 interview. The court overruled the defense's motion to declare Walkowiak unavailable. The defense thereafter withdrew any prior motion it had made to declare Walkowiak incompetent to testify.

### (ii) 1989 Statement

In a 1989 statement to law enforcement, Walkowiak said that he looked out the window of the back door to the alley after Oldson and Beard walked out. He witnessed Beard get into a medium-blue Ford pickup truck with "88 county" license plates. He said there were two men in the truck. The driver had a red beard and a ponytail, and the other man had a black beard and black hair. Oldson was still standing in the alley, and Walkowiak saw Oldson walk away.

### (iii) Multiple Interviews and
### Multiple Stories

Law enforcement interviewed Walkowiak multiple times after the 1989 interview. These other interviews were apparently conducted in 1990, 1992, and 2010 and are not in the record.

### (iv) Walkowiak's Testimony at Hearing
### on Motion in Limine

At a hearing outside the presence of the jury, Walkowiak testified that when interviewed more recently in 2011, law enforcement told him there was no window in the back door at the Someplace Else Tavern. Walkowiak said when he insisted that he must have opened the door, the officer became upset and threatened to throw him in jail.

Walkowiak testified that he still vaguely remembered some parts of what had occurred on May 31, 1989. He was presented with the 1989 interview to refresh his recollection. Walkowiak testified that he remembered Beard voluntarily crawled into a blue truck with "88 county" plates. The driver had a red beard and carried a "big knife on his side." Walkowiak testified that he saw Oldson climb into the truck with Beard and the red-bearded man.

### (v) 2011 Interview

A full transcript of the 2011 interview was entered into evidence for purposes of the hearing. In the beginning of the interview, Walkowiak testified that he saw Beard leave with Oldson out the back door into the alley. He said he did not see Oldson or Beard after that. The door to the alley, Walkowiak said, was solid; there was no window in it. When thereafter confronted with his 1989 interview, Walkowiak recalled that there was a window in the door to the alley and that he had watched Beard climb into a pickup with a man with a red beard.

When, moments later, law enforcement assured Walkowiak that he had nothing to fear from Oldson anymore, Walkowiak

said he did not see anything after Beard and Oldson left through the back door of the Someplace Else Tavern. When law enforcement officers pressed Walkowiak to tell him who had him make up the story about the "88 county" truck, Walkowiak denied that anyone had told him to tell the story. He could not recall why he had told that story before. Then Walkowiak said that sometimes he thought the red-bearded man story was the truth and that sometimes he thought it was not.

The officers tried to focus Walkowiak's attention on getting justice for Beard and closure for Beard's sister. The officers emphasized that they knew Walkowiak was not involved in Beard's disappearance but that they needed him to tell the truth. At some later point in the interview, as tensions rose, an officer suggested that there was no window in the back door of the bar, so the statement in 1989 could not be accurate. Walkowiak said he simply did not remember giving the statement in 1989.

The interviewing officers continued to press Walkowiak for information about why he told the red-bearded-man story. The questioning became more forceful. Eventually, one of the officers told Walkowiak firmly that there was no window in the back door of the Someplace Else Tavern. After a break, Walkowiak stated, "The more I think about it, that story comes to mind." And because he had apparently seen it with his "own two eyes," if there were no window in the back door, he must have walked into the alley. Walkowiak could not imagine himself making up a story about Beard's leaving with a red-bearded man, so "that's what I must have seen."

Shortly after that, however, upon the law enforcement officers' suggestions, Walkowiak confirmed he probably had just heard the story around town and repeated it. Five minutes later, Walkowiak said that that was a lie; he did not hear the story from anybody. When one of the officers eventually pointed out that they were "just going in a big circle," Walkowiak responded, "Yeah, I know it. I wish I could get off the circle. I don't want to be in no circle anymore." When asked by law

enforcement what they were supposed to think, Walkowiak responded, "That I'm a confused person on this."

### (vi) Walkowiak's Testimony at Trial

As set forth in the background section, Walkowiak testified before the jury that he was at the Someplace Else Tavern on May 31, 1989, and saw Beard talking with a man with a red beard and other "[c]ommon-looking guys" with black beards. The man with the red beard had a ponytail and a knife "hanging on his side." Walkowiak also saw Oldson and Beard talking and go out together to the back alley. The bearded men had left the Someplace Else Tavern just prior to that. Walkowiak looked out the back alley and saw a blue truck with "88 county" license plates. The same men he saw Beard talking to in the bar were in the pickup. It seemed like an "awful crowded pickup." Walkowiak testified that he saw Oldson get into the truck with Beard and the other men.

Defense counsel confronted Walkowiak with his statement from 1989 wherein he said that Oldson had walked away and did not go into the truck. Walkowiak testified that he did not know why he had said that. The defense proceeded to read extensively and repeatedly from Walkowiak's 1989 interview. Walkowiak testified that he did not remember the 1989 interview and that his memory of the night of May 31, 1989, was better now than it was then.

### (b) Standard of Review

It is within the discretion of the trial court to determine whether the unavailability of a witness under Neb. Evid. R. 804, Neb. Rev. Stat. § 27-804 (Reissue 2008), has been shown.[104] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and the evidence.[105]

---

[104] *State v. Kitt*, 284 Neb. 611, 823 N.W.2d 175 (2012).

[105] *Id.*

(c) Analysis

It is not entirely clear what precise error Oldson asserts the trial court made. Oldson was denied his request to have Walkowiak declared unavailable so that Oldson could submit to the jury only prior police reports in which he said he saw Beard leave with other men on the night of her disappearance. Oldson sought to avoid the jury's learning of Walkowiak's more recent recollection that Oldson also left with Beard and the other men on the night of her disappearance. We find no error in this ruling.

Oldson's argument that Walkowiak was unavailable—despite his presence, willingness to testify, and affirmation that he recalled the events of the evening in question—was based loosely on accusations that the police had deliberately confused Walkowiak during questioning in order to turn what were once exculpatory accounts into inculpatory ones. Rule 804 sets forth the examples of witness unavailability. The most pertinent provisions are in rule 804(1)(c) and (d): "(c) Testifies to lack of memory of the subject matter of his statement; or (d) Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity." Rule 804 also generally provides: "A declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying."

[20] Oldson does not rely on rule 804, however. He relies on broad due process propositions to argue Walkowiak was unavailable. He points out that whether rooted directly in the Due Process Clause of the 14th Amendment or in the Compulsory Process or Confrontation Clause of the 6th Amendment, the federal Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.[106] We can find no case law discussing whether an

---

[106] *State v. Phillips*, 286 Neb. 974, 840 N.W.2d 500 (2013).

alleged due process violation based on improper police questioning could render a defense witness unavailable, and Oldson points to none.

[21,22] The right to present a defense is not unqualified and is subject to countervailing public interests such as preventing perjury and investigating criminal conduct.[107] Furthermore, the aim of the requirement of due process is not to exclude presumptively false or unreliable evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false.[108] "Only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice'" has the U.S. Supreme Court imposed a "constraint tied to the Due Process Clause."[109]

*Webb v. Texas*[110] is the principal case that Oldson relies on in making his due process arguments. In *Webb*, the trial judge on his own motion admonished the defense's only witness during a temporary recess before the witness was to be called. The U.S. Supreme Court described the trial judge as having "gratuitously" singled out the witness for not only a lengthy admonition on the dangers of perjury, but also to imply he expected the witness to lie, and to "assure" the witness that he would personally see that the witness would be prosecuted if he lied.[111] The trial court had also described in detail to the defense witness the detrimental consequences of a perjury

---

[107] See, *Taylor v. Illinois*, 484 U.S. 400, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988); *Buie v. Sullivan*, 923 F.2d 10 (2d Cir. 1990); *United States v. Whittington*, 783 F.2d 1210 (5th Cir. 1986).

[108] See *Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

[109] *Perry v. New Hampshire*, ___ U.S. ___, 132 S. Ct. 716, 723, 181 L. Ed. 2d 694 (2012).

[110] *Webb v. Texas*, 409 U.S. 95, 93 S. Ct. 351, 34 L. Ed. 2d 330 (1972). See, also, e.g., *U.S. v. Heller*, 830 F.2d 150 (11th Cir. 1987).

[111] *Webb v. Texas, supra* note 110, 409 U.S. at 97.

conviction for the witness' present sentence and possibility for parole.[112] The witness chose not to testify.[113]

The U.S. Supreme Court reasoned that in light of the great disparity between the posture of the presiding judge and that of the witness, and the unnecessarily strong terms used, the judge "could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify."[114] The Court held that the trial judge had driven the witness off the stand and had thereby deprived the defendant of due process of law under the 14th Amendment.

We similarly held in *State v. Ammons*,[115] that the defendant was deprived of due process when the prosecutor drove a material defense witness off the stand by threatening that the witness' prior plea agreement would be null and that the witness would be prosecuted if he testified at the defendant's trial. The witness was going to admit that he, not the defendant, was the true perpetrator.[116] But after the discussion with the prosecutor, the witness took the Fifth Amendment and refused to testify. We said that "[t]he constitutional right of a defendant to call witnesses in his defense mandates that they must be called without intimidation. A prosecutor may impeach a witness in court but he may not intimidate him in or out of court."[117] We explained that if prejudice results from intimidation of a witness, a defendant is deprived of due process.[118]

[23,24] Oldson argues that the police, during the 2011 interview, acted on behalf of the State in intimidating Walkowiak

---

[112] *Id.*

[113] *Id.*

[114] *Id.*, 409 U.S. at 98.

[115] *State v. Ammons*, 208 Neb. 797, 305 N.W.2d 808 (1981).

[116] *Id.*

[117] *Id.* at 801, 305 N.W.2d at 811.

[118] *State v. Ammons, supra* note 115.

into changing his eyewitness report. But even in the context of confessions by an accused, lying, good cop/bad cop, and other tactics designed to play on the interrogee's sense of responsibility or guilt have been held under the circumstances not to violate due process. For example, the U.S. Supreme Court, in *Frazier v. Cupp*,[119] held that a defendant's confession was not coerced, despite the fact that during somewhat vigorous questioning, the police lied and told the defendant that his accomplice had confessed and had incriminated him. We have explained that mere deception will not render a statement involuntary or unreliable; the test is whether the officer's statements overbore the will of the defendant.[120] Furthermore, we have said that police practices of deception during interrogation are not inherently offensive.[121]

We have rejected in several cases the assertion that police imposition of psychological pressure rendered a defendant's confession involuntary under the circumstances presented.[122] In *State v. Melton*,[123] for instance, the police had interviewed the defendant immediately upon his release from the hospital after sustaining injuries in a car crash in which his friend had been killed. Both the defendant and his friend had been drinking heavily. The defendant claimed the friend had been driving. But the officers obtained a confession that the defendant was driving after showing him pictures of the accident and telling him that "as a man," it "would be the right thing to do to tell the truth," and that "to place blame on a dead person merely as a means of escaping responsibility would be a

---

[119] *Frazier v. Cupp*, 394 U.S. 731, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969).

[120] See, *State v. Nissen, supra* note 83; *State v. Walker*, 242 Neb. 99, 493 N.W.2d 329 (1992).

[121] See *State v. Haywood*, 232 Neb. 97, 439 N.W.2d 511 (1989).

[122] *State v. Melton*, 239 Neb. 506, 476 N.W.2d 842 (1991); *State v. Norfolk*, 221 Neb. 810, 381 N.W.2d 120 (1986); *State v. Tucker*, 215 Neb. 636, 340 N.W.2d 376 (1983).

[123] *State v. Melton, supra* note 122.

cowardly thing to do."[124] We affirmed the trial court's determination that the defendant's confession was not coerced.

The Second Circuit describes three basic elements of any claim under the right to present a defense: (1) deprivation of material and exculpatory evidence that could not reasonably be obtained by other means, (2) bad faith or misconduct on the part of the government, and (3) that the absence of fundamental fairness infected the trial and prevented a fair trial.[125] If any claim could be made that police questioning confused a potentially exculpatory eyewitness or intimidated the witness into changing his or her story, then we agree that, minimally, these elements would apply.

Assuming without deciding that due process could mandate witness unavailability because of intimidating or deceptive police questioning, the defense has failed to demonstrate a due process violation. The defense did not call the interviewing officers to testify at the hearings on the motions in limine or the motion to declare Walkowiak unavailable. And there is little to suggest from the 2011 interview itself that the officers acted in bad faith when interviewing Walkowiak. Oldson claims law enforcement confused Walkowiak into believing there was no window in the door, but Walkowiak himself began his 2011 interview saying that there was no window in the door and that he did not see Beard or Oldson after they walked to the alley. It is not even clear that the officer who later pressed upon Walkowiak that there was no window in the door in 1989 knew that statement to be false; there was no longer a window in that door at the time of questioning. And regardless, lying and emotional manipulation are usually insufficient to violate due process.

We find no merit to Oldson's assignment of error concerning the alleged tampering with Walkowiak.

---

[124] *Id.* at 508, 476 N.W.2d at 844.

[125] See, e.g., *U.S. v. Pinto*, 850 F.2d 927 (2d Cir. 1988).

5. Speedy Trial Under
Due Process Clause

We turn next to Oldson's speedy trial arguments.

(a) Background

The allegation that the State violated Oldson's constitutional right to a speedy trial formed the basis of both Oldson's plea in abatement and motion for new trial, which were both overruled by the trial court. Oldson asserted that the State deliberately delayed for purposes of obtaining a tactical advantage and that this was evidenced by the fact that there was no evidence submitted at trial that was not available in the early 1990's. The State pointed out that there was no intended or actual advantage from the delay and that the State had attempted to be exceptionally accommodating with regard to the defense's use of residual hearsay. The record is unclear as to why the delay in prosecution occurred.

(b) Standard of Review

[25,26] A criminal defendant's claim of denial of due process resulting from preindictment delay presents a mixed question of law and fact.[126] When reviewing a trial court's determination of a claim of denial of due process resulting from preindictment delay, an appellate court will review determinations of historical fact for clear error, but will review de novo the trial court's ultimate determination as to whether any delay by the prosecutor in bringing charges caused substantial prejudice to the defendant's right to a fair trial.[127]

(c) Analysis

[27] The Fifth Amendment's Due Process Clause has only a "'limited role to play in protecting against oppressive delay'" in the criminal context.[128] It is the measure against which

---

[126] *State v. Watson*, 285 Neb. 497, 827 N.W.2d 507 (2013).

[127] *Id.*

[128] *State v. Hettle*, 288 Neb. 288, 304, 848 N.W.2d 582, 596 (2014).

prearrest or indictment delay is scrutinized,[129] and statutes of limitations are the primary safeguard against prejudicial pre-indictment delay.[130] The due process claimant's burden is a "'heavy'" one, requiring a showing of both substantial actual prejudice resulting from the delay and bad faith on the part of the government.[131]

[28] Thus, the Due Process Clause requires dismissal only if a defendant can prove that the preindictment delay caused actual prejudice to his or her defense and was a deliberate action by the State designed to gain a tactical advantage.[132] We have stated that a defendant bears the burden to show actual prejudice, and not just prejudice due to dimmed memories, inaccessible witnesses, and lost evidence.[133]

Oldson argues that the State waited and reinterviewed witnesses until their memories improved to the advantage of the State. He generally asserts that evolving town gossip turned against Oldson as the subsequent assault conviction became known and that this also affected witnesses' memories.

Oldson illustrates that one witness, a local resident, did not mention seeing the Oldson family truck's being cleaned shortly after Beard's disappearance until his third statement to police in October 1992. Oldson also illustrates Donnelson's and Walkowiak's changing reports. Oldson generally asserts that nearly every favorable witness has died during the State's delay, but he does not illustrate which favorable witnesses he might be referring to.

The reason for the delay in bringing the indictment is less obvious here than it was in a similar case of *State v. Watson*,[134] where advances in technology allowed the State to finally

---

[129] *Id.*

[130] *State v. Trammell*, 240 Neb. 724, 484 N.W.2d 263 (1992).

[131] *State v. Hettle, supra* note 128, 288 Neb. at 305, 848 N.W.2d at 596.

[132] See *State v. Trammell, supra* note 130.

[133] *State v. Watson, supra* note 126; *State v. Glazebrook, supra* note 103.

[134] *State v. Watson, supra* note 126.

obtain additional evidence against the defendant. But, in *State v. Glazebrook*,[135] we concluded without elaborating on the justification for the delay that there was simply no evidence demonstrating the State had intentionally caused the approximately 30-year delay in order to gain an unfair tactical advantage. Such is likewise true here.

It is the defendant's burden to prove both bad faith on the part of the government in intentionally delaying prosecution in order to gain a tactical advantage and substantial actual prejudice resulting from the delay. This burden in not sustained through speculation over what witnesses' memories would otherwise be or through the defense's inability to "imagine" any explanation for the delay other than intentional calculation.[136] We agree with the trial court that Oldson did not sustain his burden to demonstrate a constitutional speedy trial violation.

## 6. ALLEGED BACKUS DIARY

Next, Oldson assigns as error the trial court's refusal to admit into evidence photocopies of a diary that Oldson claims was written by Jean Backus (hereinafter Backus).

## (a) Background

As previously described, the defense was able to adduce at trial testimony that a diary had been found and that the diary was purportedly authored by Backus. The defense was also able to adduce testimony detailing the events described in the diary, such as the abduction and sexual abuse of the missing women and the killing of "Kathy" from Ord. And the defense adduced evidence that the diary's description of the missing women was somewhat consistent with real events.

But the defense was unable to enter the diary pages themselves into evidence. After a separate hearing, the court had sustained the State's objection to the admission of the diary pages on the ground of lack of authenticity. The court explained

---

[135] *State v. Glazebrook, supra* note 103.

[136] Brief for appellant at 116.

that there was insufficient evidence to support a finding that the writing was what Oldson purported it to be.

### (i) Mailed From Unknown
### Address in Omaha

The parties had stipulated at the hearing that the purported diary pages were mailed from an unknown address in Omaha, Nebraska, to Oldson's home address while he was awaiting trial. The mailing envelope was handwritten in print and indicated it was from "Lonnie," with no return address. Inside were 54 pages of handwritten entries by an unnamed authorship, which appeared to have been torn from a bound diary, and are contained in the record pursuant to Oldson's offer of proof.

### (ii) Backus' Deposition

The defense submitted Backus' deposition testimony at the hearing. Backus was 88 years old at the time of her deposition. Backus testified that she never kept a diary or journal. She did not recognize the leather diary cover or the diary pages presented to her. She did not recognize the handwriting of the inscription or the diary pages.

### (iii) Handwriting

Although defense counsel obtained several exemplars of Backus' handwriting during the deposition, no handwriting analysis was conducted. Nor did defense counsel argue at the hearing that a jury might find, pursuant to Neb. Rev. Stat. § 25-1220 (Reissue 2008), that the diary was written in Backus' handwriting.

Facially, the handwriting on the envelope seems to match to a handwritten inscription on what was purportedly the inside of the diary's cover. Although it is not entirely clear from the record where the diary cover was found, the exhibit is a photograph of a leather-bound diary with numerous pages torn out. The inside of the cover has a handwritten inscription: "Merry Xmas, Jean," as well as Backus' address at the ranch.

### (iv) Douglas Olson

A person of some acquaintance with Backus, Douglas Olson (Douglas), was suspected by all parties of having mailed the diary pages to Oldson. Backus testified in her deposition that Douglas worked at a sale barn in O'Neill, Nebraska, where she sold her cattle. Sometimes, Douglas would work for her at the ranch hauling and vaccinating her cattle.

### (v) Testimony by Private Investigator

Defense counsel's private investigator testified at the hearing that Katie Bowers, Douglas' former live-in girlfriend, had found that Douglas possessed three boxes of information that appeared to pertain to Backus, including Backus' mail. Bowers had turned these items over to law enforcement, and a private investigator had gained access to them. In addition, Bowers had directly given the private investigator other writings that Douglas had sent her since she had turned over the boxes to law enforcement. Bowers worked at the veterinary clinic where Backus brought her animals. Bowers had a protection order against Douglas.

The private investigator testified that as of the time of the hearing, he had been unable to locate Douglas. Douglas' last known residences were a halfway house in Omaha and, prior to that, the Regional Center in Norfolk, Nebraska.

### (vi) Douglas' Other Writings

In support of the authenticity of the diary pages, the defense presented copies of several letters apparently either sent by Douglas to Bowers or found in the boxes of Backus-related items kept by Douglas in Bowers' house. These included several typed letters from an unnamed author to Bowers and sent in a handwritten envelope to her, in handwriting facially similar to that of the envelope in which the diary pages had been mailed to Oldson and similar to the diary cover inscription.

The letters themselves are largely incomprehensible. They seem to refer to a conspiracy, with the ultimate end of Backus' keeping the ranch and other parties' gaining money. The letters

also refer to a man being held for several weeks, drugged, in Douglas' basement and Douglas' attempts to free him. There is no reference in these letters to a diary or to kidnapped women kept at the Backus ranch.

The private investigator also obtained a handwritten letter that was in the possession of the owners of the O'Neill sale barn where Douglas had worked. The letter, offered for purposes of the hearing, had been addressed to Douglas and had been sent to the sale barn. It purported to threaten Douglas and made reference to having "her diary," that "Jean will lose her ranch," and that Douglas should "[k]eep [his] mouth shut or [he] could wind up sleeping with the others."

Another letter sent to Bowers in 2011—in an envelope with writing similar to the one in which the diary pages were sent to Oldson—contained a handwritten note: "KATE THEY DONT KNOW I MADE COPIES." The note appears to be in the same distinctive handwriting as the mailing envelopes and the diary inscription. An attached map, in what appears to be the same handwriting, is written on the back of a 2010 correspondence to Backus from her optometrist. The map refers to a gun, Backus, and "BURN THIS WHEN DONE." A typed letter from "Marie" to "JORGE," and contained in the same envelope, referred to the directions on the map for the pickup point for a rifle. It also states, "This is between jean and kate for her dog . . . ."

### (vii) Consistencies of Diary
### With Real Events

In addition to this supposed chain of custody evidence, defense counsel's argument for the authenticity of the diary pages as being authored by Backus was that the entries could be corroborated by real events. The defense pointed out the real kidnappings of Cutshall, Weeks, and Bald Eagle.

Defense counsel also pointed out that neighbors who were mentioned in the diary were Backus' actual neighbors. The diary also described cattle escaping and wandering onto the neighbors' property, and Backus confirmed in her deposition

that sometimes that occurred. The diary indicated that Backus and Wetzel Backus preferred Hereford cows and that they had horses. Backus also confirmed those things to be true.

One diary entry states, "[F]riday we get to go to SD to look for our new guest we can have 3 guest[s] stay in there we have 3 sets of the shackles but can make more." Defense counsel pointed out that Backus admitted in her deposition that they had sometimes gone to South Dakota to buy bulls.

On September 18, 1989, the diary states that Wetzel, born in January 1910, had died. Defense counsel pointed out that these dates of Wetzel's birth and death are correct.

Thereafter, a diary entry states, "what to do with Kathy now," then describes that "Kathy" ran away and will not come back, and "I hit her with pickup will haul her to some place else as they R lookin for her." Defense counsel emphasized that the blunt trauma found on Beard's remains could be consistent with being struck by a vehicle.

### (b) Standard of Review

[29] Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated. An appellate court reviews the trial court's ruling on authentication for abuse of discretion.[137]

An abuse of discretion, warranting reversal of a trial court's evidentiary decision on appeal, occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[138]

### (c) Analysis

[30] We find that the trial court did not abuse its discretion in determining that the purported Backus diary had not been properly authenticated. Authentication or identification of evidence is a condition precedent to its admission and is satisfied

---

[137] State v. Elseman, 287 Neb. 134, 841 N.W.2d 225 (2014).

[138] State v. Merchant, 285 Neb. 456, 827 N.W.2d 473 (2013).

by evidence sufficient to prove that the evidence is what the proponent claims.[139] A court must determine whether there is sufficient foundation evidence for the admission of physical evidence on a case-by-case basis.[140] Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated; we review a trial court's ruling on authentication for abuse of discretion.[141]

Neb. Evid. R. 901, Neb. Rev. Stat. § 27-901 (Reissue 2008), lists by way of illustration 10 means of adequately authenticating a document, none of which directly corresponds to the corroboration argument made by Oldson in this appeal. The most similar statutory illustration is rule 901(2)(d): "Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."

Under such provision, other courts have found a writing to be adequately authenticated when, for instance, the writing was attributed to someone who was the only known resident of an isolated and remote area where the writings were found.[142] Writings have also been adequately authenticated by virtue of the fact that they disclose information that is likely known only to the purported author.[143]

But the circumstances of the diary pages' having been apparently in Douglas' possession and mailed by Douglas do not uniquely authenticate them as being written by Backus. Furthermore, none of the corroborated facts mentioned in the diary are the kind of facts that only Backus would know. The corroborated facts are either public record or facts Douglas could have discovered in his work at the ranch and at the sale barn.

---

[139] *State v. Draganescu, supra* note 80.

[140] *Id.*

[141] *State v. Elseman, supra* note 137.

[142] See *U.S. v. Harvey*, 117 F.3d 1044 (7th Cir. 1997).

[143] See *State v. Love*, 691 So. 2d 620 (Fla. App. 1997).

These facts did not satisfy Oldson's burden to present evidence sufficient to support a finding that the diary was written by Backus. And they must be viewed in light of the fact that Backus denied writing the diary. In addition, there was no evidence that the diary pages were ever seen in Backus' possession or in a place where Backus solely had access.

Finally, it would have been natural for the trial court to have considered the elephant in the room: Why, despite being in possession of the alleged author's writing exemplars, obtained during Backus' deposition, did Oldson make no attempt to demonstrate or even argue that the diary pages were written in Backus' handwriting.[144] We are troubled by the lack of discussion below of the handwriting of the diary, especially when it seems from our layperson's perspective that the handwriting on the envelopes—which the parties seem to assume was Douglas' handwriting—is much more similar to the handwriting of the diary than to any of Backus' handwriting exemplars.

While not a high hurdle, as Oldson points out, it is still the burden of the proponent of the evidence to provide the court with sufficient evidence that the writing is what it purports to be. And to establish on appeal that the trial court abused its discretion in finding that the evidence was not properly authenticated is a higher hurdle. An abuse of discretion occurs only when the decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[145] The trial court did not abuse its discretion in concluding that there was insufficient evidence that the diary was actually written by Backus. It did not abuse its discretion in concluding that the exhibit had not been authenticated to be Backus' diary.

---

[144] See, e.g., *Bishop v. State*, 252 Ga. App. 211, 555 S.E.2d 504 (2001); *Box v. State*, 74 Ark. App. 82, 45 S.W.3d 415 (2001).

[145] *State v. Merchant, supra* note 138.

### 7. MOTION FOR NEW TRIAL

Shortly after trial, Douglas was finally found and arrested. The defense moved for a new trial based on this event as well as on the ground that there had been a late disclosure of the DNA evidence presented at trial determining that hairs found on Beard's sweater belonged to cows and to a DNA technician. Oldson asserts on appeal that the trial court erred in denying his motion for new trial on both these grounds.

### (a) Standard of Review

[31] The standard of review for the denial of a motion for new trial is whether the trial court abused its discretion in denying the motion.[146]

### (b) Ground One: Douglas Found After Trial

#### (i) Background

Douglas was interviewed by defense counsel's private investigator and by law enforcement, and those interviews were entered into evidence in support of a motion for new trial. The defense also offered a recorded conversation between Douglas and his girlfriend while Douglas was in jail. Finally, the defense called Douglas to testify at the hearing.

#### a. Telephone Conversation With Girlfriend

In the telephone conversation with his girlfriend, Douglas stated that he cannot tell law enforcement what he knows or "they" will hurt his mother. Douglas said he knew Backus had a diary and knew where she buried it and why it did not burn in a fire on her property. He denied writing the diary. Douglas later made reference to how "these people have told me everything what to write and what to do," but it does not seem from the context that he was referring to the diary.

---

[146] *State v. Severin*, 250 Neb. 841, 553 N.W.2d 452 (1996).

b. Interview With Private
Investigator and Police

In the interviews with law enforcement and with defense counsel's private investigator, Douglas denied sending the diary pages or writing the diary. He was confronted with the fact that his DNA was found on the envelope the pages were mailed in. Douglas explained that he had envelopes and stamps in his backpack. Douglas speculated that when he was staying at a homeless shelter, the backpack was stolen.

In the interview with defense counsel's private investigator, Douglas made oblique references to Backus' having once told him she had had young girls living with her on the ranch in the past to help with washing and cooking. Douglas also talked about hauling scrap metal out of a wood shanty built into a hill. Douglas denied any knowledge of kidnappings at the ranch.

In the interview with law enforcement, Douglas referred to having just passed a mental evaluation in Norfolk. He explained that he had most recently been living at a homeless shelter in Omaha and spent most of his days at the library looking on the Internet at the local news.

Douglas explained that he previously worked odd jobs for Backus. Douglas said that Backus owed him money. Douglas described that, one day, three men who said they worked for Backus threatened Douglas and told him to forget he had ever seen them. Douglas thought that Backus and these men were "moving drugs." Douglas explained that sometime after that, he woke up in the hospital with no recollection of why he was there.

Law enforcement accused Douglas of writing the diary, indicating that it appeared to be Douglas' handwriting on the diary. Douglas did not specifically deny the handwriting was his. But Douglas claimed he had never seen the diary pages or the envelope in which they were mailed.

c. Douglas' Testimony at Hearing

In his testimony at the hearing on the motion for new trial, Douglas said he started doing odd jobs for Backus at the ranch

in 2007. He testified that Backus stopped paying him. Douglas eventually again stopped working for Backus; Douglas testified that Backus owed him over $30,000 for work he had done for her. Douglas claimed some of what was owed him was eventually paid by a man named "Claire," last name unknown, who lived near Chambers, Nebraska. Douglas came into contact with "Claire" after "a guy that had worked for [Backus] before called me and told me, he said if you want to get paid to go see this Claire."

Douglas testified that he had seen Backus writing cattle prices and similar things in a journal that she carried with her when she went to the sale barns. He had never touched the journal, but had once seen it lying open and saw entries about her cattle.

Even though defense counsel submitted evidence that Douglas' DNA was found on the seal and the stamp of the envelope in which the diary pages had been mailed to Oldson, Douglas continued to deny having either written or mailed the diary. Douglas testified that he did not recognize the diary pages that defense counsel showed him at the hearing. Douglas also testified that he did not recognize the handwriting in the diary pages as Backus', although he stated that "[i]t's similar . . . ."

Douglas stated that there were balloons in a spot on the ranch where Backus told him one of her cutting horses was buried. Douglas also reiterated that he had torn apart a structure built into a hill on the ranch and had found heavy chains in 50-gallon barrels that were inside the structure. He saw two bedframes in the structure. Douglas reiterated that Backus had told him that she once had girls living on the ranch who helped with the chores.

Douglas mentioned that one day, he opened a "wood shell box" that Backus carried around with her. In that box were "napkins and stuff" with writing on them, including several small books. He saw a reference to "Barbara" and how she had run away. Also, once when he proposed digging on the ranch

to place a water line, Backus "blew up right away and told me you ain't digging nothing on my land."

Douglas testified that he was scared of "[t]he guy in Grand Island that [Backus] had with her," an "Antonio Rodriguez," because Rodriguez had threatened Douglas several times. Douglas described a dog that became sick after eating "white powder" that looked like "drug stuff" in a box in the back of Backus' truck. Douglas said that Rodriguez made him take care of the dog and "keep [Douglas'] mouth shut," so that Backus would not get in trouble. Later, Douglas purportedly found a list of names that Backus and Rodriguez were "delivering stuff to." He said he was threatened to keep quiet.

### d. Defense Arguments at Hearing

At the hearing on the motion for new trial, defense counsel argued that DNA evidence confirming that the diary was in Douglas' possession somehow further authenticated the diary—apparently by providing a better chain of custody. Defense counsel also pointed out that Douglas did not know Oldson and had no motive for fabricating a diary and sending it to Oldson in order to exculpate him. Defense counsel's theory was that Douglas was trying to blackmail Backus with the diary. Defense counsel also pointed out that Douglas' testimony at the hearing provided information that corroborated other pieces of the diary, thus providing sufficient authentication of the diary as Backus' writing. The trial court denied the motion for new trial.

### (ii) Analysis

Oldson makes arguments on appeal similar to those made below. Oldson also makes new arguments about the authenticity of the diary that have little to do with finding Douglas. Oldson asserts for the first time on appeal that Backus was able to alter her handwriting for purposes of the deposition and asserts that Backus used similar shorthand abbreviations in the deposition exemplars as those in the diary. Oldson also argues

that Backus' request to speak with counsel during the deposition, as well as Backus' evasive behavior during her deposition, such as "well-timed heart palpitations," "punctuate [Backus'] culpability."[147] Oldson argues that the fact that Backus denied writing the diary should be given little weight, because it would be imprudent for Backus to admit to kidnapping and killing the women described.

[32] We find no abuse of discretion in the trial court's determination to deny the motion for new trial based upon information gleaned after Douglas' arrest. A trial judge is accorded significant discretion in granting or denying a motion for new trial, because the trial judge sees the witnesses, hears the testimony, and has a special perspective on the relationship between the evidence and the verdict.[148]

Neb. Rev. Stat. § 29-2101 (Reissue 2008) provides that a new trial may be granted for any of the following grounds affecting materially the defendant's substantial rights: (1) irregularity in the proceedings which prevented the defendant from having a fair trial; (2) misconduct of the jury, the prosecuting attorney, or the witnesses for the state; (3) accident or surprise which ordinary prudence could not have guarded against; (4) the verdict is not sustained by sufficient evidence or is contrary to law; (5) newly discovered evidence material for the defendant which he or she could not with reasonable diligence have discovered and produced at trial; (6) newly discovered exculpatory DNA or similar forensic testing evidence obtained under the DNA Testing Act; or (7) error at law occurring at trial.

[33] We address whether a new trial was warranted on the ground that locating Douglas was newly discovered evidence material to Oldson's case. A criminal defendant who seeks a new trial because of newly discovered evidence must show that if the evidence had been admitted at the former trial, it would

---

[147] Brief for appellant at 75, 143.

[148] *State v. Archie*, 273 Neb. 612, 733 N.W.2d 513 (2007).

probably have produced a substantially different result.[149] Evidence tendered in support of a motion for new trial on the ground of newly discovered evidence must be so potent that, by strengthening evidence already offered, a new trial would probably result in a different verdict.[150]

Oldson apparently believes that Douglas' testimony would have, in conjunction with the other corroborating evidence, sufficiently authenticated the diary as a writing by Backus, thereby making it admissible. Oldson also apparently believes that the admission of the diary into evidence at a trial would have probably produced a substantially different result. We disagree on both points.

We find no abuse of discretion in the trial court's conclusion that the additional evidence did not cure the foundational and reliability deficiencies that existed prior to finding Douglas. Douglas' arrest provided little more than the circular foundation of Douglas' own statements to support his assertion that he did not write the diary and his insinuations that Backus did. Oldson did not present at the hearing any independent evidence corroborating Douglas' testimony, including that Backus kept a diary, that Backus had a shanty built into a hill with beds and chains in it, that Douglas was an unwilling witness to Backus' apparent illegal drug operations, that Backus owed him a substantial amount of money, or that Rodriguez had threatened Douglas and possibly assaulted and kidnapped him.

Moreover, even if the court should or would have admitted the diary pages into evidence had it been presented with Douglas' statements during trial, Oldson failed to establish the probability that the jury would have reached a different result if the evidence had been admitted at trial. The jury had already been presented with the theory that Backus was the real killer. The jury had been told that there was a diary purportedly

[149] *State v. Kofoed*, 283 Neb. 767, 817 N.W.2d 225 (2012).

[150] *State v. Boppre*, 243 Neb. 908, 503 N.W.2d 526 (1993).

written by Backus in which she had described kidnapping and killing Beard and the other missing women.

The jury clearly rejected this theory, in spite of testimony that there was "corroborating evidence," such as the diary listing the correct names, dates, physical descriptions, and other correct details pertaining to the missing women named in the diary. It is unclear exactly how Oldson hypothesizes that presenting to the jury the photocopies of the actual diary pages or Douglas' testimony would have probably resulted in the jury's accepting the theory that Backus and Wetzel kept several kidnapped women as sex slaves and that Backus killed Beard by running her down with a truck.

We conclude that, as relates to the alleged Backus diary, the trial court did not abuse its discretion in denying Oldson's motion for new trial.

### (c) Ground Two: Late Disclosure
### of DNA Report of Hairs
### on Sweater

There was testimony at trial, without objection, that a hair found on Beard's sweater ultimately was found to belong to a DNA technician and that other hairs found on the sweater were cow hairs. According to defense counsel, the defense did not receive a copy of the DNA report concerning the hairs until approximately 2 weeks before trial. Beside the fact that this argument appears waived by the failure to object at trial, it is unclear from Oldson's cursory arguments how the alleged nondisclosure would fall under one of the grounds listed in § 29-2101 or how the alleged nondisclosure materially affected his substantial rights. Oldson does not allege that the State violated *Brady v. Maryland*,[151] and Oldson does not argue that ordinary prudence would have guarded against whatever surprise Oldson thinks occurred. Most importantly, Oldson has failed to demonstrate how earlier disclosure of the DNA report

---

[151] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

would have probably led to a different verdict. We find no abuse of discretion in denying Oldson's motion for new trial on the grounds that the State had allegedly failed to timely disclose a DNA report demonstrating that a male hair found on Beard's remains did not belong to Oldson, but to a DNA technician, and that other hairs were cow hairs.

## 8. Cumulative Error

Having found no error, we find no merit to Oldson's assertion that cumulative error warrants a new trial.

## 9. Sufficiency of Evidence

Neither do we find merit to Oldson's claim that the evidence admitted at trial was insufficient to sustain the verdict.

The law imposes a heavy burden on a defendant who claims on appeal that the evidence is insufficient to support a conviction.[152] The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[153]

Oldson asserts that the only evidence supporting his conviction are Oldson's own statements and the fact that he was last seen leaving the Someplace Else Tavern with Beard on the night of her disappearance. Oldson argues, "Given the plethora of other suspects, . . . the lack of physical evidence, and the implausibility of the State's scant theory, this conviction cannot stand."[154]

[34] We have reviewed all the evidence submitted at trial and find it sufficient to support the verdict. While there is no physical or eyewitness evidence directly linking Oldson to the crime, circumstantial evidence is not inherently less probative than direct evidence. In finding a defendant guilty beyond a

---

[152] *State v. Escamilla*, 291 Neb. 181, 864 N.W.2d 376 (2015).

[153] *Id.*

[154] Brief for appellant at 134.

reasonable doubt, a fact finder may rely upon circumstantial evidence and the inferences that may be drawn therefrom.[155]

Beard was last seen leaving the Someplace Else Tavern with Oldson. Oldson's own statements indicated that he took Beard out to the alley behind the bar, where some violence occurred in his attempt to get her into his truck. Oldson was expected to come back to the Someplace Else Tavern and give his father and Kittinger a ride home, but he did not. Instead, Oldson's father and Kittinger arrived at home to find Oldson freshly showered and on his way to the Laundromat.

There was evidence from which the jury could reasonably infer that from the moment Oldson left the Someplace Else Tavern until the time he arrived home to shower, Oldson had enough time to kill Beard and leave her remains outside of Ord. Viewing the evidence in a light most favorable to the prosecution, there was also evidence that Oldson indicated to his wife, Minnie, he would kill her just as he had killed Beard.

It was the province of the jury to reject Oldson's story that after an unsuccessful and somewhat violent attempt to get Beard into his truck, Beard immediately left the Someplace Else Tavern in the truck of an unidentified person, leaving all her personal belongings inside the bar. And it was the province of the jury to reject the notion that Beard was killed by Hawley, White, Mentzer, or unidentified carnival workers, or that she became involved in a sex-slave operation at the Backus ranch and was eventually run over by Backus' truck. In sum, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Oldson killed Beard.

## 10. LIFE SENTENCE

Lastly, Oldson asserts that the trial court erred in sentencing him to life-to-life imprisonment when the jury found him guilty of the lesser offense of second degree murder. Oldson

---

[155] State v. Escamilla, supra note 152.

argues that imposing the maximum sentence for second degree murder, which corresponds to the mandatory sentence for first degree murder, constitutes an abuse of discretion and undermines the sentencing structure created by the Legislature. He also argues his sentence is excessive.

### (a) Standard of Review

[35] An appellate court will not disturb sentences that are within statutory limits, unless the district court abused its discretion in establishing the sentences.[156]

[36] When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.[157]

[37] Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.[158]

### (b) Analysis

[38] Murder in the first degree without a notice of aggravating circumstances is a Class IA felony.[159] The sentence for a Class IA felony is life imprisonment.[160] Murder in the second degree is a Class IB felony. The maximum penalty for a Class IB felony is life imprisonment; the minimum sentence is 20 years' imprisonment.[161] We have repeatedly said that a life-to-life sentence for second degree murder is a permissible sentence under Neb. Rev. Stat. § 29-2204 (Cum. Supp. 2014).[162]

---

[156] *State v. Dominguez*, 290 Neb. 477, 860 N.W.2d 732 (2015).

[157] *State v. Casterline*, 290 Neb. 985, 863 N.W.2d 148 (2015).

[158] *Id.*

[159] See Neb. Rev. Stat. § 28-303 (Reissue 2008).

[160] Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2011).

[161] *Id.*

[162] See, *State v. Casterline, supra* note 157; *State v. Abdulkadir*, 286 Neb. 417, 837 N.W.2d 510 (2013); *State v. Moore*, 277 Neb. 111, 759 N.W.2d 698 (2009); *State v. Marrs*, 272 Neb. 573, 723 N.W.2d 499 (2006).

We have explained that the Legislature has had numerous opportunities to amend the statutory scheme in the event that this interpretation was not what it had intended.[163] It has not done so. It is not this court's place to rewrite legislation.[164]

[39,40] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.[165] When imposing a sentence, the sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the offense.[166] The sentencing court is not limited to any mathematically applied set of factors.[167] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[168]

This case concerns a brutal murder. The trial court explained that in reaching its sentence, it considered the amount of violence involved in the commission of this crime. The court explained, "Although we are not certain as to the exact circumstances surrounding . . . Beard's death, there is no doubt it was vicious and violent." The court also considered Oldson's prior convictions for third degree assault in 1989, attempted third degree sexual assault in 1992, and intentional child abuse in

---

[163] *State v. Casterline, supra* note 157.

[164] *Id.*

[165] *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015).

[166] *State v. Dominguez, supra* note 156.

[167] *Id.*

[168] *Id.*

1998. The court noted Oldson's failure to accept responsibility for his actions and his failure to express remorse or empathy for Beard or the victims of his other crimes.

An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[169] The trial court's reasoning was neither untenable nor unreasonable. And the trial court's sentence of life to life was not clearly against justice, conscience, reason, or the evidence. We find no error in the trial court's imposition of a life-to-life sentence.

### V. CONCLUSION

For the foregoing reasons, we affirm the judgment below.

AFFIRMED.

STEPHAN, J., not participating.

---

[169] See *State v. Kozisek*, 22 Neb. App. 805, 861 N.W.2d 465 (2015).

CONNOLLY, J., concurring.

I concur in the judgment. But I disagree with the majority opinion in three key respects:

• First, I disagree with the majority's analysis of the court's admission of exhibits 263 through 266 and exhibits 268 through 271. I believe the trial court improperly admitted seven of these redacted pages from Oldson's journal to show his consciousness of guilt and one to show his motive for killing Cathy Beard.

• Second, I disagree with the majority's mischaracterization of our evidentiary admission standard under Neb. Evid. R. 404.[1] To uphold the trial court's evidentiary rulings, the majority misstates the meaning of our independent relevance standard under rule 404. And it ignores the propensity inference that was necessarily in the chain of reasoning for one exhibit and likely present for another one.

---

[1] Neb. Rev. Stat. § 27-404 (Cum. Supp. 2014).

• Third, I believe the majority similarly ignores our precedent under Neb. Evid. R. 403[2] that prohibits a court from admitting speculative evidence. Under rule 403, it ignores that consciousness of guilt evidence must reasonably support every necessary inference in the chain of reasoning to infer Oldson's guilt.

But because I conclude that the court's errors were harmless beyond a reasonable doubt, I concur in the judgment.

## I. INDEPENDENT RELEVANCE IS THE ADMISSIBILITY STANDARD FOR EVIDENCE OFFERED UNDER RULE 404(2)

Because the majority has drifted from our rule 404 jurisprudence, I believe it is necessary to restate the rule's admission requirements under our precedents. Apart from exceptions that are not at issue here, rule 404(1) provides that "[e]vidence of a person's character or a trait of his or her character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion . . . ." Section 27-404(2) similarly prohibits proving a defendant's conforming behavior with a character trait through evidence of a defendant's acts that are extrinsic to the charged crime:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In 1987, this court held that evidence showing a defendant's consciousness of guilt is relevant to support an inference that the defendant committed the charged crime. We further held that rule 404(2) governs consciousness of guilt

---

[2] Neb. Rev. Stat. § 27-403 (Reissue 2008).

evidence.[3] So the standard of admissibility for consciousness of guilt evidence is the same as the standard for evidence offered for any other purpose under rule 404(2): independent relevance.

To be independently relevant for a proponent's stated purpose, evidence offered under rule 404(2) must not depend upon a forbidden propensity inference about the defendant's character:

> Rule 404(2) prohibits the admission of other bad acts evidence for the purpose of demonstrating a person's propensity to act in a certain manner. But evidence of other crimes which is relevant for any purpose other than to show the actor's propensity is admissible under rule 404(2). Evidence that is offered for a proper purpose is often referred to as having a "special" or "independent" relevance, which means that its relevance does not depend upon its tendency to show propensity. An appellate court's analysis under rule 404(2) considers (1) whether the evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith; (2) whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice; and (3) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted.[4]

---

[3] See, *State v. Clancy*, 224 Neb. 492, 398 N.W.2d 710 (1987), *disapproved in part on other grounds, State v. Culver*, 233 Neb. 228, 444 N.W.2d 662 (1989), *abrogated on other grounds, J. E. B. v. Alabama ex rel. T. B.*, 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). But see *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

[4] *State v. McGuire*, 286 Neb. 494, 511-12, 837 N.W.2d 767, 784-85 (2013). Accord, e.g., *State v. Almasaudi*, 282 Neb. 162, 802 N.W.2d 110 (2011); *State v. Collins*, 281 Neb. 927, 799 N.W.2d 693 (2011); *State v. Chavez*, 281 Neb. 99, 793 N.W.2d 347 (2011); *State v. Baker*, 280 Neb. 752, 789 N.W.2d 702 (2010); *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999); *State v. McManus*, 257 Neb. 1, 594 N.W.2d 623 (1999).

We have specifically held that evidence of a defendant's extrinsic act lacked independent relevance when a fact finder could have only found that it was relevant through classic propensity reasoning about the defendant's character.[5] To facilitate appellate review of independent relevance under rule 404(2), we require the proponent to state its purpose when offering the evidence. We also require the trial court to state the purpose for which it was admitted:

> A proponent of evidence offered pursuant to rule 404(2) shall, upon objection to its admissibility, be required to state on the record the specific purpose or purposes for which the evidence is being offered, and the trial court shall similarly state the purpose or purposes for which such evidence is received. And any limiting instruction given upon receipt of such evidence shall likewise identify only those specific purposes for which the evidence was received.[6]

We first set out this procedural requirement and our admissibility standard of independent relevance in 1999.[7] Both rules are well-established components of our rule 404 jurisprudence.[8] Nevertheless, the majority, in a tortuous analysis, relies on secondary authorities to undermine that jurisprudence. Worse, they suggest independent relevance has the same meaning as the pre-1999, standardless rule that we have abandoned.

The majority does not state that a fact finder's chain of reasoning must not depend on propensity reasoning about the

---

[5] See, *State v. Ellis*, 281 Neb. 571, 799 N.W.2d 267 (2011); *State v. Trotter*, 262 Neb. 443, 632 N.W.2d 325 (2001); *Sanchez, supra* note 4; *McManus, supra* note 4. See, also, *State v. Sutton*, 16 Neb. App. 185, 741 N.W.2d 713 (2007).

[6] *Almasaudi, supra* note 4, 282 Neb. at 179, 802 N.W.2d at 125. Accord, e.g., *Collins, supra* note 4; *Sanchez, supra* note 4.

[7] See, *Sanchez, supra* note 4; *McManus, supra* note 4.

[8] See cases cited *supra* notes 4 through 6.

defendant's character. Instead, it cites a legal encyclopedia and states that extrinsic evidence that "only incidentally impugns a defendant's character is not prohibited by rule 404." It cites a legal commentator who has pointed out that evidence of a defendant's extrinsic bad acts always contains legitimate and illegitimate inferences. From this, the majority makes a giant leap to draw this erroneous conclusion:

> Rule 404(2) permits introduction of relevant evidence concerning the occurrence of "other crimes, wrongs, or acts," *so long as the sole purpose for the offer is not to establish a defendant's propensity* to act in a particular manner, and thereby supply a basis for the inference that the defendant committed the crime charged.

(Emphasis supplied.) But we have rejected this reasoning by adopting our independent relevance standard.

Moreover, the two Nebraska cases that the majority cites do not support its conclusion. One of the cited cases, *State v. McGuire*,[9] is the most recent statement of our independent relevance standard that is set out above. I am puzzled how citing the correct standard supports the majority's misstatement of the standard. We decided the other cited case, *State v. Yager*,[10] in 1990, before we adopted the independent relevance standard in 1999. Under the standardless rule urged by the majority, anything goes. And the majority's reliance on a pre-1999 case ignores our concern about rule 404's potential "to trample on a defendant's right to a fair trial."[11] That recurring concern resulted in adopting the independent relevance test and its related procedural requirements in 1999.

Our independent relevance standard guards against the danger that jurors will overestimate the value of extrinsic acts and convict a defendant for an improper reason.[12] And the majority

---

[9] *McGuire, supra* note 4.

[10] See *State v. Yager*, 236 Neb. 481, 461 N.W.2d 741 (1990).

[11] See *id.* at 500, 461 N.W.2d at 752 (Shanahan, J., dissenting).

[12] See *McManus, supra* note 4.

saps that principle by implying that extrinsic acts evidence should be admissible unless the proponent's sole purpose is to establish a defendant's propensity to act in conformity with a character trait. To the contrary, it is because jurors usually cannot ignore a propensity inference, even when a court properly instructs them, that legal commentators have advocated the independent relevance test that we adopted in 1999.[13]

Finally, and most important, the majority's statements are contrary to the statute itself. Rule 404(2) does not provide that extrinsic acts are admissible if the proponent's sole purpose is not to prove the defendant's conforming behavior. Rule 404(2) precludes the use of extrinsic acts to prove a defendant acted in conformity with a character trait—period. It does not provide that extrinsic acts *are* admissible as proof of a defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." It provides that extrinsic acts evidence *may* be admissible for such purposes:

> (2) Evidence of other crimes, wrongs, or acts *is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith*. It *may*, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.[14]

So, contrary to the majority's statement, the question is not whether a proponent has offered extrinsic acts evidence solely to prove a defendant's propensity to act in conformity with a character trait. Such evidence would clearly be inadmissible in Nebraska. Under our independent relevance test, the question is whether the proponent's evidence is relevant for

---

[13] See, 1 Edward J. Imwinkelried, Uncharged Misconduct Evidence § 2:19 (rev. ed. 2002); 1 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 4:28 (4th ed. 2013); 22B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure § 5239 (Supp. 2014).

[14] § 27-404(2) (emphasis supplied).

an ostensibly legitimate purpose *only* through the forbidden propensity reasoning. Although the majority's statement may reflect the admissibility standard for a defendant's extrinsic acts in some other jurisdictions,[15] it is an incorrect statement of our standard under rule 404(2).

The majority, not satisfied with misstating our admissibility standard for rule 404(2) evidence, goes even further. It states that "[i]f character evidence is admitted for a proper purpose, then, ipso facto, it is not admitted for the purpose of showing propensity." This is misleading. We do not determine whether a court's stated purpose for admitting rule 404(2) evidence was proper in a vacuum. The purpose is only proper if a fact finder could conclude the evidence is relevant to establish the proponent's intended proof *without* engaging in propensity reasoning about the defendant's character.

## II. THE MAJORITY IS BOUND BY OUR PREVIOUS HOLDINGS

As stated, our independent relevance standard and procedures for admitting evidence under rule 404(2) has been the law since 1999. Yet, the majority has not overruled any of these cases, nor could it convincingly do so. When we have interpreted or established a rule, the doctrine of stare decisis applies. It requires us to adhere to our previous decisions "unless the reasons therefor have ceased to exist, are clearly erroneous, or are manifestly wrong and mischievous or unless more harm than good will result from doing so."[16] The doctrine "is grounded in the public policy that the law should be stable, fostering both equality and predictability of treatment."[17]

And major legal commentators have advocated our independent relevance standard.[18] It is consistent with the holdings of

---

[15] See *U.S. v. Curley*, 639 F.3d 50 (2d Cir. 2011).

[16] *Potter v. McCulla*, 288 Neb. 741, 753, 851 N.W.2d 94, 104 (2014).

[17] *State v. Hausmann*, 277 Neb. 819, 828, 765 N.W.2d 219, 226 (2009).

[18] See sources cited *supra* note 13.

many other courts.[19] So there is nothing manifestly wrong with our approach to this evidentiary rule—and much to lament about the standardless rule to which the majority would apparently revert. But the majority's mere suggestion that it disagrees with our established precedent is ineffective to change it unless it overrules or disapproves our precedent.

By requiring appellate courts to adhere to their previous decisions in most circumstances, the doctrine of stare decisis

> "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." . . . Although "not an inexorable command" . . . *stare decisis* is a foundation stone of the rule of law, necessary to ensure that legal rules develop "in a principled and intelligible fashion."[20]

And the doctrine should apply with greatest force to our decisions on evidentiary issues because lower courts and practitioners must predictably apply these rules daily. But the important point here is that the majority has not overruled our established precedent. Under the doctrine of stare decisis then, the standard of admissibility under rule 404(2) continues to be independent relevance—as we have defined and applied it. That means that the trial court properly admitted evidence of Oldson's extrinsic acts or statements only if it was relevant to a fact of consequence independent of an inference that Oldson acted in conformity with a character trait. But before addressing that issue, I turn to the meaning of independent

---

[19] See, e.g., *U.S. v. Green*, 617 F.3d 233 (3d Cir. 2010); *U.S. v. Commanche*, 577 F.3d 1261 (10th Cir. 2009); *U.S. v. Varoudakis*, 233 F.3d 113 (1st Cir. 2000); *State v. Cassavaugh*, 161 N.H. 90, 12 A.3d 1277 (2010); *State v. Johnson*, 340 Or. 319, 131 P.3d 173 (2006); *State v. Clifford*, 328 Mont. 300, 121 P.3d 489 (2005); *Masters v. People*, 58 P.3d 979 (Colo. 2002).

[20] *Michigan v. Bay Mills Indian Community*, ___ U.S. ___, 134 S. Ct. 2024, 2036, 188 L. Ed. 2d 1071 (2014) (citations omitted).

relevance as it specifically relates to a defendant's consciousness of guilt.

## III. CONSCIOUSNESS OF GUILT EVIDENCE MUST REASONABLY SUPPORT ALL NECESSARY INFERENCES TO CONCLUDE A DEFENDANT WAS GUILTY OF THE CHARGED CRIME

As stated, rule 404(2) governs the admissibility of consciousness of guilt evidence.[21] And it is relevant as a circumstance supporting an inference that the defendant committed the crime charged.[22] In *State v. Clancy*,[23] we considered, under rule 404(2), whether a defendant's intimidation of a State's witness was admissible to show his consciousness of guilt. We explained that the chain of reasoning from his threat to his guilt of the charged crime required two inferences: "'from conduct to consciousness of guilt, and then from consciousness of guilt to the guilty deed.'"[24] And we quoted Wigmore's treatise to emphasize the strength of such evidence: "'No one doubts that the state of mind which we call "guilty consciousness" is perhaps the strongest evidence . . . that the person is indeed the guilty doer; nothing but an hallucination or a most extraordinary mistake will otherwise explain its presence.'"[25] And as the Ninth Circuit put it, evidence showing consciousness of guilt is "second only to a confession in terms of probative value."[26]

---

[21] See *Clancy, supra* note 3.

[22] See *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008); *Clancy, supra* note 3.

[23] *Clancy, supra* note 3.

[24] *Id.* at 499, 398 N.W.2d at 716, quoting 1 John Henry Wigmore, Evidence in Trials at Common Law § 173 (James H. Chadbourn rev. ed. 1979).

[25] *Id.*, quoting 2 John Henry Wigmore, Evidence in Trials at Common Law § 273(1) (James H. Chadbourn rev. ed. 1979).

[26] *U.S. v. Meling*, 47 F.3d 1546, 1557 (9th Cir. 1995).

Our reasoning in *Clancy* is consistent with legal authorities who agree that under rule 404(2), consciousness of guilt evidence is logically relevant to establish a defendant's guilty "knowledge" of the charged crime under rule 404(2). The guilty knowledge, in turn, serves as an intermediate inference to prove the defendant's "identity" under rule 404(2). That is, guilty knowledge is an intermediate inference that the defendant is the perpetrator of the charged crime.[27] The logical relevance of such evidence rests on a fact finder's assumption that an innocent person would not have committed the act or made the statement that the prosecution holds up as "'an expost facto indication' of the defendant's identity as the criminal."[28]

But our statement in *Clancy* that "'nothing but an hallucination or a most extraordinary mistake will otherwise explain its presence'"[29] speaks to another important requirement for admitting evidence to show consciousness of guilt: The evidence should be sufficient to reasonably support the inference that the defendant had guilty knowledge of the charged crime. As Wigmore recognized, "in the process of inferring the existence of that inner consciousness from the outward conduct, there is ample room for erroneous inference; and it is in this respect chiefly that caution becomes desirable and that judicial rulings upon specific kinds of conduct become necessary."[30] So our opinions upholding consciousness of guilt evidence have generally involved conduct or statements that firmly linked the defendant's extrinsic conduct or statement to the defendant's guilty knowledge of the charged crime. For example, in *Clancy*, a fact finder could confidently

---

[27] See, 1 Barbara E. Bergman & Nancy Hollander, Wharton's Criminal Evidence § 4:36 (15th ed. 1997); 1 Imwinkelried, *supra* note 13, § 3:04.

[28] See 1 Imwinkelried, *supra* note 13, § 3:04 at 10.

[29] *Clancy, supra* note 3, 224 Neb. at 499, 398 N.W.2d at 716.

[30] 2 Wigmore, *supra* note 25, § 273(1) at 115-16.

infer that a person innocent of a charged crime would not threaten a witness against him or her in the pending trial for that crime.

Courts have found that many different types of acts are relevant to show a defendant's consciousness of guilt. Many of these acts have involved a defendant's flight or avoidant behavior to escape arrest or detection, or a defendant's attempt to influence jurors or witnesses.[31] But some cases dealing with a defendant's alleged flight illustrate that consciousness of guilt evidence can be unreliable, depending on the surrounding circumstances. We have recognized this problem.

In a case involving a defendant's alleged flight from a burglary, we stated the following rule:

> Departure from the scene after a crime has been committed, of itself, does not warrant an inference of guilt. . . . [T]he proper rule [is] that for departure to take on the legal significance of flight, there must be circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid apprehension or prosecution based on that guilt.[32]

Similarly, we affirmed a court's admission of flight evidence to show the defendant's consciousness of guilt when the "testimony indicate[d] that [the defendant] could have only leapt out of a second-story window to avoid apprehension."[33] Accordingly, we have said that *when the evidence is sufficient to justify an inference that the defendant acted with consciousness of guilt*, the fact finder can consider such evidence even if the conduct could be explained in another way.[34]

---

[31] See 1 Imwinkelried, *supra* note 13.

[32] *State v. Lincoln*, 183 Neb. 770, 772, 164 N.W.2d 470, 472 (1969) (citations omitted).

[33] *State v. Freemont*, 284 Neb. 179, 195, 817 N.W.2d 277, 293 (2012).

[34] See *Draganescu, supra* note 22.

But not all evidence will justify an inference of a defendant's guilty knowledge. There are limits to how far a trial court can allow the State to stretch inferences from circumstantial evidence that is relevant to prove the elements of a crime beyond a reasonable doubt. An inference resting on speculation or conjecture cannot support a criminal conviction.[35] So if the State's circumstantial evidence only supports an inference through speculation or only supports two equally speculative inferences, a trial court should exclude it when a party has properly invoked rule 403.

Under rule 403, a court may exclude relevant evidence if it presents a danger of unfair prejudice, of confusing the issues, or of misleading the jury that substantially outweighs its probative value. Evidence is unfairly prejudicial if it has a tendency to suggest a decision on an improper basis.[36] Courts should generally exclude speculative evidence as irrelevant and unfairly prejudicial under rule 403 because it encourages jurors to reach a determination on an improper basis—that is, by drawing unreasonable inferences.[37]

For example, we have held that a court should exclude an expert's opinion when it gives rise to conflicting inferences of equal probability, because the choice between them is a matter of conjecture.[38] Federal courts agree that evidence which requires speculation to be relevant is inadmissible under their

---

[35] See *State v. Garza*, 256 Neb. 752, 592 N.W.2d 485 (1999). Accord, e.g., *U.S. v. Katakis*, 800 F.3d 1017 (9th Cir. 2015); *U.S. v. Adams*, 722 F.3d 788 (6th Cir. 2013); *U.S. v. Friske*, 640 F.3d 1288 (11th Cir. 2011); *U.S. v. Pinckney*, 85 F.3d 4 (2d Cir. 1996).

[36] *State v. Castillas*, 285 Neb. 174, 826 N.W.2d 255 (2013), *disapproved in part on other grounds, State v. Lantz*, 290 Neb. 757, 861 N.W.2d 728 (2015).

[37] See, *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015); *Aon Consulting v. Midlands Fin. Benefits*, 275 Neb. 642, 748 N.W.2d 626 (2008).

[38] See *Johnson, supra* note 37; *State v. Kuehn*, 273 Neb. 219, 728 N.W.2d 589 (2007).

counterpart to rule 403.[39] And because speculative evidence has little, if any, probative value, its potential for unfair prejudice under rule 403 will usually substantially outweigh its probative value.

Regarding flight fact patterns, legal commentators and other courts have extensively discussed how circumstances unrelated to a defendant's guilt of a charged crime can often explain a defendant's alleged avoidance or flight from law enforcement officials.[40] Because evidence of flight can be unreliable and therefore unfairly prejudicial, flight cases illustrate how courts should consider rules 403 and 404 in tandem when the State offers evidence of a defendant's consciousness of guilt. Federal courts require "careful deliberation" in the admission of flight evidence.[41] Specifically, whether evidence of flight is admissible as circumstantial evidence of a defendant's guilt depends on how confidently it supports all four necessary inferences in the chain of logic to reach a determination of guilt from the extrinsic conduct: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.[42]

---

[39] See, *Yellow Pages Photos, Inc. v. Ziplocal*, 795 F.3d 1255 (11th Cir. 2015); *U.S. v. Iron Hawk*, 612 F.3d 1031 (8th Cir. 2010); *U.S. v. Jordan*, 485 F.3d 1214 (10th Cir. 2007); *U.S. v. Sellers*, 906 F.2d 597 (11th Cir. 1990).

[40] See, *U.S. v. Williams*, 33 F.3d 876 (7th Cir. 1994), citing *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977); 1 Imwinkelried, *supra* note 13, § 3:05 (citing cases).

[41] *Williams, supra* note 40, 33 F.3d at 879. Accord *United States v. Blue Thunder*, 604 F.2d 550 (8th Cir. 1979).

[42] See, *U.S. v. Carrillo*, 660 F.3d 914 (5th Cir. 2011); *Myers, supra* note 40. Accord, *U.S. v. Harrison*, 585 F.3d 1155 (9th Cir. 2009); *U.S. v. Al-Sadawi*, 432 F.3d 419 (2d Cir. 2005); *Williams, supra* note 40; *U.S. v. Hankins*, 931 F.2d 1256 (8th Cir. 1991); *U.S. v. Porter*, 821 F.2d 968 (4th Cir. 1987); *Escobar v. State*, 699 So. 2d 988 (Fla. 1997), *abrogated on other grounds, Connor v. State*, 803 So. 2d 598 (Fla. 2001).

In a seminal case, the Fifth Circuit held that the court erred in admitting evidence of the defendant's flight because it could not support the third inference: consciousness of guilt *for the charged crime*. In *United States v. Myers*,[43] the government charged the defendant with robbing a bank in Florida. Between the Florida robbery and his arrest in California—when he allegedly tried to flee arrest—he was known to have committed an armed robbery in Pennsylvania. The Fifth Circuit concluded that even assuming that the defendant had tried to flee arrest in California, the evidence did not rule out the possibility that he was fleeing arrest for the Pennsylvania robbery, his guilt of which would have been a sufficient cause for his flight in itself. Accordingly, it was error to allow the jury to infer from his flight that he was guilty of the charged robbery in Florida.

And the same reasoning applies to the string of necessary inferences to conclude that the excerpts from Oldson's journal showed his guilt. In these excerpts, Oldson did not confess to physically or sexually assaulting Beard. Nor did he confess to kidnapping or killing her. And the court did not admit any of these excerpts to show a confession. So to conclude that any excerpt was relevant to show Oldson's guilt for Beard's murder, a juror would need to make the following string of inferences: (1) Oldson's statement in the excerpt referred to Beard; (2) he did not explicitly refer to Beard in the excerpt because he was trying to conceal the information in it from law enforcement officers who were still investigating her disappearance; (3) he was trying to conceal the information in the excerpt because it would show either that he had previously lied about not having a sexual relationship with Beard, or about his interactions with her on the night she disappeared, or that he had guilty knowledge about her murder; (4) if the excerpt showed that he had previously lied, he did so because

---

[43] *Myers, supra* note 40.

he was guilty of committing a crime against Beard; and (5) the crime he was guilty of was her murder.

Because a chain of inferences is necessary to reach a determination of guilt, the extrinsic evidence should reasonably support each inference in the chain of logic. Especially under these circumstances, it is insufficient to conclude that the evidence supports an inference that Oldson was guilty of a crime if it does not also reasonably support an inference that he was conscious of his guilt for the *charged* crime.

Second, although the State can show a defendant's consciousness of guilt from the defendant's inculpatory statements, instead of acts, such statements should also reasonably support an inference of the defendant's guilty knowledge of the charged crime. An example would be a verbal threat to a State's witness, as in *Clancy*. Our decision in *State v. Ellis*[44] also speaks to this issue.

In *Ellis*, the inculpatory statements made by the defendant, Roy Ellis, showed his guilty knowledge of facts specific to a child's murder before the State charged him with the crime. We concluded that the trial court erred under rule 404 in admitting evidence that he had sexually assaulted his stepdaughters 10 years earlier to show his intent for the child's murder. We reasoned that this evidence was relevant only through classic propensity reasoning, but we concluded that the error was harmless. In doing so, we emphasized witnesses' testimonies about suspicious statements that the defendant made while he was in jail for unrelated crimes. We concluded the witnesses had described details that they could not have known unless they had learned them from the person who killed the child:

> There was no innocent explanation for how Ellis' DNA came to be on [the victim's] bloody clothing. Nor is there any innocent explanation for how several witnesses came forward with information *before* [the victim's] body or

---

[44] *State v. Ellis*, 281 Neb. 571, 799 N.W.2d 267 (2011).

Ellis' DNA on her clothing had been discovered link-
ing Ellis to the killing—some of whom even accurately
described [the victim's] cause of death and the possible
location of her body. This evidence can only be explained
by the conclusion that Ellis was the killer.[45]

The reason for requiring the State's evidence to reasonably
support each inference necessary to a determination of guilt
should be apparent. Consciousness of guilt evidence usually
casts the defendant in an unfavorable light and always requires
more than one inference to reach a determination of guilt.
So unless the evidence reasonably supports each inference
in the chain, the danger is high that the jurors will engage in
outright conjecture or resort to propensity reasoning to con-
clude that a defendant is guilty. The danger exists because
the court has instructed them that the evidence is relevant for
a specific purpose or has allowed them to consider it for any
purpose. Finding guilt based on conjectural facts or propensity
reasoning is obviously unfairly prejudicial and necessarily
outweighs the probative value of a weak or nonexistent chain
of inferences.

So under our case law, the ultimate test of admissibility
should be whether a juror could reasonably conclude—i.e.,
without relying on speculation or propensity reasoning—that
the circumstantial evidence shows a defendant's guilt for the
charged crime. Having established the relevant admissibility
standard for rule 404(2) evidence generally and consciousness
of guilt evidence specifically, I turn to the court's admission of
Oldson's statements in his journal.

## IV. ALL BUT ONE OF OLDSON'S JOURNAL EXCERPTS WERE INADMISSIBLE TO SHOW HIS GUILT OF BEARD'S MURDER

### 1. General Background Evidence

Beard disappeared from Ord, Nebraska, on May 31,
1989. In June, local and state law enforcement investigators

---

[45] *Id.* at 581-82, 799 N.W.2d at 282-83.

interviewed Oldson at least three times about his interactions with Beard on the night she disappeared. Evidence not presented to the jury showed that in July, officers arrested Oldson for assaulting a woman in Burwell, Nebraska. While he was serving the sentence for this assault in the county jail, he kept a journal. From December 1989 to September 1990, when Oldson was not in his cell, county jail officers copied the pages of Oldson's journal every other week during searches of his cell. Almost 2 years later, in April 1992, investigators found Beard's remains in a pasture outside of Ord. In January 2012, 23 years after Beard's disappearance, a sheriff's officer in Missouri, where Oldson was then living, arrested him for Beard's murder.

## 2. TRIAL PROCEEDINGS

On the sixth day of Oldson's trial, the court conducted an in camera hearing on the admissibility of evidence. The State sought to submit nine redacted pages from Oldson's journal while he was in jail for committing the assault in Burwell. It argued that a rule 404(3) hearing was unnecessary. The prosecutor stated that "every single admission or inculpatory statement that's made in that diary specifically addresses what took place and the facts and circumstances between Mr. Oldson and Cathy Beard on May 31st, 1989, nothing else."

In response to Oldson's objections to this argument, the court went through the redacted pages individually. Oldson's attorney explained that in a proceeding to obtain a search warrant, an officer stated that county jail officers had found Oldson's journal in the trash. But when the court later asked the prosecutor what the State's foundation would be for one of these pages, the prosecutor gave a different account. He said that while Oldson was in jail, county jail officers performed cell checks every other week. At these times, the officers would remove Oldson from his cell, take him to the library, and then copy his journal. The prosecutor said that this went on from December 1989 to September 1990, when the State released Oldson.

The court admitted Oldson's entire 230-page journal to rule on the admissibility of the redacted pages. The next day, the court issued a written order admitting all nine pages of Oldson's journal. The court admitted exhibits 263 through 271 during the testimony of Gerald Woodgate, who said only that he was the sheriff of Valley County, Nebraska, in 1989 when Beard disappeared. But the evidence and parties' statements at the pretrial hearings to exclude the evidence showed that Oldson was in the Valley County jail for an unrelated assault when he wrote these journal entries. The State asked Woodgate only if he had come into contact with any of Oldson's writings between December 1989 and September 1990. The State provided no explanation for when Oldson would have written this journal or how the State came to possess it. In a sidebar discussion, Oldson repeated his pretrial objections, which the court overruled.

After the court instructed the jury not to speculate about the text that had been redacted, the State published these excerpts to the jury. Except for exhibits 266 and 270, the court provided no explanation to the jury for why these exhibits were relevant to prove a fact of consequence in the prosecution. Out of the jury's presence, the court overruled Oldson's motion for a mistrial. Later, the court submitted exhibits 263 through 271 to the jury for review during its deliberations.

### 3. Evidence Fails to Show That Oldson Used a Pattern of Concealment or Encryption to Refer to Beard

#### (a) Exhibit 263 Did Not Show Consciousness of Guilt

##### (i) Trial Court's Ruling

In exhibit 263, Oldson wrote the following entry: "I guess the whole import of this thing with the 'missing one' has not hit home, yet. But it should, as they are now looking for charges. If they do prefer charges, well - ? I don't see how they can hang me for anything."

The court ruled that exhibit 263 was admissible to show that Oldson knew he was a suspect: "Further, the content directly relates to this charge. This is not character evidence and is not unfairly prejudicial."

### (ii) Trial Court Erred in
### Admitting Exhibit 263

I assume that in exhibit 263, Oldson's reference to the "'missing one'" was a reference to Beard. But I believe the court erred in admitting this evidence to show that Oldson knew he was a suspect in Beard's disappearance. It is true that Oldson's statement that he doubted investigators could "hang [him] for anything" could be reasonably interpreted to mean he knew he was a suspect. But that evidence was unnecessary. Oldson knew that he was a suspect because investigators had questioned him at least three times in June 1989. And standing alone, his knowledge that he was a suspect was not probative of any fact of consequence. So the court's implicit agreement with the State that exhibit 263 showed Oldson's consciousness of guilt was speculative.

I agree that Oldson's statement could reasonably support an inference that he doubted the State would charge him with a crime. But apart from speculation, that inference could not support the further inferences of Oldson's guilty knowledge about the crime or his guilt of murder. And it could equally support an inference that he was innocent of Beard's murder but concerned that investigators would suspect him of being involved in her disappearance because he was allegedly the last man to have been seen with her. Another reasonable inference could be that Oldson was expressing a doubt that investigators would manufacture evidence against him. He explicitly questioned whether investigators might try to manufacture evidence against him in exhibit 268. And the majority concedes that Oldson's statement in exhibit 268 was largely exculpatory. So if Oldson was expressing the same sentiment in exhibit 263—i.e., doubting that investigators would try to frame him—his

statement did not reasonably support an inference that he had guilty knowledge of Beard's murder.

It is true that Oldson's statement could have also been interpreted to mean that he doubted investigators would find evidence that he murdered Beard. That interpretation would have supported the State's argument that Oldson's statement was relevant to show his consciousness of guilt. But the actual meaning of his statement in exhibit 263 requires guesswork. To interpret his statement to mean that he doubted investigators would find evidence that he murdered Beard required a fact finder to engage in complete speculation about Oldson's meaning.

As stated, courts generally exclude speculative evidence as irrelevant and unfairly prejudicial under rule 403. It encourages jurors to determine an issue by drawing an unreasonable inference.[46] And evidence of a defendant's conduct or statement does not justify an inference of his or her consciousness of guilt under rule 404 if it requires a fact finder to make speculative connections. Here, the evidence supports three equally speculative interpretations: one inculpatory and two innocent. So the court erred in failing to recognize that admitting exhibit 263 would allow the jurors to speculate that it was relevant to show his consciousness of guilt. Its potential for unfair prejudice outweighed its weak and possibly nonexistent probative value.

### (iii) The Majority's Alternative
### Reasoning Is Incorrect

The majority ignores the court's error under rule 403 in admitting exhibit 263 to show (1) Oldson's knowledge that he was a suspect and (2) implicitly, his consciousness of guilt. Instead, it zeros in on the State's alternative argument at trial.

In a single paragraph, the majority summarily opines that the "oblique nature of Oldson's references to Beard . . . or

---

[46] See cases cited *supra* notes 35 and 37 through 39.

evidence relating to her disappearance" in exhibit 263, 264, 265, and 267 support an inference of Oldson's consciousness of guilt. It incorrectly reasons that his consciousness of guilt can be "inferred from the secretive way in which Oldson referred to Beard throughout his writings." If this analysis of "secretive" references seems weak, it is because the majority necessarily avoids scrutinizing the State's reasoning. The majority states that evidence showing a defendant's consciousness of guilt is strong evidence of guilt *because nothing else will explain the evidence*. Yet, the majority concludes that the court did not abuse its discretion under 403 in admitting these "oblique" references to Beard or the facts of her disappearance.

There are two problems with this reasoning. First, the trial court gave the jurors no instructions on how they were to consider exhibit 263. Oldson would not have requested a limiting instruction because he argued that the evidence was inadmissible for any purpose. So even if the majority's alternative reasoning were correct, the court's failure to limit the jury to considering exhibit 263 for a proper purpose would have only compounded its error in admitting it for a speculative purpose. Because the jurors would have assumed that the evidence was relevant for proving Oldson's guilt, the danger was high they would have speculated about the meaning of his statement.

Equally important, the majority's alternative theory of relevance—to show Oldson's consciousness of guilt under rule 404(2)—also invites speculation about the meaning of Oldson's statements. The majority points to no other excerpts from his journal that show the "'missing one'" was Oldson's secret code for Beard. Nor does the majority show that he used any pattern of encryption to conceal his statements about Beard. And the evidence does not support that conclusion.

First, a review of Oldson's entire journal, which the court received for ruling on these excerpts, shows that there is no other reference to the "'missing one.'" Second, the majority

acknowledges that Oldson directly referred to Beard by her last name when he wrote that the Valley County Attorney was '"so obsessed with Beard.'" Oldson also mused about "Cathie" in at least three journal entries, which writings may have also been references to Beard. At least, the record does not show they are not. So Oldson's journal, viewed as a whole, suggests with an equal degree of confidence that he was not attempting to conceal his writings about Beard. Third, Oldson referred to other people by derogatory labels throughout his journal. So his mere use of a label in exhibit 263 is insufficient to show that he deliberately concealed references to Beard. In sum, his references to Beard as the "'missing one'" in exhibit 263 did not reasonably support an inference that he was deliberately concealing his references to Beard. That interpretation is speculative.

More important, even accepting the majority's premise that Oldson was attempting to conceal his references to Beard, exhibit 263 did not show his consciousness of guilt. Even a hundred "oblique" references to Beard could not do that unless the statements themselves were sufficient to support a reasonable inference that he had guilty knowledge of the charged crime. The majority fails to set out the chain of necessary inferences to conclude that Oldson had guilty knowledge of Beard's murder from his statement in exhibit 263. The reason for its omission is clear. As explained above, exhibit 263 could not support that inference apart from speculation. And even if the trial court considered exhibit 263 with exhibits 264, 265, and 267, they do not reasonably support that inference.

### (b) Exhibit 264 Did Not Show
### Consciousness of Guilt

#### (i) Trial Court's Ruling

The State redacted all but one sentence of exhibit 264: "Well, one doesn't write certain things in his journal, does he?" The court concluded that this page was admissible because it

"contains an inference that [Oldson] is hiding something and is inculpatory. It is not character evidence."

### (ii) Trial Court Erred in Admitting Exhibit 264 and the Majority's Alternative Reasoning Is Incorrect

The court's admission of exhibit 264 to show that Oldson was hiding something was even more improper under rule 403 than its admission of exhibit 263—because inferring Oldson's meaning in exhibit 264 was even more speculative. This statement could only be probative of a fact of consequence if it showed that Oldson was hiding his guilty knowledge about murdering Beard. But it was equally plausible that Oldson was musing about a fantasy that he did not want to reveal. Or that he was musing about his desire to kill a cellmate, his regret of a previous bad act, *or* the facts of murdering Beard. But short of using a Ouija board, no fact finder could divine what Oldson was writing about.

The majority's conclusion that exhibit 264 was admissible to show Oldson's consciousness of guilt through his cryptic references to Beard is similarly wrong. Under its reasoning—regardless of content—Oldson's obvious references to Beard, *and* his silence, show a pattern of trying to conceal his guilty knowledge. This is circular reasoning. The majority finds a reference to Beard in exhibit 264 only by proceeding from an assumption that a pattern of concealment exists. But the absence of actual evidence showing a pattern can never lead to a reliable conclusion that he was attempting to conceal his statements. I conclude that exhibit 264 fails to show a pattern of oblique references or encryption. And it does not support an inference of guilty knowledge.

### (c) Exhibit 265 Did Not Show Consciousness of Guilt

### (i) Trial Court's Ruling

In exhibit 265, the court admitted the following redacted statement: "Well, it looks as if this foolishness about the

missing doo-doo has reached a point where the end is in sight. That's good. I like it - perhaps now I can ease my mind." In its order, the court stated, "This is not character evidence. These are statements made by [Oldson] that are directly related to this charge. The jury is allowed to make whatever inferences they choose about this statement."

### (ii) Trial Court Erred in Admitting Exhibit 265 and the Majority's Alternative Reasoning Is Incorrect

The trial court incorrectly reasoned that exhibit 265 was admissible because Oldson's statement directly related to the charged crime. I assume that the reference to the "missing doo-doo" was another reference to Beard. As stated, however, other evidence established that Oldson knew he was a suspect. So it was not incriminating for Oldson to express relief that the investigation was almost over. An innocent person could have expressed that sentiment, and Oldson's characterization of the investigation as "foolishness" strengthens an innocent interpretation of the statement. But that interpretation was irrelevant to a fact of consequence.

The trial court may have alternatively reasoned that Oldson's statement was directly related to the charged crime by interpreting it to mean that he was relieved to be getting away with murdering Beard. But again, Oldson's actual meaning required guesswork. The exculpatory and inculpatory interpretations of his statement are both speculative. And because a fact finder could only find that the evidence was relevant to a fact of consequence through speculation, the court's admission of exhibit 265 for any purpose at all virtually ensured that the jurors would speculate about Oldson's meaning. So under rule 403, the court erred in allowing the jurors to speculate that Oldson had guilty knowledge of Beard's murder.

Furthermore, the alternative reasoning in the majority opinion does not cure the problem under rule 404(2). As a reminder, the majority concludes that exhibit 265 was also admissible to

show Oldson's consciousness of guilt through his cryptic references to Beard or evidence related to her disappearance. But Oldson's reference to Beard here as the "'missing doo-doo'" fails to show that this was a term he used to conceal his writings about Beard. Knowing that he was a suspect in Beard's disappearance, this label was no more secretive than his reference to the "'missing one'" in exhibit 263. Additionally, he specifically referred to other people in his journal as "doo-doos." And he used worse derogatory labels for others throughout his journal. So in context, his use of labels illustrates only his insensitivity to others, not an encryption. Finally, as noted, Oldson directly referred to "Beard" and mused about an unidentified "Cathie" in other entries. So when his journal is viewed as a whole, this entry also fails to show that he was trying to conceal or use encryption for his references to Beard. And because the meaning of Oldson's statement requires guesswork to conclude that it shows his consciousness of guilt about Beard's murder, it obviously did not provide a sufficient factual foundation to reasonably support that inference.

### (d) Exhibit 267 Did Not Show That Oldson Secretively Referred to Beard in Other Exhibits

As I explain later, I agree that exhibit 267 was probative of Oldson's consciousness of guilt for Beard's murder. In that exhibit, Oldson stated that his first priority upon his release was to get rid of something that linked him to an unnamed person or thing. But that single statement cannot show a pattern that proves Oldson was secretly writing about Beard in other excerpts to conceal his guilty knowledge of the crime. It is the content of exhibit 267 that evidences Oldson's consciousness of guilt, not proof of a pattern that shows he used secret references for Beard. Even if the court considered exhibit 267 with the other exhibits offered to show Oldson's attempt to conceal his references to Beard, it failed to show a pattern. There is no nonspeculative pattern in these exhibits. So the

majority incorrectly fails to consider each excerpt separately to determine whether it was properly admitted to show Oldson's consciousness of guilt.

### 4. TRIAL COURT ERRED IN ADMITTING EXHIBIT 266

#### (a) Parties' Arguments and Trial Court's Ruling

The journal entry that the court admitted as exhibit 266 originally read as follows:

> I have determined that I am not going to be physically bullied by anyone, any longer. . . . I have acquired a great deal of confidence. I can see it in the people around me that they respect that confidence. This is good. I can now be what I want to be with no fear of any man. Of course, emotional fear of women may still be there - I don't know. I haven[']t had any interaction w/girls lately - obviously.
>
> Of course, I see little reason to fear any longer. I know pain, I know loss, I know hardship - nothing that can happen can be as bad as what I have already been "stricked" (or stricken) with. Besides, as much as I like being with girls, and as much as I want a relationship, I would think that it's in my best interest to plunge right in with no fear. Show off my best side, etc. Maybe the problem has been my making girls too high a priority - and having real problems with accepting rejection. Which may be how all this got started. "Get it any way you can" (?) Doesn't sound like a good attitude. It got me in trouble.

The State redacted all but the last three sentences of this entry "[j]ust to be as cautious as possible." So exhibit 266, as presented to the jury, provided the following: "Maybe the problem has been my making girls too high a priority - and having real problems with accepting rejection. Which may be how all this got started. 'Get it any way you can' (?) Doesn't sound like a good attitude. It got me in trouble."

The State argued that exhibit 266 was admissible to show Oldson's state of mind when he interacted with Beard outside the bar on May 31, 1989, because he was writing about that specific event. It additionally argued that exhibit 266 was relevant to show Oldson's motive for the charged crime: his refusal to accept rejection.

Oldson's attorney argued that exhibit 266 was too speculative to show that he was writing about Beard. She reminded the court that Oldson wrote that this "may be how all this got started" when he was in custody for an "incident involving a woman, involving rejection at Burwell." The court had previously received evidence showing that in July 1989, officers arrested Oldson for an assault against a woman in Burwell. The assault involved his forcibly touching her stomach and then fleeing. But at trial, the court did not seem to know what the Burwell incident referred to. So Oldson's attorney briefly explained that the State had convicted Oldson of an assault there. She argued that his journal entry was likely about the unrelated assault because it was similar to "the sexual proclivities that are described in the diary" and the woman had resisted in some manner.

The court admitted Oldson's statements that he had problems accepting rejection and that his "'[g]et it any way you can'" attitude had got him into trouble to show his motive and consciousness of guilt for Beard's murder:

> This is not evidence of a prior act under 27-404(2). The State is not offering this to prove [Oldson] has a character trait (problem with accepting rejection) that causes him or has caused him to murder other women. The evidence does not indicate or imply that [Oldson] kills women who reject him. This is proper to offer as evidence of motive and consciousness of guilt as to this charge. Further, this is relevant to statements [Oldson] made to others that Cathy Beard rejected him.

Despite this ruling, just before the State published exhibit 266 to the jury, the trial court changed course. It instructed the

jurors that exhibit 266 was being admitted "to help you decide motive . . . . You must consider this evidence only for this limited purpose." So the court admitted exhibit 266 to show only motive, not consciousness of guilt.

(b) The Majority's Reasoning

The majority agrees that exhibit 266 was logically relevant to show Oldson's reason for killing Beard. But to reach that conclusion, it first reasons that the evidence shows Oldson's consciousness of guilt. It states that the court "[i]n essence . . . found that the jury could reasonably infer from exhibit 266 that Oldson was acknowledging he had gotten himself into 'trouble' because he attempted to '[g]et it any way you can' when Beard rejected him on the night of her disappearance." Citing *Huddleston v. United States*,[47] the majority concludes that court's only duty in its gatekeeping role was limited to determining whether the jury could reasonably find by a preponderance of the evidence the conditioning fact necessary to make exhibit 266 relevant: i.e., that Oldson was writing about getting himself in trouble with Beard on the night she disappeared because he attempted to "'[g]et it any way you can'" and Beard rejected him.

The majority concludes that the court was required to consider other evidence, "especially the other journal excerpts." It concludes that the jury could reasonably draw the inference that Oldson was writing about Beard because his other journal entries independently supported an inference that he referred to Beard in a purposefully vague way. It finds nothing in Oldson's journal excerpts to undermine this conclusion. So it concludes that the "jury could reasonably infer from exhibit 266 that Oldson was reflecting upon the fact that he had killed Beard because she rejected him."

On appeal, Oldson argues that the court should have excluded exhibit 266 because he could not rebut the motive

---

[47] *Huddleston v. United States*, 485 U.S. 681, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988).

inference without opening the door to extrinsic evidence that he was in custody for an unrelated assault. Although Oldson ties his argument to rule 403 in his brief,[48] the majority mischaracterizes it. It treats the argument as a rule 404 issue and concludes that presenting the extrinsic evidence on cross-examination would have been free of propensity reasoning. The majority opinion cites cases in which a court upheld the admission of flight or escape evidence to show a defendant's consciousness of guilt even though the defendant was sought or being held for more than one crime. From this, it concludes that Oldson's tough choice whether to present evidence that would damn him in the jury's eyes was not a reason to exclude the evidence.

Finally, the majority concludes that exhibit 266 did not present a rule 403 problem. It implicitly reasons that the exhibit did not create a propensity inference because Oldson was writing about killing Beard. But it alternatively reasons that because there is no character trait involved in having a problem with rejection, he could not have been prejudiced by improper propensity reasoning. As the final nail in the coffin, the majority states that only rarely, and only under "'extraordinarily compelling circumstances,'" will this court reverse a trial court's rule 403 determination.

To summarize, the majority's confusing analysis concludes that when read in context with his other cryptic statements, Oldson's statement in exhibit 266 was direct evidence of his motive: He was explaining why he killed Beard. Because he was writing about Beard's murder, it was not evidence of his character. Through this reasoning, it dodges Oldson's argument that exhibit 266 was character evidence. Worse yet, the majority concludes that because exhibit 266 showed that Oldson's motive for killing Beard was rejection, exhibit 266 was properly admitted under rule 404 even if it was character evidence. It reasons that the court's admission of Oldson's statement

---

[48] See brief for appellant at 62-65.

is not nearly as bad as statements that courts have admitted in some other cases. And the danger of unfair prejudice did not outweigh the exhibit's probative value under the majority's new standard of rarely questioning a court's ruling under rule 403. Finally, requiring Oldson to produce evidence of an unrelated assault to rebut a motive inference was not unfairly prejudicial because he could have cross-examined the State's witness about the extrinsic evidence without relying on propensity inferences about his character.

### (c) The Majority Opinion Wrongly Upholds the Admission of Exhibit 266

The court's admission of exhibit 266 to show Oldson's motive for murdering Beard was wrong for three reasons. It required speculative reasoning when offered as direct evidence of Oldson's motive. It required propensity reasoning when offered as circumstantial evidence of Oldson's motive. Finally, the jurors were highly likely to have engaged in speculative or propensity reasoning because they did not know that Oldson was probably writing about the extrinsic Burwell incident. And Oldson could not have presented the extrinsic evidence without painting himself as a person who was likely to have committed the charged crime.

The majority ignores much of our precedent to uphold the admission of this single exhibit in a single case. I disagree with its reasoning, and I particularly disagree with its suggestion that we should abdicate our role to uphold our evidentiary standards and give blanket deference to a trial court's rulings under rule 403.

### (i) Exhibit 266 Was Too Speculative to Show Oldson Was Writing About Killing Beard

The circumstances known to the court showed that Oldson was likely writing about his incarceration for assaulting a woman in Burwell. That offense was the closest in time to his

journal entry and the only crime that had actually "got [him] in trouble." So he was more likely to have been writing about that crime. And because the court knew these circumstances, it knew that the jurors would be speculating to conclude that Oldson was writing about why he murdered Beard. For that reason alone, rule 403 should have precluded its admission. The unfair prejudice from drawing a speculative—and thus unreasonable—inference about Oldson's motive outweighed any probative value.

Although the majority states that the court was required to consider other evidence when considering whether to admit exhibit 266, it apparently does not include in that mandate the court's knowledge that when Oldson wrote this, he was serving a sentence for assaulting another woman. Instead, the only evidence that the majority thinks the trial court should have considered are Oldson's other journal entries.

But Oldson's other journal entries fail to show that he was writing about why he murdered Beard in exhibit 266. His labels and silence in the other exhibits are too inconsistent to show that he used a pattern of cryptic references for Beard or that he omitted her name whenever he wrote about her. And most of them are simply not incriminating. So they do not show that Oldson was secretly writing about why he murdered Beard in exhibit 266. It is only because the majority ignores the speculation problem in detecting a pattern in Oldson's references to Beard that it can avoid the speculation problem in reasoning that Oldson was writing about Beard in exhibit 266. Equally important, Oldson's full statement in exhibit 266 showed that he was ruminating about his problems with women generally. Only by extracting the three selected sentences from their context could the State convincingly argue that Oldson was writing about why he murdered Beard.

So I disagree with the majority's reasoning that there is no support in Oldson's journal to show that the admission of exhibit 266 was misleading and unfairly prejudicial. And if these statements are unambiguously direct evidence of the

reason that Oldson killed Beard, a reader must wonder why the State waited so long to prosecute him when they were aware of his statements soon after he wrote each journal entry.

### (ii) If Jurors Did Not Speculate That Oldson Was Writing About Beard, They Relied on Propensity Inferences to Find Exhibit 266 Relevant to Prove Motive

As a reminder, exhibit 266 comprised this statement: "Maybe the problem has been my making girls too high a priority - and having real problems with accepting rejection. Which may be how all this got started. 'Get it any way you can.'"

The majority incorrectly states that the probative value of this statement depended upon a finding that Oldson was writing about Beard. Remember, the court instructed the jurors only that exhibit 266 was admissible to help them decide Oldson's motive for killing Beard. It did not condition their consideration of the evidence on a finding that Oldson was writing about why he killed Beard, and Oldson never referred to Beard in the statement. Because it was not direct evidence of Oldson's guilt, its admission allowed the jury to find it relevant to prove Oldson's propensity to commit assaults against women who rejected him. So even if the jurors did not speculatively infer that the statement was direct evidence of why Oldson killed Beard, they would have considered it for the State's original purpose in offering it at a pretrial hearing: to show that Oldson was upset by a woman's rejection, which coincided with its theory that Oldson murdered Beard when she rejected his sexual advances.

Other than speculating that exhibit 266 was direct evidence of Oldson's motive for killing Beard, the jurors could have only considered it to be proof of his motive by reasoning that he was probably acting in conformity with a character trait. That trait was Oldson's propensity to "'[g]et it any way you can'" if he was rejected. But this theory of logical relevance conflicted with rule 404(1)'s forbidden propensity reasoning.

Apart from exceptions that do not apply, rule 404(1) provides that "[e]vidence of a person's character or a trait of his or her character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion . . . ."

The majority rebukes Oldson for extracting the meaning of his statement "from any context that it referred to Oldson's actions with Beard on the night of her disappearance and his motive for those actions." But it is the majority that has extracted the statement from its context, both from the context of his full statement in exhibit 266 and from the circumstances known to the trial court. The majority, with a surgeon's scalpel, even attempts to extract his statement that he had problems accepting rejection—which it declares is not a character trait—from his statement that his attitude of "'[g]et it any way you can'" got him into trouble. Nonetheless, the jury would have got the point that the two traits were connected. The prosecutor specifically argued in closing that exhibit 266 provided a glimpse of Oldson's mindset and showed that he was unable to accept Beard's rejection of him. And the State argues on appeal that Oldson's journal writings "reflect that Oldson got in trouble because he [could] not handle being rejected."[49]

The majority apparently recognizes the propensity problem in the State's argument because it resorts to again undermining our rule 404 jurisprudence. It states, "If character evidence is admitted for a proper purpose, then, ipso facto, it is not admitted for the purpose of showing propensity" and rule 404(1) does not apply. But regardless of whether subsection (1) or (2) of rule 404 governs Oldson's statement, it was not independently relevant as circumstantial evidence of his motive. Under that theory of relevance, the primary purpose of presenting the evidence was to establish Oldson's propensity to do whatever it takes to get sex if rejected—his character trait.

---

[49] Brief for appellee at 18.

Only by establishing this inference could the State use the statement to show his motive for the charged crime. And we have previously held the State cannot rely on propensity reasoning to show motive.[50]

In sum, the jurors could only conclude that Oldson was writing about why he killed Beard through an inference resting on speculation. Alternatively, they could only conclude that his writing was circumstantial evidence of his motive through a propensity inference about his character. Either inference was unreasonable. Because the inferences were unreasonable, the evidence's potential for unfair prejudice outweighed its probative value. So exhibit 266 was inadmissible under both rules 404 and 403. And it was inadmissible for the additional reason that Oldson could not rebut the inference without presenting evidence of his extrinsic misconduct with similarities to the charged crime.

### (iii) A Defendant Should Not Have to Rebut an Unreasonable Inference by Presenting Damning Evidence

The majority dismisses Oldson's argument that he could not rebut the inference created by the admission of exhibit 266 as a tough strategical choice. It cites cases in which a court upheld the admission of flight or escape evidence to show a defendant's consciousness of guilt even though the defendant was sought or being held for more than one crime. But these cases primarily show that even when the defendant has committed multiple crimes, the circumstantial evidence is admissible if it reasonably supports one of two inferences: (1) the defendant was primarily attempting to evade capture or escape custody for the charged crime[51] or (2) the defendant

---

[50] See, *State v. Payne-McCoy*, 284 Neb. 302, 818 N.W.2d 608 (2012); *Sanchez, supra* note 4.

[51] See, e.g., *United States v. Kalish*, 690 F.2d 1144 (5th Cir. 1982); *United States v. Boyle*, 675 F.2d 430 (1st Cir. 1982); *State v. Hughes*, 596 S.W.2d 723 (Mo. 1980); *Fentis v. State*, 582 S.W.2d 779 (Tex. Crim. App. 1976).

was attempting to evade capture or escape custody for all of his crimes.[52]

Some of the cases that the majority relies on are older and arguably inconsistent with the majority of cases that require courts to be cautious in admitting evidence of a defendant's alleged flight or evasive conduct. But to the extent they are inconsistent, they should be interpreted to mean that a trial court must be sensitive to the facts of the case.[53] To the extent they broadly authorize the admission of circumstantial evidence even if it allows jurors to speculate that the evidence shows a defendant's guilt, the cited cases are contrary to our own case law. Here, the State has not met the reasonable inference requirement.

Similarly, in rejecting Oldson's argument that exhibit 266 was character evidence, the majority relies on hate crime cases or cases in which a defendant expressed a desire to kill or harm a random member of a group.[54] Those cases are also distinguishable. It is true that courts have sometimes admitted evidence showing a defendant's hatred of a distinct group or desire to harm a random member of a group to show the defendant's motive or intent for a seemingly random act of violence. But these fact patterns are distinguishable and courts should analyze them on a case-by-case basis.[55] Unlike the facts in *People v. Greenlee*,[56] Oldson's journal entries did not show a

---

[52] See, e.g., *United States v. De Parias*, 805 F.2d 1447 (11th Cir. 1986), *overruled on other grounds, U.S. v. Kaplan*, 171 F.3d 1351 (11th Cir. 1999); *Boyle, supra* note 51; *People v. Remiro*, 89 Cal. App. 3d 809, 153 Cal. Rptr. 89 (1979); *Fulford v. State*, 221 Ga. 257, 144 S.E.2d 370 (1965).

[53] See *Escobar, supra* note 42.

[54] See, *People v. Griffin*, 224 P.3d 292 (Colo. App. 2009); *Masters, supra* note 19; *People v. Hoffman*, 225 Mich. App. 103, 570 N.W.2d 146 (1997); *State v. Crumb*, 277 N.J. Super. 311, 649 A.2d 879 (1994).

[55] Compare *Masters, supra* note 19, with *Kaufman v. People*, 202 P.3d 542 (Colo. 2009).

[56] *People v. Greenlee*, 200 P.3d 363 (Colo. 2009).

desire to randomly kill a woman. Nor did they show his hatred of women as a group. So the majority's discussion of such cases amounts to a distraction.

What matters here is that inferring motive from exhibit 266 required an unreasonable inference. And the majority recognizes that Oldson could not rebut that inference without presenting evidence of his extrinsic misconduct with similarities to the State's theory of his conduct in committing the charged crime. So the unfair rebuttal issue was an additional reason to conclude that the exhibit's potential for unfair prejudice outweighed any probative value.

The rebuttal dilemma underlies the requirement that the evidence used to show a defendant's consciousness of guilt must reasonably support each necessary inference in the chain of logic for that proof. The Fourth Circuit discussed this problem in a flight case where the defendant left the jurisdiction immediately after an investigator left a note at his residence for him to contact the investigator. In *United States v. Beahm*,[57] the court held that a trial court may not instruct the jury on flight as evidence of guilt when the evidence fails to show the defendant knew the government was investigating him for the charged crime:

> *Otherwise, defendant would bear an unconscionable burden of offering not only an innocent explanation for his departure but guilty ones as well in order to dispel the inference to which the government would apparently be entitled* that an investigation calling upon defendant could have but one purpose, namely, his apprehension for the crime for which he is ultimately charged. If the government wishes to offer evidence of flight to demonstrate guilt, it must ensure that each link in the chain of inferences leading to that conclusion is sturdily supported.[58]

---

[57] *United States v. Beahm*, 664 F.2d 414 (4th Cir. 1981).

[58] *Id.* at 420 (emphasis supplied).

Other courts have similarly reasoned that the introduction of propensity evidence can unfairly put a defendant in a position of explaining extrinsic misconduct or a character trait.[59] That concern should surely apply when the trial court knew, or should have known, that the State's evidence only supported a fact of consequence through an unreasonable inference. Here, requiring Oldson to prove that the inference was unreasonable would have only strengthened the propensity inference in the jury's eyes. This is not a tough strategical choice; it is an unfair burden. I conclude the trial court erred in admitting exhibit 266.

### 5. Court Improperly Admitted Exhibits 268, 269, and 271

#### (a) Oldson's Meaning in Exhibit 268 Was Speculative

##### (i) Trial Court's Ruling

Twenty-seven days before he was released from jail in 1990, Oldson again ruminated about the Beard investigation: "Well, there it is. What's next, I wonder? It's gettin' closer - and G.J. and the Fried Eggplant gang aren't movin' - although they still could, conceivably. How, I don't know - in fact, [illegible] wonder if there is any way he could even manufacture something? I doubt it."

In this statement, I accept that the initials "G.J." are reasonably interpreted as a reference to the Valley County Attorney at that time and that the "Fried Eggplant gang" was a derogatory label for the investigators. The court ruled that exhibit 268 was admissible to show Oldson's knowledge that he was a suspect and to show why he might have wanted to get rid of evidence "as can be inferred from [exhibit 267]."

---

[59] See, *Kaufman, supra* note 55; *State v. Loebach*, 310 N.W.2d 58 (Minn. 1981).

### (ii) Trial Court Erred in Admitting
### Exhibit 268 and the Majority
### Wrongly Upholds the Ruling

The court erred in admitting exhibit 268 to show Oldson's knowledge that he was a suspect and to show why he needed to get rid of something. Oldson only needed to dispose of evidence connected to Beard's murder if he was guilty of committing that crime. But exhibit 268 did not reasonably support an inference that Oldson had guilty knowledge of Beard's murder. Oldson only wondered if the Valley County Attorney might still charge him with a crime and if investigators would manufacture evidence for that purpose. An innocent man might also wonder if investigators would manufacture evidence against him when he knew he was a suspect. And the majority concedes that Oldson's statement in exhibit 268 was "largely exculpatory." Nonetheless, it concludes that the court did not abuse its discretion in admitting exhibit 268 under rule 403. Not so.

The majority's statement that exhibit 268 was largely exculpatory shows that an innocent interpretation was the most probable interpretation and, minimally, an equally speculative interpretation. Nor does the majority point to any fact of consequence or intermediate inference for which exhibit 268 was probative. Oldson's meaning in exhibit 268 was too speculative to prove a fact of consequence. So the court erred in admitting evidence that allowed the jurors to speculate that the exhibit showed Oldson's guilt of murdering Beard.

### (b) Oldson's Meaning in Exhibit 269
### Was Speculative

### (i) Trial Court's Ruling

In this excerpt, Oldson disparaged the investigators for not investigating whether anyone else was involved in Beard's disappearance and stated that he was going to "get away":

> Fried Eggplant gang ain't makin' it - they're gonna slip and fall and just generally fu-- up! That's nice . . .

I'm gonna get away and I'll bet it breaks their yellow hearts - they're so dead-set that I did this and they're not gonna look any farther unless they are forced to. Well; now, they'd best look elsewhere, 'cuz I refuse to be a part of this charade any longer. I'm well fed up with this tomfoolery - they can stick it in their asses. So there.

The court ruled that exhibit 269 was admissible for the same reason as exhibit 268: to show Oldson's knowledge that he was a suspect and to show why he might have wanted to get rid of evidence "as can be inferred from [exhibit 267]."

### (ii) Trial Court Erred in Admitting Exhibit 269 and the Majority's Reasoning Is Incorrect

As with exhibit 268, the majority seems to agree with Oldson that exhibit 269 was largely exculpatory: "Oldson opines in exhibits 268 and 269 that the only way law enforcement could bring charges against him is if it manufactured evidence." Nonetheless, it concludes that exhibit 269 is probative of Oldson's guilt. It reasons that a fact finder could infer from exhibit 269 that Oldson thought he would "'get away,' because law enforcement was going to make mistakes." So the majority implicitly reasons that exhibit 269 could show his consciousness of guilt by interpreting the statement to mean that Oldson believed he would "'get away'" with murder. It concludes that the court did not abuse its discretion in admitting the evidence under rule 403.

The problem with the majority's reasoning is that the trial court knew that Oldson was in jail for the unrelated crime in Burwell when he wrote this. Oldson made this statement on August 14, 1990, 23 days before the State released him from jail. The day before making the statement in exhibit 269, Oldson wrote this entry:

Every sound I hear that I cannot directly identify, and every time anything questionable happens with Woody or some other law . . . person, makes me suspect that they are talking about me, or plotting some way to keep me

here forever. I have to imagine that G.J. is working fever-
ishly to prevent my slipping out of here. I bet he can't
stand the idea that I'm going to "get away". Too bad - and
he better leave me the f--- alone. <u>Death is no stranger to
me</u>, Army and all.

When viewed in the context of Oldson's journal entry on
the preceding day, his statement that "I'm gonna get away" is
reasonably interpreted to mean that he was going to "get out of
jail," instead of going to "get away with murder." Even without
the context of his previous day's entry, the majority concedes
the statement was largely exculpatory.

But because the jurors did not know that Oldson was in
jail for another crime when he wrote this statement, they were
highly likely to draw the conclusion that he had guilty knowl-
edge of the charged crime. Remember, the jurors only knew
that Woodgate was sheriff of Valley County in 1989 when
Beard disappeared and that he had obtained Oldson's writings
between December 1989 and September 1990. Because the
context of the writings was unknown to the jurors, the danger
was high they would speculate that Woodgate had obtained
them through a search during the investigation of Beard's mur-
der. Disconnected from the context of Oldson's incarceration
for unrelated crime, the excerpt supported a damning infer-
ence that Oldson was writing about getting away with murder.
But the trial court knew the actual context and should have
excluded exhibit 268 because it would allow the jurors to spec-
ulate that Oldson believed he would get away with murdering
Beard. Had they known the context, they could have just as
easily speculated that he thought he would get out of jail before
investigators manufactured evidence against him.

### (c) Oldson's Meaning in Exhibit 271
### Was Speculative

*(i) Trial Court's Ruling*

Sixteen days before he was released, Oldson wrote the fol-
lowing journal entry:

Ha, Ha! [The Valley County Attorney] is a stupid slut!
He will never find anything no matter how hard he looks
because their [sic] is nothing to find. And he's too stu-
pid to manufacture anything. He's just doo-fah and he'll
always be scum. I've beaten him! Of course, there was
never any doubt in anyone's . . . mind that I would . . . if
he ever turned it into this kind of thing. So, hah!!

The court ruled that the statement was relevant to show
Oldson's knowledge that he was a suspect and to show why he
might have wanted to get rid of evidence "as can be inferred
from [exhibit 267]."

### (ii) The Majority Incorrectly
### Affirms Court's Ruling

As with Oldson's other journal excerpts, exhibit 271 could
only show why Oldson would need to dispose of evidence if
it supported a reasonable inference that he had killed Beard.
The majority states that Oldson's statement is probative of his
guilt because a fact finder could infer that "law enforcement
would not find any incriminating evidence, because Oldson
had particular knowledge about the evidence." The major-
ity implicitly reasons that he meant investigators would not
find any evidence because he has destroyed it or hid it so
investigators could not find it. That interpretation, however,
conflicts with the trial court's ruling that it was admissible to
show why he needed to dispose of something when he got out
of jail.

It is true that the statement could have meant that Oldson
was confident investigators would not find the evidence that he
had destroyed or hid. But it could have meant that investigators
would not find incriminating evidence because he was inno-
cent. And in holding that exhibit 271 was admissible to show
Oldson's consciousness of guilt, the majority again ignores
the absolute speculation required to draw either conclusion.
Because it did not support a reasonable inference of guilt, the
court should have excluded it under rule 403.

6. TRIAL COURT ERRED IN
ADMITTING EXHIBIT 270

(a) Trial Court's Ruling

In exhibit 270, Oldson expressed his attraction to the stomach of listed persons with whom he had had "experience":

> Love that gut, tummy, belly, abdomen, stomach, midriff, middle, torso, etc. Extensive experience comes with Sandy, Dondie, C.B., and Linda. Other mediocre experiences with Robin, Cathie, Shirley,[o] Shawna, Alyce, K.P.,[[illegible]] Donna H., Irma S., Allison, Ronda (from G.I. 1980), Mary Jane, Teresa, 2116; resident upstairs; 1980, Salinas 1987, Lincoln 48th/Leighton[(1989)], Darlene, Connie, Pam, Tammy S., Cami G, Bonnie M, Carolyn D, et. al. List remains incomplete. Will add more as more comes available. For now, must rate C.B. as most gratifying, Sandy as most comfortable, Teresa as prettiest, maybe Darlene. Just don't know - they[']re all so nice. YUH! Go on and gitcha some!

In its written order, the court admitted exhibit 270 for the following reason:

> State is offering this excerpt as inculpatory evidence that contradicts exculpatory statements by [Oldson] regarding his relationship with Cathy Beard and his prior sexual experience with women. Further, this is not character evidence. The State is not offering this to prove he had a sexual relationship with these women and then murdered them, or even that [Oldson] actually had sexual contacts with these women. They are statements by [Oldson] offered to disprove an exculpatory statement made by [Oldson] that he did not have sex until he was married and/or that he did not have sex with . . . Beard.

The court overruled Oldson's objections. It implicitly agreed with the State that a limiting instruction could cure any prejudicial effect from the admission of exhibit 270. But contrary to the court's ruling in its order, before the State published exhibit 270, the court gave this limiting instruction:

Jurors, you are now seeing evidence that is being submitted to you for a specific limited purpose. This evidence is being offered for the limited purpose to help you decide what if any knowledge [Oldson] had of Cathy Beard, the nature and extent of any relationship he and Cathy Beard may have had, and for the purpose of evaluating [Oldson's] credibility with respect to any other statements that he made. You must consider this evidence only for this limited purpose.

Under this limiting instruction, the court admitted exhibit 270 only as proof that Oldson was lying about not having a sexual relationship with Beard. The instruction precluded the jurors from considering the statement as proof that he had lied when he said he was a virgin until he got married.

The majority incorrectly states that the court did not give this limiting instruction specifically for exhibit 270. The prosecutor had already published exhibits 263 through 269, and the court gave this instruction immediately after the prosecutor asked for leave to publish exhibit 270 to the jury. Right after the court gave the instruction, the prosecutor stated, "And, Judge, just so the record's clear, that instruction pertains to this particular exhibit that's on the screen now, Exhibit 270." The court responded, "It does."

(b) The Majority's Reasoning

The majority states that the court implicitly determined that exhibit 270 was logically relevant to show that Oldson had sexual contact with Beard on the night that she disappeared. It rejects Oldson's argument that exhibit 270 could simply be a reference to his sexual fantasies. It states that false exculpatory statements of fact which are sufficient to justify an inference of guilt are admissible even if they could be explained another way. It concludes that exhibit 270 was sufficient to support an inference that Oldson made false exculpatory statements of fact when he said that "he was a virgin, Oldson and Beard had apparently not had a sexual relationship prior to

her disappearance, and . . . Beard rejected Oldson's sexual advances on the night of her disappearance." It also concludes that exhibit 270 did not present a rule 404 problem because Oldson's statement proved conduct that was intrinsic to the charged crime:

> Rather, it concerns an act intrinsic to the crime. The State's theory of the case was that Oldson killed Beard in the course of a sexual assault. That the jury did not convict on that concurrent assault charge does not retrospectively change the nature of the evidence to be of "other acts."

In short, the majority concludes that the statement shows *both* that Oldson had a sexual relationship with Beard before she disappeared *and* that he sexually assaulted her on the night that she disappeared.

Although Oldson referred to other people with whom he had had "stomach" experiences, the majority states that the other names in exhibit 270 were relevant only to show that the sole person Oldson referred to by initials was "C.B." The majority concludes that Oldson was not prejudiced by evidence suggesting that he had similar sexual experiences with other people: "While promiscuity or even sexual fantasies might be considered by some people to be reflective of a bad character trait, it is hardly the kind of character trait that would compel a jury by improper propensity reasoning to convict a defendant of murder."

So for the other listed names, Oldson's stated experience with them could be real or imagined. There was no deviant sexual propensity suggested in the excerpt because his reference to a "female body part simply clarified the sexual nature of the other sentences. This illustrated that the 'experiences' Oldson referred to throughout the excerpt were sexual experiences, *either* real or imagined." (Emphasis supplied.) But for "C.B.," Oldson's implied sexual experience was with Beard, it was real, and it happened on the night that Beard disappeared.

(c) The Majority's Reasoning
Is Wrong

The majority's reasoning is contrary to the court's ruling and internally inconsistent. The court did not allow the jury to consider the evidence as proof that Oldson had lied when he said he was a virgin until he married. Nor did it admit this evidence as a confession, i.e., to show that Oldson sexually assaulted Beard on the night that she disappeared or on any other night. And nothing in his excerpt refers to an assault or to sexual contact with Beard on the night she disappeared. Under the court's limiting instruction, the jury's consideration of exhibit 270 was limited to determining whether Oldson lied when he told others that he had never had a sexual relationship with Beard. The court did not implicitly determine that exhibit 270 was relevant to show that Oldson had sexual contact with Beard on the night that she disappeared. It explicitly instructed the jurors to consider exhibit 270 *only* for deciding "what if any knowledge [Oldson] had of . . . Beard, the nature and extent of any relationship he and . . . Beard may have had, and for the purpose of evaluating [Oldson's] credibility with respect to any other statements that he made." So the jury was not asked to decide whether exhibit 270 showed Oldson had sexual contact with Beard on the night she disappeared.

Even if the court had given such an instruction, exhibit 270 is completely speculative to prove Oldson had sexual contact with Beard on the night she disappeared. To begin with, it is too speculative to determine that Oldson was even writing about Beard. In this regard, the majority incorrectly states that Oldson only referred to "C.B." by initials. He also referred to a "K.P." by initials. The word in the superscripted parenthetical beside the initials "K.P." is illegible and its meaning unclear. But other names in this excerpt also have superscripted parentheticals with no comprehensible common meaning. So to the extent that the majority has interpreted the superscript beside the initials "K.P." to be a last name, it

is speculating. Additionally, as Oldson's attorney argued at trial, Oldson also referred to "Cathie" in this excerpt. He also referred to "Cathie" in two additional excerpts and directly referred to "Beard" in another excerpt.

So the trial court knew, or should have known, that allowing the jurors to determine that "C.B." referred to Beard would be a speculative inference. The other listed names did not cure that speculation. And because it was speculative to conclude that "C.B." was a reference to Beard, the inference that Oldson was writing about his sexual experiences with her was unreasonable under rule 403.

The majority implausibly doubles down on this speculation. Even if Oldson's statement in exhibit 270 had been sufficient to show that he had a sexual relationship with Beard, it would have been too speculative to show that he had sexually assaulted her on the night she disappeared. The trial court at least recognized the speculative inferences required for that conclusion because it did not instruct the jury to consider it for that purpose. Even the majority recognizes that some of Oldson's listed experiences could have been fantasies. But it denies that Oldson's experience with "C.B." could have been a fantasy: "[I]t would not follow that because Oldson's sexual 'experiences' with the other women listed were fantasies, the 'most gratifying' 'experience' with 'C.B.' was also a fantasy."

Actually, it does follow. There was no logical reason to conclude that Oldson's gratifying experience with "C.B." was different in kind from his "comfortable" experience with Sandy. And by conceding that some of these "experiences" could have been fantasies, the majority undermines its own reasoning that Oldson's experience with "C.B." was real—even more so its reasoning that Oldson was writing about sexually assaulting Beard on the night she disappeared.

And exhibit 270 was inadmissible character evidence under rule 404. To prove that Oldson was lying, the State needed to show that Oldson had a sexual relationship with Beard some

time before her disappearance. Contrary to the majority's statement, the court did not explicitly inform the jurors that they could not consider whether Oldson had sexual contact with any of the other women listed. It instructed them that they could consider exhibit 270 only to determine whether Oldson had a sexual relationship with Beard and to evaluate his credibility on other statements. Nor did the court instruct the jurors to consider the other listed names only to determine whether Oldson's reference to "C.B." was a reference to Beard. So the majority incorrectly reasons that the other names were only relevant to show that "C.B." was a reference to Beard and that this relevance did not depend upon whether Oldson's experiences with the other listed people were real or fantasies.

The only way that the jurors could have concluded from exhibit 270 that Oldson had a sexual relationship with Beard before she disappeared was by reasoning that he had actual sexual experiences with all of the people whom he listed in exhibit 270. Exhibit 270 is either too speculative to prove that his "experiences" with any of the listed people were real sexual experiences or it proves that they all were. So exhibit 270 put before the jurors Oldson's sexual experiences with many people, accompanied by the strong suggestion that he rated those experiences based on his unusual sexual preference for stomachs.

Finally, both the court's written order and limiting instruction show that it considered exhibit 270 relevant to prove Oldson's extrinsic sexual acts with Beard to prove his consciousness of guilt: i.e., that he was lying when he said that he had never had a sexual relationship with Beard. So under rule 404(3), before admitting the statement, the court had to find by clear and convincing evidence that the State had proved the extrinsic sexual act(s). It did not. This fatal procedural defect is apparently why the majority unconvincingly opines that exhibit 270 was sufficient to prove that Oldson sexually assaulted Beard on the night she disappeared. Only by claiming that the

alleged sexual contact was intrinsic to the murder charge—i.e., Oldson was writing about sexually assaulting Beard on the night he murdered her—can the majority avoid the procedural requirement under rule 404(3).

But even if that procedural defect did not exist, the majority opinion is unpersuasive. The question is not whether the State's evidence can support any inference supporting the proof for which the evidence was offered. The question is whether it can support a *reasonable* inference that does not rest on speculation or propensity reasoning.

In sum, I conclude that the court erred in admitting exhibit 270 to show that Oldson had lied when he said he never had a sexual relationship with Beard. Concluding that Oldson was writing about Beard in this excerpt required speculation. Even if exhibit 270 could show that he was writing about Beard, it could not show that he had sexually assaulted her on the night she disappeared. And concluding that Oldson was writing about a sexual experience with Beard rested on the inference that Oldson was writing about his sexual experiences with all of the people he listed in exhibit 270. The inference that he had listed his sexual experiences could not be separated from his first statement, showing an unusual sexual preference for the stomach. In context, exhibit 270 listed his sexual experiences that coincided with his stomach fetish. The potential for jurors to reason that he acted in accordance with a deviant sexual trait outweighed any probative value of speculative evidence.

## V. TRIAL COURT'S IMPROPER ADMISSION OF JOURNAL EXCERPTS WAS HARMLESS ERROR

In summary, I conclude that the court erred in admitting eight of the nine redacted excerpts from Oldson's journal. In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the error was

harmless beyond a reasonable doubt.[60] Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered was surely unattributable to the error.[61] If the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.[62]

I believe that the court improperly admitted exhibit 266 to show Oldson's motive for killing Beard: he sexually assaulted her when she rejected him and then killed her. It improperly admitted the remaining seven journal excerpts to show his consciousness of guilt.

But one journal excerpt did show that Oldson had guilty knowledge of Beard's murder. The court properly admitted exhibit 267 for that purpose.

In exhibit 267, the court admitted this redacted statement:

I really have no idea about what to do or where to go. My first priority is to get rid of something A.S.A.P.! That is, if I can still find them. The only . . . link left between me and . . .

But after that, I imagine I'll stay in the Midwest and try something. Maybe stick around here to work for Pop. He no doubt needs the help. And I could use the $ . . . .

From the bench, the court stated that Oldson's statement about the "only . . . link left" was more likely to be a reference to the Beard investigation than any other bad act Oldson had committed. The court ruled that exhibit 267 was admissible to show his consciousness of guilt, i.e., that he needed

---

[60] *State v. Grant, ante* p. 163, 876 N.W.2d 639 (2016).

[61] *State v. Lavalleur*, 289 Neb. 102, 116, 853 N.W.2d 203, 215 (2014), *disapproved in part on other grounds* 292 Neb. 424, 873 N.W.2d 155 (2016).

[62] See *Grant, supra* note 60.

to destroy evidence, which the jury could infer related to his charge.

I agree with the court that a fact finder could reasonably infer from exhibit 267 that Oldson was concerned about destroying evidence related to the Beard investigation. He wrote this when he was serving a sentence for committing an assault in Burwell, so he would not have been worried about evidence connected to that crime. Beard's murder was the only active investigation against him, and he knew he was a suspect. Moreover, in Oldson's other journal entries, he was not reticent about expounding on his moral failings, sexual fantasies, or sexual behaviors that he needed to control or abandon. So his attorney's argument that in exhibit 267, he could have been writing about a character flaw or pornography that he needed to "get rid of" was not persuasive. The court correctly determined that the statement supported a reasonable inference of his guilty knowledge.

Additionally, the State presented other, stronger evidence of his consciousness of guilt. In January 2012, after officers arrested Oldson, they recorded his conversations with his wife. These conversations showed that he was concerned that investigators might have found evidence linking him to Beard's murder.

In the 2012 conversations, Oldson was generally trying to explain why officers had arrested him for murder and speculating that new DNA testing techniques might have shown his DNA was mixed with Beard's DNA on some item or on an area of his father's pickup. To rationalize how investigators might find a mixed DNA sample in his father's pickup, Oldson admitted that he had struggled with Beard and tried to pull her into the pickup with him:

[Oldson:] Well, we don't know that they found nothing, they probably found plenty and they just probably never told anybody what they found [be]cause they couldn't attach . . . they couldn't do anything with it at the time.

But see now with the techniques and they think ooh-ooh, no, we've got something. I don't know.

[Wife:] But how could they have found anything? If there was nothing to find Johnny? If you didn't do it.

[Oldson:] That's the thing, see, . . . . All they have to do is find a spot, any one spot, anywhere, where your DNA and the victim's DNA are in the same place. That's all they've got to find. They don't have to prove anything else anymore.

[Wife:] Are you saying that's true?

[Oldson:] [inaudible] I tried, I wrestled around with Cathy Lee Beard, I tried to pull her into the pickup, saying, "Come on, let's go do it." "No, I don't like you that way." And she may have bumped the side of the pickup, she may have put her hand down on the seat, she may have, you know, may have whatever—may have fallen down on the floor. I don't know.

In another excerpt, Oldson speculated about where investigators might find a mixed DNA sample from Beard and himself:

You know, what could it be? . . . I'm a brick layer, alright? What if they say with tests we found her DNA on your brick hammer? Or we found DNA on the bumper of your truck. You hit her with it—you killed her that way. Or you—we found DNA on a gas can—you torched her and set her on fire, you know. Or you know—who knows—I have no idea what, I have no idea what they are going to find. Because, and here's the thing, it's not gonna worry me—I've [sic] never was denying that we mingled. That our DNA would have mingled somewhere or another because I grabbed her by the arm and I tried to pull her into the truck and she struggled back—and so I had ahold of her and she was pushing against me—I think she put her hand down on the seat once to balance herself as she tried to pull away so her DNA was in the truck, her DNA was on me—sure.

But in 1989, Oldson gave a different version of his physical interactions with Beard. On June 2, Oldson told local officers only that he had tried to get Beard to come with him and that she had refused. He got into the pickup after she refused and, in the the rearview mirror, saw her leave with someone else. A retired investigator for the Nebraska State Patrol testified that on June 5, Oldson said that while he was standing outside of the open passenger door of his father's pickup, he asked Beard again if she wanted to do something and she again declined. Oldson admitted that he grabbed her by the wrists and was going to pull her inside the pickup, but he said that she pulled away. The investigator's testimony was consistent with his report. Oldson did not say that he was inside the pickup when he grabbed Beard's wrists or that he had struggled with her inside the pickup.

From these conversations, a juror could have reasonably inferred that Oldson changed his story because he was concerned that new DNA testing procedures would reveal incriminating evidence that Beard had been inside the pickup, contrary to what he had stated in 1989. And Beard's DNA on his hammer or the pickup's bumper would have been consistent with the blunt force injuries that Beard sustained. In sum, Oldson's attempt to explain why investigators might find such evidence strongly supported an inference of his guilty knowledge that such evidence existed. And his concern in 2012 that a mixed DNA sample might be found on his hammer or other items sufficient to have caused Beard's death is strikingly similar to the concern expressed in exhibit 267 that he had to get rid of the "only . . . link left between me and . . . ."

This evidence was before the jurors. The State played the excerpts from the telephone conversations. And the prosecutor specifically argued in closing that Oldson had changed his story in his telephone conversations with his wife and said for the first time that he had wrestled with Beard and tried to pull her into the pickup with him. So there was strong cumulative evidence of Oldson's consciousness of guilt to offset the

court's erroneous admission of speculative evidence for that proof. Because the evidence reasonably supported a consciousness of guilt inference, the jurors could properly rely on it to find Oldson guilty of murder. And because he admitted to trying to pull Beard into the pickup with him when she rejected him, the jurors could have reasonably inferred from the 2012 conversations that he had a motive for murder: forcing sexual contact upon Beard or covering up that crime.

To sum up, the speculative evidence that the court erroneously admitted was cumulative to evidence that the court properly admitted for the same purpose. Because I agree with the majority that other sufficient competent evidence supported Oldson's conviction, I conclude he was not prejudiced by the erroneous admissions of his journal excerpts.

Miller-Lerman, J., joins in this concurrence.